1  JENNIFER LEE TAYLOR (CA SBN 161368)
   JTaylor@mofo.com
2  MORRISON & FOERSTER LLP
   425 Market Street
3  San Francisco, California  94105-2482
   Telephone:  (415) 268-7000
4  Facsimile:  (415) 268-7522

5  DEAN J. ZIPSER (CA SBN 94680)
   DZipser@mofo.com
6  CAROLE E. REAGAN (CA SBN 162674)
   CReagan@mofo.com
7  MORRISON & FOERSTER LLP
   19900 MacArthur Blvd., 12th Floor
8  Irvine, California  92612-2445
   Telephone:  (949) 251-7500
9  Facsimile:  (949) 251-0900

10 Attorneys for Plaintiff
   COMMON SENSE MEDIA, INC.

11

12

13                UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                    OAKLAND DIVISION

16

17

18 COMMON SENSE MEDIA, INC., a California      Case No.      C08-00155-CW
   corporation,
19                                             **PLAINTIFF COMMON SENSE
                  Plaintiff,                    MEDIA, INC.'S MEMORANDUM
20                                              OF POINTS AND AUTHORITIES IN
                                                SUPPORT OF ITS EX PARTE
21         v.                                   APPLICATION FOR A
                                                TEMPORARY RESTRAINING
22 COMMON SENSE ISSUES, INC., a Delaware        ORDER**
   corporation,
23                                             Date:
                  Defendant.                   Time:
24                                             Ctrm:
                                               Judge:  Honorable Claudia Wilken
25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

I.      STATEMENT OF ISSUES TO BE DECIDED ................................................. 1

II.     INTRODUCTION ............................................................................................. 1

III.    STATEMENT OF FACTS ................................................................................ 2

        A.      About Plaintiff Common Sense Media ................................................. 2

        B.      Common Sense Media's Trademark Rights .......................................... 4

        C.      Defendant Common Sense Issues ......................................................... 6

        D.      Common Sense Media Is Facing Imminent Harm ................................ 7

        E.      Common Sense Media Provided Notice of This Application to CSI ...... 9

IV.     THE LEGAL STANDARD FOR INJUNCTIVE RELIEF ................................ 10

V.      ARGUMENT ..................................................................................................... 10

        A.      Common Sense Media Is Likely to Succeed on the Merits. ................... 10

                1.      Common Sense Media Holds Valid, Protectable
                        Trademarks. ............................................................................... 10

                2.      Common Sense Media Established Its Trademark Rights
                        Prior to CSI's First Use of COMMON SENSE ISSUES. ........... 12

                3.      Under the Ninth Circuit's *Sleekcraft* Analysis a Likelihood
                        of Consumer Confusion Exists. .................................................. 13

                        a.      *CSI's Name Is Nearly Identical to Common Sense
                                Media's Trademarks.* ..................................................... 13

                        b.      *Common Sense Media and CSI Are Involved in
                                Related and Complementary Services —Educating
                                the Public and Influencing Public Policy.* ..................... 16

                        c.      *Common Sense Media's and CSI's Marketing
                                Channels Overlap Significantly.* .................................... 17

                        d.      *The COMMON SENSE Trademarks Are Strong
                                Marks.* ......................................................................... 18

                        e.      *Level of Care by Purchasers* ....................................... 19

                        f.      *The Remaining Sleekcraft Factors Have Little
                                Significance Here.* ........................................................ 20

                                (i)     Intent .................................................................. 20

                                (ii)    Actual Confusion ................................................ 21

                                (iii)   Likelihood of Expansion ..................................... 21

        B.      Common Sense Media Faces Irreparable Harm .................................... 22

        C.      Common Sense Media Has Raised Serious Questions and The
                Balance of Hardships Tips Sharply in Its Favor. .................................. 24

VI.     CONCLUSION .................................................................................................. 25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

## CASES

4

*AMF, Inc. v. Sleekcraft Boats,*
    599 F.2d 341 (9th Cir. 1979) ................................................................ *passim*

5

*Americana Trading, Inc. v. Russ Berrie & Co.,*
    966 F.2d 1284 (9th Cir. 1992) ................................................................ 18

6

7

*Apple Computer, Inc. v. Formula Int'l, Inc.,*
    725 F.2d 521 (9th Cir. 1984) ................................................................ 24

8

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.,*
    174 F.3d 1036 (9th Cir. 1999) ................................................................ *passim*

9

10

*Century 21 Real Estate Corp. v. Sandlin,*
    846 F.2d 1175 (9th Cir. 1988) ................................................................ 10, 14

11

*Comm. For Idaho's High Desert, Inc. v. Yost,*
    92 F.3d 814 (9th Cir. 1996) ................................................................ 11, 12

12

13

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.,*
    109 F.3d 1394 (9th Cir. 1997) ................................................................ 10

14

*GoTo.Com, Inc. v. Walt Disney Co.,*
    202 F.3d 1199 (9th Cir. 2000) ................................................................ *passim*

15

16

*Hewlett-Packard Co. v. Packard Press, Inc.,*
    281 F.3d 1261 (Fed. Cir. 2002) ................................................................ 12

17

*Int'l Olympic Comm. v. San Francisco Arts & Athletics,*
    219 U.S.P.Q. (BNA) 982 (N.D. Cal. 1982) ................................................................ 22

18

19

*International Jensen, Inc. v. Metrosound U.S.A., Inc.,*
    4 F.3d 819 (9th Cir. 1993) ................................................................ 22

20

*J & J Snack Foods Corp. v. McDonald's Corp.,*
    932 F.2d 1460 (Fed. Cir. 1991) ................................................................ 14

21

22

*Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.,*
    963 F.2d 350 (Fed. Cir. 1992) ................................................................ 19

23

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,*
    799 F.2d 867 (2d Cir. 1986) ................................................................ 18

24

25

*McDonald's Corp. v. McBagel's, Inc.,*
    649 F. Supp. 1268 (S.D.N.Y. 1986) ................................................................ 15

26

*Metro Publ'g, Inc. v. Surfmet, Inc.,*
    No. C02-01833CW, 2002 U.S. Dist. LEXIS 26232 (N.D. Cal. July 3, 2002) ................................................................ 20

27

28

*Perfumebay.com Inc. v. eBay Inc.*,
   506 F.3d 1165 (9th Cir. 2007) ................................................................................. 14

*Powerfood, Inc. v. Sports Science Inst.*,
   No. C-93-0259MHP, 1993 U.S. Dist. LEXIS 2191 (N.D. Cal. Feb. 24, 1993) ........................ 14

*Sengoku Works Ltd. v. RMC Int'l, Ltd.*,
   96 F.3d 1217 (9th Cir. 1996) ................................................................................. 10

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001) ................................................................................... 9

*Sun Microsystems v. Astro-Med, Inc.*,
   39 U.S.P.Q.2D (BNA) 1144 (N.D. Cal. 1996) ........................................................... 15

*United We Stand America, Inc. v. United We Stand, America New York, Inc.*,
   128 F.3d 86 (2d Cir. 1997) ............................................................................. 12, 22

*Watts Health Sys., Inc. v. United Healthcare Corp.*,
   960 F. Supp. 1431 (C.D. Cal. 1996) ................................................................. 14, 20

**STATUTES**

15 U.S.C.
   § 1057(b) ......................................................................................................... 10
   § 1057(c) ......................................................................................................... 12
   § 1114(1)(a) ..................................................................................................... 12

**OTHER AUTHORITIES**

2 McCarthy on Trademarks and Unfair Competition
   § 11:75 (4th ed. 2007) ....................................................................................... 18

Restatement (Third) of Unfair Competition § 21, comment I (1995) .......................................... 18

1    I.    **STATEMENT OF ISSUES TO BE DECIDED**

2    1.    Whether Plaintiff Common Sense Media, Inc. ("Common Sense Media") can

3    demonstrate probable success on the merits of its claim that Defendant Common Sense Issues,

4    Inc. ("CSI") is infringing its rights in its family of COMMON SENSE trademarks.

5    2.    Whether Common Sense Media faces irreparable harm by CSI's infringement of

6    its rights in its family of COMMON SENSE trademarks.

7    II.    **INTRODUCTION**

8    Common Sense Media is a nonpartisan, nonprofit organization that, since 2003, has been

9    a leading national advocate on issues relating to children and the media.  In addition to work with

10   elected officials and presidential candidates aimed at educating the public and shaping the

11   national debate on media issues that affect children and families, Common Sense Media produces

12   a widely distributed system of media ratings that reaches some 45 million U.S. homes via cable,

13   in addition to several million Internet users.  Common Sense Media uses a family of COMMON

14   SENSE trademarks to identify itself and its services.  Common Sense Media's ability to provide

15   these valuable public services depends on its reputation as a trusted, unbiased source of

16   information and public policy development.  That reputation is immediately threatened by

17   defendant CSI's use of its confusingly similar COMMON SENSE ISSUES name in connection

18   with highly partisan political activities.

19   Within the past several weeks, CSI has emerged as a political action group that actively

20   promotes certain Republican causes and candidates and apparently employs controversial tactics

21   such as "push-polling" in an effort to influence the presidential primaries and, ultimately, the

22   election.   The similarity between the name COMMON SENSE ISSUES and Common Sense

23   Media's various COMMON SENSE trademarks, combined with the fact that both parties operate

24   in the same sphere of public policy, creates the likelihood of a misperception that the two

25   organizations are somehow affiliated.  Any such misperception that Common Sense Media is

26   affiliated with a particular political party or agenda will jeopardize its ability to work with policy

27   makers and candidates from both parties, to maintain the trust of the public, and to attract the

28   donations and licensing revenues on which it depends.

1    Most immediately, CSI's nationwide partisan electoral activities are likely to interfere

2   with Common Sense Media's planned presidential debate and its current policy initiative seeking

3   to direct to educational purposes billions of dollars from the Federal Communications

4   Commission's wireless spectrum auction, set to occur on January 24, 2008.  Common Sense

5   Media currently intends to announce this initiative in *one week*, on January 22, 2008.

6   Accordingly, as set forth below, Common Sense Media requests that the Court issue a temporary

7   restraining order enjoining any further use by CSI of COMMON SENSE ISSUES or any other

8   designation confusingly similar to Common Sense Media's family of COMMON SENSE

9   trademarks.

10   **III.    STATEMENT OF FACTS**

11        **A.    About Plaintiff Common Sense Media**

12    Common Sense Media is a nonpartisan, nonprofit organization dedicated to improving the

13   media and entertainment lives of children and families.  (Declaration of Anne Zehren in Support

14   of Common Sense Media, Inc.'s Application for a Temporary Restraining Order ("Zehren Decl.")

15   at ¶ 2.)  Common Sense Media was founded in May 2003 under the name Common Sense Media,

16   Inc., and has since operated continuously under that name.  The organization also is widely

17   known by the names CommonSense.com and Common Sense.  Common Sense Media operates

18   nationally, providing widely used media-related information services, as well as advocating for

19   nonpartisan positions on numerous media policy issues that relate to families and children.  (*Id.*

20   ¶¶ 3-9.)

21    In particular, Common Sense Media runs a website designed to help parents make

22   informed decisions about whether material is age-appropriate and suitable for their children.  (*Id.*

23   ¶ 4.)  This information includes reviews of media products—including movies, video games,

24   CDs, and websites—prepared by the Common Sense Media staff or posted by parents or children,

25   as well as links to reviews by third parties.  (*Id.*)  Common Sense Media also collects and

26   distributes nonpartisan studies relevant to parents and policy makers concerned about how media

27   is affecting children.  (*Id.* ¶ 5.)  Over six million unique users accessed the Common Sense Media

28   website in 2007, and Common Sense Media has over 100,000 registered subscribers to its weekly

1  newsletter.  (*Id.* ¶ 4.)  Common Sense Media has ongoing partnerships with Comcast Corporation,

2  Cox Cable Communications, Inc., and Time Warner Cable LLC, through which Common Sense

3  Media's video reviews reach some 45 million homes via their video-on-demand services.  These

4  partners also distribute the video reviews via their broadband ISP services.  (*Id.*)  Common Sense

5  Media also partners with distributors, including Google Inc., AOL LLC, and Netflix Inc., who

6  circulate Common Sense Media's ratings of media products via their websites.  (*Id.*)  Common

7  Sense Media's public service announcements—which feature prominent public figures and role

8  models—air nationwide on radio and on major broadcast and cable networks.  (*Id.*)

9       In addition to providing these services, Common Sense Media is a leading public policy

10  voice on issues related to media and children.  (*Id.* ¶ 7.)  On both the state and federal levels,

11  Common Sense Media is active in framing nonpartisan public positions on proposed laws and

12  regulations affecting media.  Common Sense Media also advocates actively for a universal media

13  rating system, increased diversity of programming and media ownership, and higher quality

14  children's programming.  (*Id.* ¶ 3.)  In the context of elections, Common Sense Media distributes

15  surveys, commissions polls, and organizes debates to help inform voters about the candidates'

16  positions on issues related to children and media.  (*Id.* ¶ 5.)  Most recently, for example, Common

17  Sense Media distributed a questionnaire about such issues to twelve of the top 2008 Republican

18  and Democratic presidential candidates.  (*Id.*)  Common Sense Media released the candidates'

19  responses in mid-December 2007, receiving front-page coverage of the event in *The New York*

20  *Times*.  (*Id.* ¶¶ 5, 7.)  In Spring 2008, Common Sense Media will be hosting a major debate

21  among the presidential candidates from both parties.  (*Id.* ¶ 5.)

22       The organization has been effective in forging working relationships with policy makers,

23  elected officials, and political candidates from all major political parties.  (*Id.* ¶ 8.)  Among other

24  efforts, Common Sense Media worked with Senators Sam Brownback, Rich Santorum (both

25  Republicans), Hillary Clinton (a Democrat), and Joe Lieberman (an Independent) to promote the

26  Children and Media Research Advancement Act.  (*Id.*)  Common Sense Media also collaborated

27  on the Broadcast Decency Enforcement Act and the Family Entertainment Protection Act, and

28  regularly works with the bipartisan Federal Communications Commission (the "FCC").  Common

1  Sense Media is also currently working with politicians on both sides of the aisle to secure support

2  for a proposal that will ask Congress to allocate to educational campaigns about children and

3  media a portion of the billions of dollars expected to be raised by the FCC's upcoming

4  January 24, 2008 wireless auction.  (*Id*. ¶ 29.)

5      The continued success of Common Sense Media's services and advocacy efforts depends

6  on the preservation of its reputation as a strictly nonpartisan organization and an unbiased and

7  reliable source of information.  (*Id*. ¶ 6.)  Loss of the public's perception of the neutrality of

8  Common Sense Media's popular rating system would cause significant financial losses from

9  decreased licensing revenues and donations.  (*Id.*)

10     **B.    Common Sense Media's Trademark Rights**

11     Common Sense Media owns two federal trademark registrations for COMMON SENSE

12  MEDIA®.[1]  (*Id.* ¶ 10.)  Registration No. 2,973,224 for the word mark COMMON SENSE

13  MEDIA® was filed on April 18, 2003 and registered on July 19, 2005.  (*Id.* ¶ 12.)  Registration

14  No. 3,353,234 for COMMON SENSE MEDIA® and Design was filed on March 23, 2004, and

15  registered on December 11, 2007.  (*Id.* ¶ 11.)

16     Common Sense Media also owns two trademark applications that incorporate the term

17  COMMON SENSE.  (*Id.* ¶ 13.)  Applications for COMMON SENSE (Serial No. 78/858,133) and

18  USE COMMON SENSE (Serial No. 78/858,124) were filed on April 10, 2006 for the same

19  services.  (*Id.* ¶¶ 14-15.)  A Notice of Allowance has issued on each of these applications and

20  certificates of registration will issue as soon as Common Sense Media files specimens showing its

21

22  _____

23     [1] These trademarks are registered for "conducting business research and surveys regarding
children, families, and entertainment media; public opinion polling regarding children, families and

24  entertainment media; providing online information regarding business research and surveys regarding
children, entertainment and the media; educational services, namely, providing seminars and workshops in

25  the field of children, families, and entertainment media; educational services, namely, conducting online
exhibitions and displays and interactive exhibits in the field of children, families, and entertainment media;

26  providing a website featuring information, advice, analysis, monitoring, ratings and reviews in the field of
entertainment media; providing information, advice, analysis, monitoring, ratings and reviews in the field

27  of entertainment media; providing information in the form of reviews and ratings of entertainment media;
providing online information regarding entertainment and the media."  (*Id.* ¶¶ 10-11.)

28

1  use of these marks in commerce.  (*Id.*)  Common Sense Media is in the process of preparing this

2  documentation now.  (*Id.*)

3  Although Common Sense Media's full name is Common Sense Media, Inc., the

4  organization is also widely known as "CommonSense.com" and by its abbreviated name

5  "Common Sense."  (*Id.* ¶ 16.)  The trademark COMMON SENSE appears throughout Common

6  Sense Media's website where it is used to refer to Common Sense Media.  (*Id.* ¶¶ 16-17.)

7  Common Sense Media has also been using the slogan USE COMMON SENSE since at least as

8  early as 2005 and the ASK COMMON SENSE trademark since at least as early as 2006.  (*Id.*)

9  Common Sense Media uses its COMMON SENSE MEDIA®, COMMON SENSE

10  MEDIA® and Design, COMMON SENSE, USE COMMON SENSE, and ASK COMMON

11  SENSE family of trademarks (collectively the "COMMON SENSE Trademarks") on its website

12  where it offers information relevant to media and children and families, parenting tips, and media

13  reviews, as well as on its public service announcements and video segments.  The term

14  COMMON SENSE is prominently featured in the logo, as shown below ("the COMMON

15  SENSE Logo"), that appears in the upper left-hand corner of every page of the website.  The logo

16  features the prominent words COMMON SENSE, with a box around the letters ON that draws

17  attention to the words COMMON SENSE.  Beneath the box, the word MEDIA appears in small

18  type.

19

20

21  

22

23

24  Every video review that is offered through the website, and through the distribution partners that

25  carry the segments to over 45 million homes, starts with a prominent view of the COMMON

26  SENSE Logo.  The COMMON SENSE Logo continues to be displayed adjacent to the reporter's

27

28

1  name throughout the review.  The video review segments frequently conclude with the statement

2  "Common Sense gives this movie a [rating]."

3      Common Sense Media uses the domain name www.CommonSense.com as a primary link

4  to its website and directs others to this domain name in its written materials.  (*Id.*)  Several other

5  Common Sense Media-owned domain names that include the COMMON SENSE Trademarks

6  also link to Common Sense Media's website, including but not limited to CommonSenseTV.com,

7  MyCommonSense.com, UseCommonSense.com, and CommonSenseMedia.org.

8      **C.    Defendant Common Sense Issues**

9      On December 19, 2007, Common Sense Media became aware of an article in that day's

10  edition of *The Wall Street Journal.*  (*Id.* ¶ 18, Exhibit 6.)  The article concerned a political action

11  group formed in 2007 named Common Sense Issues, Inc. ("CSI") that was actively supporting

12  Republican causes and candidates.  (*Id.*)  According to the article, these activities included

13  automated telephone calls in Iowa in support of presidential candidate Mike Huckabee and

14  "spreading negative information" in a manner that the article characterized as "mudslinging," and

15  that resulted in certain commentators comparing CSI to the Swift Boat Veterans groups that

16  operated in aggressive opposition to Senator John Kerry in the 2004 presidential campaign.  (*Id.*)

17      This was the first time that anyone at Common Sense Media had heard of CSI and it

18  appears to be the first coverage that CSI received in the national press.  (*Id.*)  It is not, however,

19  the extent of CSI's activities.  CSI's website indicates that CSI is a highly partisan organization

20  that singles out and criticizes specific politicians, while promoting others.  (*Id*. ¶¶ 21-23.)  CSI

21  uses the COMMON SENSE designation prominently on its CommonSenseIssues.com website,

22  on a sponsored TrustHuckabee.com website, and on a merchandising webpage selling "Trust

23  Huckabee" clothing and accessories.  (*Id.* ¶¶ 22-25.)  The Trust Huckabee site includes

24  background information on CSI, creating a clear association between CSI and the pro-Mike

25  Huckabee website.  (*Id.* ¶ 24.)  For example, as of January 8, 2008, the Trust Huckabee website

26  featured a section with the heading "Common Sense Issues, Inc. Equipping Informed Voters with

27  Facts about Presidential Candidates and Their Positions on Key Issues."  On the same page, a

28  prominent video clip is featured that shows a picture of Mitt Romney with the words "Cannot

1  Trust Romney.com" juxtaposed on the candidate's face.  Underneath the video clip is the heading

2  "Common Sense Issues launches new television ad."  (*Id.*)

3      CSI also sponsors a separate website linked to the CubanHero.com domain name where it

4  provides negative information about Democratic Representative Mark Udall and is running a

5  short video clip of mock newscasters reporting that Representative Udall received the "Cuban

6  Propaganda Award."  (*Id.* ¶ 22.)  This video clip is also available at the top of the main

7  CommonSenseIssues.com website.  (*Id.*)

8      Numerous candidates, including Mike Huckabee who has received support from CSI,

9  have become concerned about the nature of CSI's activities and have expressed their complaints.

10  For example, Mike Hucakbee denounced CSI calls in New Hampshire that were similar to the

11  automated calls that CSI placed in Iowa as violating the spirit of his campaign, and his campaign

12  manager asked the New Hampshire Secretary of State to investigate the calls.  In addition,

13  candidate John McCain wrote a letter to New Hampshire's Attorney General to request an

14  investigation into the legality of the calls.  (*Id.* ¶ 19.)

15      CSI was incorporated in Delaware on April 11, 2007.  (*Id.* ¶ 18.)  It is a 501(c)(4)

16  organization, and it describes itself as "dedicated to educating and informing citizens in an in-

17  depth manner about public policy issues.  (*Id.* ¶ 20.)  On August 16, 2007, CSI filed a federal

18  trademark application (Serial No. 77/257,033) to register COMMON SENSE ISSUES for

19  "promoting political and public policy issues."  (*Id.* ¶ 21.)

20      **D.    Common Sense Media Is Facing Imminent Harm**

21      CSI's use of the COMMON SENSE ISSUES designation and name for a partisan

22  organization is the antithesis of Common Sense Media's use of its COMMON SENSE

23  Trademarks to promote its nonpartisan mission. (*Id.* ¶¶ 27-33.)  If Common Sense Media were

24  mistaken for a partisan organization, such confusion would result in less cooperation between

25  Common Sense Media and candidates and/or elected officials and agencies.  (*Id.*)  As a result,

26  Common Sense Media's ability to shape the debate on media and children and to advocate

27  effectively on behalf of children and their families would be irreparably weakened. (*Id.*)

28

1    In addition, Common Sense Media's core and only revenue-generating product is its

2  neutral rating system that is not affiliated with any political party.  Any confusion by the public

3  between Common Sense Media and a partisan organization will immediately and irreparably

4  tarnish the value of the rating service to the viewers, to its financial contributors, and to its

5  distribution partners who pay a substantial sum to feature Common Sense Media's ratings.  (*Id.*)

6  Specifically, the families who rely on Common Sense Media as a reliable, neutral evaluator of

7  media products likely will either reject or question those evaluations if they perceive Common

8  Sense Media as having an underlying political agenda with which they may not agree.  Common

9  Sense Media receives nearly two million dollars annually in revenue from its various media

10  partners (Comcast Corporation, Cox Communications, Inc., Time Warner Cable LLC, AOL LLC,

11  Google Inc., etc.), who license the organization's core product—its reviews and rating system—

12  because it is a neutral system without any political affiliation.  If the public perceives that political

13  bias drives that rating system, it would lose its social value and result in a drop in Common Sense

14  Media's most significant revenue stream.  (*Id.* ¶ 33.)

15    There are additional, non-financial, reasons that Common Sense Media faces imminent

16  harm if CSI's infringement is not stopped.  (*Id.* ¶¶ 27-33.)

17    First, on January 24, 2008, the Federal Communications Commission will be auctioning

18  off the wireless spectrum in a public auction.  Common Sense Media has been working on a

19  proposal that will ask Congress to allocate a portion of the billions of dollars expected to be raised

20  to educational campaigns about children and media.  Common Sense Media has been working

21  with politicians on both sides of the aisle to gain their support for this important initiative, which

22  Common Sense Media currently intends to announce *next week*, on January 22, 2008.  Common

23  Sense Media faces a risk that confusion between Common Sense Media and CSI will affect this

24  important work because it will lose the bi-partisan support that it has worked so hard to establish

25  on this issue.  (*Id.* ¶ 29.)

26    Second, the country is in the midst of a series of presidential primaries, with several states

27  like Michigan and South Carolina conducting primaries this month and over twenty states,

28  including California, scheduled to hold primary elections on "Super Tuesday," February 5, 2008.

1   Each time that CSI uses the term COMMON SENSE ISSUES to identify itself in connection with

2   its partisan campaigning, potential voters and the public in general will come to associate CSI

3   with Common Sense Media.  This is especially true where Common Sense Media is circulating

4   presidential candidate questionnaire results and CSI markets itself as disseminating information

5   about candidates' stances on key issues.  (*Id.* ¶¶ 5, 30.)

6           Third, politicians and candidates with whom Common Sense Media has worked in the

7   past may also come to associate CSI with Common Sense Media and refuse to cooperate with

8   Common Sense Media during the remainder of the political campaign.  For example, Common

9   Sense Media has been making arrangements to host a major presidential debate in Spring 2008 on

10  issues relevant to children, including children and the media.  Common Sense Media will be

11  issuing invitations to the leading Republican and Democratic candidates soon.  Some of those

12  candidates may turn down the invitation if they associate Common Sense Media with CSI or a

13  particular viewpoint, resulting in the public having less information on the candidates' positions

14  on issues related to children and the media.  (*Id.* ¶¶ 5, 8, 31-32.)

15          **E.      Common Sense Media Provided Notice of This Application to CSI**

16          On December 21, 2007, Common Sense Media sent CSI a letter demanding that it

17  immediately cease and desist from all use of COMMON SENSE ISSUES and any other marks

18  confusingly similar to Common Sense Media's family of COMMON SENSE Trademarks.

19  (Taylor Decl., ¶ 1, Ex. A.)  CSI has not sent a substantive response to that letter, although its

20  counsel telephoned on January 8, 2008 and indicated that he would be responding "shortly."  (*Id.*

21  ¶ 2.)  Common Sense Media served the complaint on CSI's registered agent on January 10, 2008,

22  and also sent CSI's counsel a courtesy copy of the complaint on the same day with a letter

23  informing CSI that it would be filing an application for a temporary restraining order early this

24  week if it did not receive written confirmation by January 11, 2008 that CSI would immediately

25  cease its infringement of Common Sense Media's trademark rights.  (*Id.* ¶ 4, Ex. B.)  As of today,

26  Common Sense Media has not received any response from CSI to either its letter of December 21,

27  2007 or its letter of January 10, 2008.  (*Id.* ¶ 5.)

28

1    **IV.    THE LEGAL STANDARD FOR INJUNCTIVE RELIEF**

2            Common Sense Media alleges violation of Sections 32 and 43(a) of the Lanham Act, as

3    well as unfair competition under state law and common law trademark infringement.  To obtain

4    injunctive relief, Common Sense Media must demonstrate either (1) probable success on the

5    merits and the possibility of irreparable injury, *or* (2) that serious questions exist going to the

6    merits of its case, and that the balance of hardships tips sharply in its favor.  *GoTo.Com, Inc. v.*

7    *Walt Disney Co.*, 202 F.3d 1199, 1204-05 (9th Cir. 2000).  Where a trademark holder establishes

8    "that it is likely to be able to show . . . a likelihood of confusion" between its mark and the

9    defendant's, a court will presume irreparable injury, and grant injunctive relief.  *Id.* at 1205.

10   These standards for injunctive relief apply to both a preliminary injunction and a temporary

11   restraining order.  *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co*., 240 F.3d 832, 839

12   n.7 (9th Cir. 2001) ("Because our analysis is substantially identical for the injunction and the

13   TRO, we do not address the TRO separately.").

14   **V.    ARGUMENT**

15          **A.    Common Sense Media Is Likely to Succeed on the Merits.**

16          To prevail on a trademark infringement claim, the trademark holder must demonstrate that

17   (1) it has a valid, protectable trademark, and (2) that subsequent use of the trademark by another

18   is likely to create consumer confusion.  *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*,

19   174 F.3d 1036, 1046 (9th Cir. 1999).[2]  As demonstrated below, Common Sense Media can do

20   both.

21                **1.    Common Sense Media Holds Valid, Protectable Trademarks.**

22          Common Sense Media owns two federally registered trademarks:  (1) the word mark

23   COMMON SENSE MEDIA® (Registration No. 2,973,224), and (2) COMMON SENSE

24          [2]  The test for unfair competition is the same as for trademark infringement.  *Century 21*
     *Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988).  The test for common law
25   trademark infringement also is the same as for federal trademark infringement.  *Dr. Seuss Enters.,*
     *L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 (9th Cir. 1997) ("'Likelihood of
26   confusion' is the basic test for both common law trademark infringement and federal statutory
     trademark infringement.")  Thus, the same test applies for likelihood of success on the merits of
27   all of Common Sense Media's claims.

28

1    MEDIA® and Design (Registration No. 3,353,234).  (Zehren Decl. ¶¶ 11, 12.)  These federal

2    registrations constitute prima facie evidence of the validity and protectability of these marks, and

3    of Common Sense Media's ownership and exclusive right to use the marks.  15 U.S.C. § 1057(b);

4    *Brookfield,* 174 F.3d at 1047.  Because Common Sense Media has valid and protectable interests

5    in its COMMON SENSE MEDIA® and COMMON SENSE MEDIA® and Design trademarks it

6    can preclude others, including CSI, from adopting confusingly similar designations.

7        Common Sense Media also has common law rights in the COMMON SENSE MEDIA®

8    and COMMON SENSE MEDIA® and Design trademarks, as well as the COMMON SENSE,

9    USE COMMON SENSE, and ASK COMMON SENSE trademarks.  Common law trademark

10   rights in all of these marks are conclusively established by actual use of the marks.  *Brookfield*

11   at 1047 ("The first to use a mark is deemed the 'senior' user and has the right to enjoin 'junior'

12   users from using confusingly similar marks in the same industry and market or within the senior

13   user's natural zone of expansion."); *see also Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d

14   1217, 1219 (9th Cir. 1996) ("It is axiomatic in trademark law that the standard test of ownership

15   is priority of use.").

16       Common Sense Media has been using the COMMON SENSE MEDIA and COMMON

17   SENSE trademarks for its educational, public interest, and advocacy services continuously since

18   2003, and the COMMON SENSE MEDIA® and Design mark since 2004.  (Zehren Decl. ¶¶ 2,

19   16); *see Comm. For Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 822-23 (9th Cir. 1996)

20   (finding that dissemination of information, advocacy of the group's agenda, and education of the

21   public are "services in commerce" under the Lanham Act).  Common Sense Media currently uses

22   both its COMMON SENSE MEDIA® and COMMON SENSE trademarks to refer to itself in

23   written materials, public service announcements, and the video segments that appear through

24   video-on-demand services and other distribution channels nationwide. (Zehren Decl. ¶ 4.)

25   Common Sense Media is widely referred to as both COMMON SENSE MEDIA® and

26   COMMON SENSE by others who use the trademarks interchangeably  (*Id*. ¶¶ 2, 4, 16.)  In

27   addition, Common Sense Media has used the slogan USE COMMON SENSE since at least as

28   early as 2005 and the ASK COMMON SENSE mark since 2006.  (*Id*. ¶ 16.)

**2.    Common Sense Media Established Its Trademark Rights Prior to CSI's First Use of COMMON SENSE ISSUES.**

Rights in a trademark arise from use and the priority of those rights is established either from the date on which the application for a federal trademark registration was filed or the date on which a trademark was first used, whichever is earlier. *Brookfield,* 174 F.3d at 1047; *see also* 15 U.S.C. § 1057(c) ("[T]he filing of the application to register [a] mark shall constitute constructive use of the mark, conferring a right of priority, nationwide in effect. . . ."). Thus, Common Sense Media's rights in the COMMON SENSE MEDIA® trademark arose on April 18, 2003 when it filed its first application to register COMMON SENSE MEDIA, and its rights in the COMMON SENSE MEDIA® and Design trademark arose on March 23, 2004 when it filed its first application to register COMMON SENSE MEDIA® and Design.  (Zehren Decl. ¶¶ 11-12.) In addition, Common Sense Media's common law rights in the COMMON SENSE, USE COMMON SENSE, and ASK COMMON SENSE trademarks arose when it started using those marks in 2003 (for COMMON SENSE), in early 2005 (for USE COMMON SENSE), and at least as early as August 2006 (for ASK COMMON SENSE).  (*Id*. ¶¶ 2, 16-17.)

CSI apparently began to use[3] its similar name only very recently.  It incorporated in April 2007, well after Common Sense Media had established rights in its family of COMMON SENSE Trademarks, and appears not to have become active until November or December 2007.  (*Id.* ¶¶ 10-19.)

---

[3] The Lanham Act proscribes the "use" of another's mark "in commerce" if it is likely to cause confusion.  15 U.S.C. § 1114(1)(a).  The services that CSI provides, including the public dissemination of information, advocacy of its political agenda, and education of the public, constitute "use in commerce."  *Comm. For Idaho's High Desert, Inc.*, 92 F.3d at 822-23. Similarly, political activities such as soliciting, collecting, and otherwise raising money for political purposes, engaging in political organizing, and distributing partisan political literature are also services within the Lanham Act's reach.  *United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 90 (2d Cir. 1997) ("Although not undertaken for profit, [these activities] unquestionably render a service.  We have no doubt that they satisfy § 1114(1)(a)'s requirement that the mark be used in connection with goods and services.").  Thus, the Lanham Act's prohibitions reach CSI's use of its confusingly similar mark.

### 3. Under the Ninth Circuit's *Sleekcraft* Analysis a Likelihood of Consumer Confusion Exists.

The Ninth Circuit has developed specific factors to guide the determination of likelihood of confusion. These factors include (1) the similarity of the marks; (2) the relatedness of the two entities' services; (3) the marketing channels used; (4) the strength of the mark; (5) intent in selecting the mark; (6) evidence of actual confusion; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by "purchasers." *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979); *GoTo.Com*, 202 F.3d at 1205. These factors are flexible, and some are more important than others, particularly the similarity of the marks and whether the parties' services are related. *Brookfield*, 174 F.3d at 1054; *see also*, *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1265 (Fed. Cir. 2002) (noting the likelihood of confusion analysis may focus on dispositive factors such as similarity of the marks and relatedness of the goods). The "relative importance of each individual factor will be case-specific" and it will often be possible "to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors." *Brookfield*, 174 F.3d at 1054. An analysis of these factors demonstrates that consumers are likely to be confused between CSI's use of the COMMON SENSE ISSUES designation and Common Sense Media's family of COMMON SENSE Trademarks.

### a. *CSI's Name Is Nearly Identical to Common Sense Media's Trademarks.*

When comparing the similarity of two trademarks, courts must look at the marks in their entireties and as they appear in the marketplace, considering their appearance, sound, and meaning. *Sleekcraft*, 599 F.2d at 351. Courts should also weigh the marks' similarities more heavily than their differences. *GoTo.Com*, 202 F.3d at 1206.

CSI's COMMON SENSE ISSUES designation incorporates in its entirety Common Sense Media's COMMON SENSE trademark. The additional term ISSUES does nothing to distinguish CSI from Common Sense Media as it is non-distinctive and merely descriptive of CSI's services—advocacy and "educational" services related to political issues. The fact that the U.S.

1    Trademark Office requested CSI to disclaim ISSUES because it is "merely descriptive," which

2    CSI did, is compelling evidence that the ISSUES portion of the COMMON SENSE ISSUES

3    trademark cannot serve to distinguish between the parties.[4] *See Perfumebay.com Inc. v. eBay*

4    *Inc.*, 506 F.3d 1165, 1174 (9th Cir. 2007) (finding the "requisite similarity" between the marks

5    where plaintiff's mark, PERFUMEBAY, "completely incorporate[d]" defendant's mark, EBAY).

6    Thus, the word "issues" does not significantly distinguish one mark from the other.

7         CSI's COMMON SENSE ISSUES designation also incorporates the dominant portion of

8    Common Sense Media's registered COMMON SENSE MEDIA® trademark – COMMON

9    SENSE.  Because Common Sense Media's work all pertains to media, the MEDIA portion of its

10   COMMON SENSE MEDIA® mark is descriptive and does not serve to distinguish COMMON

11   SENSE MEDIA® from COMMON SENSE ISSUES.  Moreover, as with the ISSUES portion of

12   CSI's mark, Common Sense Media has disclaimed the MEDIA portion of its COMMON SENSE

13   MEDIA® mark in both of its federal trademark registrations.  (Taylor Decl. ¶ 8.)  It is "Common

14   Sense" that makes both of these marks distinctive, as opposed to "media" or "issues."

15        Use of identical dominant terms as the first terms in each party's trademark is particularly

16   likely to foster confusion as that is the portion of the mark that consumers are most likely to

17   notice and to recall.  *See Century 21*, 846 F.2d at 1179 (finding that the use of CENTURY in

18   defendant's mark, CENTURY INVESTMENTS & REALTY could cause consumer confusion

19   with plaintiff's CENTURY 21 mark because "[t]he identical dominant term 'Century' is the lead

20   word in each entity's name, which can foster confusion."); *Powerfood, Inc. v. Sports Science*

21   *Inst.*, No. C-93-0259MHP, 1993 U.S. Dist. LEXIS 2191, at *13-14, 23 (N.D. Cal. Feb. 24, 1993)

22   (defendant wrongfully used the "dominant portion" of plaintiff's mark—the word POWER,

23   which was "the term that buyers are more likely to remember and use as indicating the origins of

24   the goods."); *Watts Health Sys., Inc. v. United Healthcare Corp.*, 960 F. Supp. 1431, 1435 (C.D.

25   Cal. 1996) (TRO issued against defendant's use of UNITED HEALTHCARE for its HMO, which

26   ───────────────

         [4]  In an Office Action dated November 26, 2007, the United States Patent and Trademark
27   Office required CSI to disclaim the word Issues "because it merely describes a feature of the
     services, *i.e.*, promoting public policy <u>issues</u>."  (Emphasis in original.)  (Taylor Decl. ¶ 9.)

28

1    was confusingly similar to plaintiff's UNITED HEALTH PLAN; deviations in last word and

2    certain visual variations held insufficient to distinguish marks).

3        This is particularly true where the public has grown accustomed to associating the senior

4    mark with a "family" of marks that all identify the same source of ownership.  *J & J Snack Foods*

5    *Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1462 (Fed. Cir. 1991) ("A family of marks is a group

6    of marks having a recognizable common characteristic, wherein the marks are comprised and

7    used in such a way that the consuming public associates not only the individual marks, but the

8    common characteristic of the family, with the trademark owner.").  Common Sense Media has

9    created a family of marks recognizable to the public by incorporating its COMMON SENSE

10   trademark into numerous other designations including USE COMMON SENSE, ASK

11   COMMON SENSE, and COMMON SENSE.COM, all of which refer to Common Sense Media.

12   As a result, consumers recognize each of these marks as identifying a single source—Common

13   Sense Media.  Consumers will likely believe that CSI's COMMON SENSE ISSUES is yet

14   another mark in Common Sense Media's family of COMMON SENSE Trademarks and that it

15   too is a reference to Common Sense Media.  "[I]f Plaintiff can demonstrate that it has established

16   a 'family of marks', then Plaintiff may obtain trademark protection against one whose mark

17   emanates from the same source as the Plaintiff's family."  *Sun Microsystems v. Astro-Med, Inc.*,

18   39 U.S.P.Q.2D (BNA) 1144 (N.D. Cal. 1996), *citing McDonald's Corp. v. McBagel's, Inc.*,

19   649 F. Supp. 1268, 1272 (S.D.N.Y. 1986).

20       Moreover, it is common for a trademark or trade name to be shortened to the first

21   dominant elements.  Indeed, Common Sense Media already refers to itself as Common Sense

22   alone, and third parties refer to it in that fashion.  (Zehren Decl. ¶ 16.)  If CSI's COMMON

23   SENSE ISSUES trademark is shortened (by itself or by others), the end result will be two entities

24   using identical marks.

25       Accordingly, this factor weighs in favor of a finding of likelihood of confusion and

26   supports a grant of injunctive relief.

27

28

1

      **b.**     ***Common Sense Media and CSI Are Involved in Related and Complementary Services —Educating the Public and Influencing Public Policy.***

2

3      Related or complementary services are more likely to confuse the public as to the

4     producers of the services than are unrelated services. *GoTo.Com*, 202 F.3d at 1206; *Sleekcraft,*

5     599 F.2d at 350.  The greater the similarity between marks, the less similarity required in the

6     goods or services of the parties to support a finding of likelihood of confusion.  *Sleekcraft*,

7     599 F.2d at 350.  Here, similarity exists between the services as well as the marks.

8     Common Sense Media and CSI are both nonprofit organizations whose services relate to

9     educating the public about certain issues and influencing public policy.  (Zehren Decl. ¶¶ 2-5, 17-

10    19, 21-22.)  Both try to affect public policy either directly by working with public officials or

11    indirectly by encouraging members of the public to do so.  (*Id.* ¶¶ 6-8, 19, 21-22.)  CSI markets

12    the portion of its activities that are not purely political as "educational;" Common Sense Media's

13    federal trademark registrations and applications include "educational services" among other

14    services.  (*Id.* ¶ 20.)  In addition, CSI is using the COMMON SENSE ISSUES designation in

15    association with short video segments that are distributed over the Internet, while Common Sense

16    Media's family of COMMON SENSE Trademarks appear frequently in conjunction with its own,

17    widely distributed video segments.  (*Id*. ¶¶ 16, 22, 24.)

18    Further, both organizations are taking active roles in the upcoming 2008 presidential

19    election, and are receiving media attention for those activities.  (*Id.* ¶¶ 5, 7, 17-19.)  CSI is

20    conducting controversial telephone "educational" polls related to election activities.  Common

21    Sense Media uses its trademarks in conjunction with polling and even included "public opinion

22    polling" in its federal trademark registrations and applications.  (*Id.* ¶¶ 11-15, Exs. 1-4.)  Both

23    Common Sense Media and CSI also seek to attract donations from individuals supportive of their

24    respective missions.  (*Id.* ¶¶ 4, 6, 19.)  Given that the two organizations provide many of the same

25    types of "public" services, confusion as to the source of those services is highly likely.[5]

26

27               [5] That Common Sense Media is often referred to in the media as simply "Common Sense" rather than by its full name adds to the potential for public confusion. (*Id.* ¶ 15.)  It would not be

28    unreasonable for the public to assume, in light of its advocacy of issues relating to children and

(Footnote continues on next page.)

1   Here there can be no question that the services are related and complementary.

2   Accordingly, this factor weighs in favor of a finding of likelihood of confusion.

3         **c.**     ***Common Sense Media's and CSI's Marketing Channels Overlap***
          ***Significantly.***

4

5   Common Sense Media and CSI share a presence on the Internet as well as in print and

6   broadcast media, resulting in a significant overlap of marketing channels.  The activities of

7   Common Sense Media are covered by national newspapers such as *The New York Times* and *The*

8   *Wall Street Journal*.  (Zehren Decl. ¶ 7.)  Representatives of Common Sense Media make regular

9   media appearances and Common Sense Media has been featured on popular television shows

10  such as Good Morning America and the Today Show, as well as other shows appearing on Fox,

11  CNN, and MSNBC.  (*Id.* ¶ 9.)  Common Sense Media is also featured in print media

12  advertisements distributed across the nation, in a series of public service announcements run on

13  major radio stations and major broadcast and cable television networks, and promotes itself

14  through its video reviews that appear in over 45 million homes through cable video-on-demand

15  services.  (*Id.* ¶¶ 4, 9.)  CSI is receiving news coverage from national media including *The Wall*

16  *Street Journal*, *The Washington Post*, and the Fox News network.  (*Id.* ¶¶ 18-19.)  CSI is also

17  sponsoring political advertisements for television.  (*Id.* ¶ 24, Ex. 7.)  In addition, the media

18  attention that both Common Sense Media and CSI have already received due to their election-

19  related activities presents an additional overlapping marketing channel.  This attention will likely

20  increase as both CSI and Common Sense Media continue their involvement in the highly

21  publicized presidential campaign.

22        In addition, both organizations market themselves on the Internet.  The Ninth Circuit gives

23  special consideration to use of the Internet as a marketing forum, recognizing that its use

24  exacerbates and is "particularly susceptible to" a likelihood of confusion.  *GoTo.Com,* 202 F.3d at

25

26  (Footnote continued from previous page.)

27  the media in connection with the election, that "Common Sense" is short for, or otherwise
    affiliated with, "Common Sense Issues."

28

1    1207.  Although the parties use other marketing channels in addition to the Internet, both rely

2    substantially on their respective websites to disseminate information and generate interest,

3    awareness, and donations.  CSI's web address (*www.CommonSensIssues.com*), like its name, is

4    confusingly similar to Common Sense Media's web addresses (*www.CommonSense.com* and

5    *www.CommonSenseMedia.org*).  People searching the Internet for Common Sense Media may

6    instead find CSI's website and thereby conclude that there is some political sponsorship of

7    Common Sense Media or some other affiliation between the entities.  *See Brookfield*, 174 F.3d

8    at 1057 (noting that consumers looking for plaintiff's "MovieBuff" entertainment database might

9    erroneously believe that the plaintiff was involved with or sponsored defendant's database if it

10   entered defendant's website located at *www.MovieBuff.com*).

11       Given that both entities have a competing presence on the Internet and in print and

12   broadcast media, and that both entities are currently receiving publicity regarding their activities

13   in connection with the presidential election in the same print media, this factor weighs heavily in

14   favor of a finding of likelihood of confusion.

15                    **d.    *The COMMON SENSE Trademarks Are Strong Marks*.**

16       In trademark law, distinctiveness is the measure for the strength of a mark and the terms

17   "distinctive" and "strength" are considered to be synonymous.  *See* 2 McCarthy on Trademarks

18   and Unfair Competition § 11:75 (4th ed. 2007); *see also* Restatement (Third) of Unfair

19   Competition § 21, comment I (1995).  "Registered trademarks are presumed to be distinctive and

20   should be afforded the utmost protection."  *Americana Trading, Inc. v. Russ Berrie & Co.*,

21   966 F.2d 1284, 1287 (9th Cir. 1992), *quoting Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,

22   799 F.2d 867, 871 (2d Cir. 1986).  As set forth above, Common Sense Media owns federal

23   registrations for COMMON SENSE MEDIA® and COMMON SENSE MEDIA® and Design.

24   Accordingly, Common Sense Media's registered trademarks are presumed to be strong marks.

25       In addition to the presumption of strength that accompanies Common Sense Media's

26   registered trademarks, the COMMON SENSE Trademarks are strong as a result of the

27   widespread availability of Common Sense Media's services, including its video reviews.  Over

28   six million people used the Common Sense Media website in 2007 alone.  (*Id.* ¶ 4.)  Common

1    Sense Media's video reviews and ratings reached some *45 million* homes throughout the United

2    States through Common Sense Media's partnerships with Comcast Corporation, Cox

3    Communications, and Time Warner Cable LLC.  (*Id.*)  Common Sense Media's ratings are also

4    available through the broadband ISP services of each of these companies.  (*Id.*)  Common Sense

5    Media also partners with Google Inc., AOL LLC, and Netflix Inc., who circulate Common Sense

6    Media's ratings of media products via their widely used websites.  Common Sense Media's

7    public service announcements—which feature prominent public figures and celebrity role

8    models—air nationwide on radio and on major broadcast and cable networks.  (*Id.* ¶¶ 4, 9.)

9    Common Sense Media has received widespread media coverage of its efforts, including, but not

10   limited to, articles in *The New York Times*, *San Francisco Chronicle, The Washington Post*,

11   *Chicago Tribune*, *Los Angeles Times*, *Houston Chronicle*, *Baltimore Sun*, *USA Today*, *Cincinnati*

12   *Enquirer*, and the *Christian Science Monitor*, and television coverage on Good Morning America,

13   the Today Show, and other programs on CNN, MSNBC, and Fox.  (*Id.* ¶ 7.)

14           The level of market penetration achieved by Common Sense Media and the extensive

15   publicity it has received have created a strong nationwide association with the family of

16   COMMON SENSE Trademarks, making them strong marks.  "[A] mark with extensive public

17   recognition and renown deserves and receives more legal protection than an obscure or weak

18   mark. . . . As the mark's fame increases, the [Lanham] Act's tolerance for similarities in

19   competing marks falls."  *Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353

20   (Fed. Cir. 1992), *cert. denied*, 506 U.S. 862 (1992); *see also GoTo.com, Inc.*, 202 F.3d at 1207;

21   *Brookfield*, 174 F.3d at 1058.

22           Accordingly, this factor weighs strongly in favor of finding a likelihood of confusion.

23                          **e.        *Level of Care by Purchasers***

24           The Ninth Circuit has said that the standard of care that a reasonably prudent purchaser

25   will exercise is equal to that of the least sophisticated consumer.  *GoTo.Com*, 202 F.3d at 1209.

26   Here, most "purchasers" are members of the general public accessing free websites or hearing or

27   reading information through the media.  That public is now being inundated with media coverage

28   and incessant "sound bites" relating to the presidential campaign.  In this environment, such

1   "purchasers," once they misattribute CSI's partisan beliefs and activities to Common Sense

2   Media, are unlikely to undertake much, if any, research to sort out who is actually the source of

3   which information. *See Brookfield*, 174 F.3d at 1060 ("[W]hen dealing with inexpensive

4   products, customers are likely to exercise less care, thus making confusion more likely.").  This is

5   particularly true where neither party charges the public for its services. *See Metro Publ'g, Inc. v.*

6   *Surfmet, Inc.*, No. C02-01833CW, 2002 U.S. Dist. LEXIS 26232, at *27-28 (N.D. Cal. July 3,

7   2002) (where the parties' respective goods and services were free and easily located, including

8   being available on the Internet, they were "not products for which a consumer exercises a great

9   degree of care").

10        The likelihood of confusion is heightened further in cases where the public may not even

11   be aware that the two separate entities exist, due in part to the groups' similar undertakings. *See*

12   *Watts Health Sys.*, 960 F. Supp. at 1436 (finding that the similar names of the plaintiff's and

13   defendant's HMOs could confuse both the public at large and even sophisticated potential

14   members who might not know nor realize that there was a difference between the two programs).

15   That is certainly true in this case.

16        Accordingly, this fact weighs in favor of a finding of a likelihood of confusion.

17             **f.    *The Remaining Sleekcraft Factors Have Little Significance Here*.**

18                  **(i)    Intent**

19        Common Sense Media found out about CSI only last month [December 2007] and has not

20   yet been able to conduct discovery in this matter, so it has no direct evidence that CSI chose the

21   COMMON SENSE ISSUES trademark with a specific intent to trade on Common Sense Media's

22   goodwill, but there is circumstantial evidence that CSI knew about Common Sense Media's rights

23   in the family of COMMON SENSE Trademarks before it first started using the COMMON

24   SENSE ISSUES trademark.  Specifically, Common Sense Media owns two federal trademark

25   registrations and two pending federal trademark applications for trademarks including the term

26   COMMON SENSE.  CSI hired trademark counsel to file a federal application for its COMMON

27   SENSE ISSUES trademark and the application was filed in August 2007.  Prior to filing a

28   trademark application, it is common to conduct a search of the U.S. Trademark Office database to

1    determine if any confusingly similar trademarks have already been registered or filed.  Assuming

2    even a preliminary online search was done in this case for "COMMON SENSE," all four of

3    Common Sense Media's federal trademark applications and registrations would have appeared on

4    the first page of the results.  (Taylor Decl. ¶ 11, Ex. F.)

5          However, if CSI failed to conduct such a search, and was not familiar with the COMMON

6    SENSE Trademark, those facts would not lean against a finding of infringement because "an

7    intent to confuse customers is not required for a finding of trademark infringement."  *Brookfield*,

8    174 F.3d at 1059; *see also GoTo.Com*, 202 F.3d at 1208 (refusing to "rummage through the

9    record in a quixotic attempt to determine [the defendant's] intention" given that a finding of

10   innocence would not affect the likelihood of confusion).

11         Accordingly, this factor either weighs in favor of a finding of trademark infringement, or

12   it is neutral.

### (ii)    Actual Confusion

14         Whether there has been actual confusion between the trademarks is of minimal

15   significance in this context.  *GoTo.Com*, 202 F.3d at 1208.  The absence of evidence of actual

16   confusion does not refute a likelihood of confusion.  *Id.* (noting that "'while evidence that the use

17   of the two marks has already led to confusion is persuasive proof that future confusion is likely,'

18   the converse is not true") (quoting *Sleekcraft*, 599 F.2d at 352).  Evidence of actual confusion is

19   particularly unlikely here, where CSI only became publicly active in the past month.

20         Accordingly, this factor is neutral in the trademark infringement analysis.

### (iii)    Likelihood of Expansion

22         The likelihood of expansion factor lacks significance in the current situation because

23   Common Sense Media and CSI are already active in the same market— seeking to inform and

24   appeal to the general public, particularly voters.  *See GoTo.Com*, 202 F.3d at 1208 (declining to

25   evaluate whether there was a likelihood of expansion of the parties' product lines because they

26   already competed in the same field); *Brookfield*, 174 F.3d at 1060 ("The likelihood of expansion

27   in product lines factor is relatively unimportant where two companies already compete to a

28   significant extent").

1  This factor either weighs in favor of a finding of a likelihood of confusion because the

2  parties have already expanded into the same fields, or it is neutral.

3  Thus, analysis of the *Sleekcraft* factors demonstrates that Common Sense Media can

4  successfully demonstrate a likelihood of confusion between its marks and CSI's.

5  **B.    Common Sense Media Faces Irreparable Harm**

6  "In trademark cases, once the plaintiff establishes a likelihood of confusion between the

7  plaintiff's mark and the defendant's, it is ordinarily presumed the plaintiff will suffer irreparable

8  harm if injunctive relief is not granted." *International Jensen, Inc. v. Metrosound U.S.A.*, *Inc.*,

9  4 F.3d 819, 827 (9th Cir. 1993).  Further, losing exclusive control over the symbol of one's

10  reputation constitutes irreparable injury.  *Int'l Olympic Comm. v. San Francisco Arts & Athletics*,

11  219 U.S.P.Q. (BNA) 982, 986 (N.D. Cal. 1982), *aff'd*, 707 F.2d 517 (9th Cir. 1983).

12  Nevertheless, the extent of Common Sense Media's potential injury warrants special

13  mention.  Confusion resulting from having one's political platform or endorsements mistaken for

14  another, potentially opposing message has been deemed potentially "catastrophic."  *See United*

15  *We Stand America, Inc.*, 128 F.3d at 90 (concluding that voters would have no way of

16  understanding the significance of an endorsement or position taken by political parties with

17  similar names because they would not know if the endorsement came from an organization whose

18  objectives they shared or from another organization using the same name).

19  Common Sense Media's reputation as a nonpartisan organization is crucial to its

20  legitimacy with the public and the political figures with whom it works and, in turn, to the success

21  of its mission.  The result of CSI's highly partisan positions being misattributed to Common

22  Sense Media would be devastating to the organization, causing it to lose its indispensable

23  reputation for unbiased public service.  This loss would threaten Common Sense Media's ability

24  to build broad public support and to work with politicians from all parties to achieve its policy

25  goals, as well as its ability to attract funding from a wide cross-section of the public.  Further, the

26  families who rely on Common Sense Media as a reliable, neutral evaluator of media products

27  likely will either reject or question those evaluations if they perceive Common Sense Media as

28  having an underlying political agenda with which they may not agree.  As explained above,

1  Common Sense Media receives nearly two million dollars annually in revenue from its various

2  media partners, who license the organization's core product—its reviews and rating system—

3  precisely because it is a neutral system without any political affiliation.  Any perception that

4  political bias drives that rating system would strip it of its social and financial value.  (Zehren

5  Decl. ¶¶ 4, 27-34.)

6        Particularly in light of Common Sense Media's involvement with the upcoming FCC

7  wireless spectrum auction on January 24, 2008 and its planned presidential debate in Spring 2008,

8  the injury Common Sense Media will suffer is imminent.  Additionally, the presidential caucuses,

9  primaries, and conventions currently are underway, with over twenty states conducting their

10 respective events on or before "Super Tuesday," February 5, 2008.  If CSI undertakes telephone

11 and advertising campaigns in those states under the COMMON SENSE ISSUES name, as it

12 appears primed to do, the publicity and subsequent public confusion regarding the source of those

13 activities will irreparably harm Common Sense Media.  The degree of harm is further exacerbated

14 because election activities receive nationwide attention and regularly dominate the news cycle.

15 As a result, the extent of public confusion and resulting harm is likely to be exponentially

16 increased.  (*Id.*)

17       As CSI continues to gain nationwide notoriety for partisan push-polling and attack-ads,

18 Common Sense Media is gearing up for a major nonpartisan political effort:  Common Sense

19 Media is working with politicians on both sides of the aisle to secure support for an initiative to

20 ask Congress to allocate to education a portion of the billions of dollars expected to be raised

21 from the Federal Communication Commission's wireless auction scheduled for January 24, 2008.

22 Common Sense media currently intends to announce its initiative in just *one week*, on January 22,

23 2008.  CSI's continued use of the COMMON SENSE ISSUES name in connection with

24 controversial telephone call campaigns and other highly partisan "public education" activities

25 threatens to undermine Common Sense Media's nonpartisan efforts in connection with this time-

26 sensitive opportunity to channel billions of dollars toward educating the public about the impact

27 of media on children and families.  In addition, CSI's activities harm other election-related efforts

28

1   of Common Sense Media, such as the value of its presidential questionnaire related to children

2   and media and a planned candidates' debate in the spring.  (*Id.*)

3       In sum, Common Sense Media's distinctive family of COMMON SENSE Trademarks, as

4   well as its reputation and goodwill, are being jeopardized by CSI's use of a confusingly similar

5   name.  This is precisely the type of harm the trademark laws are designed to prevent.

6   Accordingly, a temporary restraining order is warranted and necessary.

7       **C.    Common Sense Media Has Raised Serious Questions and The Balance of
                Hardships Tips Sharply in Its Favor.**

8

9       The Court need only consider the balance of the hardships if it finds that the probability of

10  success on the merits and irreparable injury alone do not justify issuing a preliminary injunction.

11  *GoTo.Com*, 202 F.3d at 1209.  In light of the foregoing, therefore, the Court need not determine

12  whether serious questions exist as to the merits nor the balance of hardships.  The foregoing does,

13  however, demonstrate that there are, at a minimum, serious questions as to the legality of CSI's

14  use of its current name.  Further, it also demonstrates that the balance of hardships tips sharply in

15  favor of Common Sense Media, which has devoted years and substantial money and resources to

16  developing the goodwill and nonpartisan reputation associated with its family of COMMON

17  SENSE Trademarks—goodwill and reputation that will quickly erode if CSI is permitted to use

18  the confusingly similar COMMON SENSE ISSUES designation for its politically partisan

19  activities.  (Zehren Decl. ¶¶ 6, 9.)

20      By contrast, CSI will suffer little harm if an injunction is entered.  CSI will still be able to

21  engage in its political and public policy related activities.  It is free to choose a new name from an

22  infinite number of possibilities.  The burden of changing a name it only recently began using is no

23  hardship under the present circumstances, particularly where established trademarks are at a risk

24  of irreparable injury.  *See Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 526 (9th Cir.

25  1984) (affirming the district court's determination that where a defendant had only recently

26  entered the computer market, the balance of hardships tipped in favor of plaintiff Apple Computer

27  who risked loss of control over its reputation and loss of goodwill from defendant's use of an

28  infringing designation).

1    The equities strongly favor a temporary restraining order, as immediate injunctive relief

2  will protect both Common Sense Media and the families and others who will benefit from

3  Common Sense Media's continued ability to pursue its laudable services and goals.  A temporary

4  restraining order is the only remedy available to preserve the status quo between the parties.

5  **VI.    CONCLUSION**

6    The foregoing demonstrates that Common Sense Media will likely succeed in proving that

7  CSI's use of the COMMON SENSE ISSUES designation will cause consumer confusion with

8  Common Sense Media's family of COMMON SENSE Trademarks.  In light of the irreparable

9  harm facing it, Common Sense Media respectfully requests that this Court issue a temporary

10  restraining order to prevent further encroachment by CSI on Common Sense Media's rights.

11  Dated: January 15, 2008                    JENNIFER LEE TAYLOR
                                                       DEAN J. ZIPSER
12                                                     CAROLE E. REAGAN
                                                       MORRISON & FOERSTER LLP
13

14
                                              By:____/s/ Jennifer Lee Taylor_____
15                                                     Jennifer Lee Taylor

16                                                     Attorneys for Plaintiff
                                                       COMMON SENSE MEDIA, INC.
17

18

19

20

21

22

23

24

25

26

27

28