1  JENNIFER LEE TAYLOR (CA SBN 161368)
   JTaylor@mofo.com
2  MORRISON & FOERSTER LLP
   425 Market Street
3  San Francisco, California  94105-2482
   Telephone:  (415) 268-7000
4  Facsimile:  (415) 268-7522

5  DEAN J. ZIPSER (CA SBN 94680)
   DZipser@mofo.com
6  CAROLE E. REAGAN (CA SBN 162674)
   CReagan@mofo.com
7  MORRISON & FOERSTER LLP
   19900 MacArthur Blvd., 12TH Floor
8  Irvine, California  92612-2445
   Telephone:  (949) 251-7500
9  Facsimile:  (949) 251-0900

10 Attorneys for Plaintiff
   COMMON SENSE MEDIA, INC.

11

12                 UNITED STATES DISTRICT COURT

13               NORTHERN DISTRICT OF CALIFORNIA

14                     OAKLAND DIVISION

15

16 COMMON SENSE MEDIA, INC., a California      Case No.    C08-00155-CW
   corporation,
17                                             **DECLARATION OF JENNIFER
                                               LEE TAYLOR IN SUPPORT OF
18              Plaintiff,                      PLAINTIFF COMMON SENSE
                                               MEDIA, INC.'S EX PARTE
19      v.                                     APPLICATION FOR A
                                               TEMPORARY RESTRAINING
20                                             ORDER**
   COMMON SENSE ISSUES, INC., a Delaware
21 corporation,                                Date:
                                               Time:
22              Defendant.                     Ctrm:
                                               Judge: Honorable Claudia Wilken
23

24

25

26

27

28

1    I, JENNIFER LEE TAYLOR, declare as follows:

2        I am an attorney duly licensed to practice law in the State of California.  I am a partner at

3    the law firm of Morrison & Foerster LLP, counsel for Plaintiff Common Sense Media, Inc.

4    ("Common Sense Media") in the above-entitled matter.  I make this declaration in connection

5    with the Common Sense Media's Ex Parte Application for a Temporary Restraining Order against

6    Defendant Common Sense Issues, Inc. ("CSI").  I have personal knowledge of the facts herein

7    and, if called as a witness, could testify competently thereto.

8        1.    On December 21, 2007, I sent a letter to CSI in care of Harold E. Swift to inform

9    CSI of the trademark rights Common Sense Media and to demand that CSI cease and desist use of

10   the COMMON SENSE ISSUES designation.  A true and correct copy of that letter is attached

11   hereto as Exhibit A.

12       2.    On January 8, 2008, I received a telephone call from Norm Rich, an attorney at

13   Foley & Lardner in Washington, D.C., who stated that he represented CSI in connection with this

14   matter.  He informed me that he would be responding to my December 21, 2007 letter "shortly."

15       3.    I have not yet received any response from Mr. Rich to my letter of December 21,

16   2007.

17       4.    On January 10, 2008, I sent a letter to Mr. Rich informing him that Common Sense

18   Media would be filing an application for a temporary restraining order early this week if we did

19   not receive CSI's commitment to cease using the COMMON SENSE ISSUES designation by

20   Friday, January 11, 2008.  I also forwarded a copy of the complaint filed in this action with that

21   letter.  A true and correct copy of that letter is attached hereto as Exhibit B.

22       5.    I have not yet received any response from Mr. Rich to my letter of January 10,

23   2008.

24       6.    CSI's registered agent for service of process was served with the complaint and

25   summons in this case on Thursday, January 10, 2008.

26       7.    Common Sense Media owns two pending federal trademark applications for

27   COMMON SENSE and for USE COMMON SENSE.  Notices of Allowance were issued for both

28   applications on February 13, 2007.  A Notice of Allowance opens the window of time in which an

TAYLOR DECL. ISO PLAINTIFF COMMON SENSE MEDIA'S APPLICATION FOR TRO        1
Case No. C08-00155-CW
sf-2450114

1  applicant can submit an Amendment to Allege Use of a mark, the final step in the registration

2  process.  While it is initially given a six-month period in which to file an Amendment to Allege

3  Use, an applicant may file up to five requests to extend that period for a total of 36 months.  True

4  and correct copies of the Notices of Allowance for both applications are attached hereto as

5  Exhibit C.

6      8.     Common Sense Media's registered trademarks for COMMON SENSE MEDIA®,

7  Registration No. 2,973,224, and COMMON SENSE MEDIA® and Design, Registration

8  No. 3,353,234, both disclaim exclusive right to use of the term "MEDIA" apart from its use in

9  conjunction with the mark as a whole.  Terms are disclaimed where they merely describe the

10  goods or services covered by the application.

11      9.     On November 26, 2007, the U.S. Trademark Office issued an office action on

12  CSI's federal application to register COMMON SENSE ISSUES, Application Serial

13  No. 77/257033.  The office action required CSI to disclaim the term "ISSUES" as "it merely

14  describes a feature of the services, *i.e.*, promoting public policy <u>issues</u>."  (Emphasis in original.)

15  A true and correct copy of the office action is attached hereto as Exhibit D.

16      10.    On January 4, 2008, counsel for CSI responded to the office action by amending

17  the application to disclaim the term "ISSUES."  A true and correct copy of CSI's response to the

18  office action is attached hereto as Exhibit E.

19      11.    On January 14, 2008, I conducted an online search on the U.S. Trademark Office

20  website for the "COMMON SENSE."  A true and correct copy of the results of that search is

21  attached hereto as Exhibit F.

22      12.    Attached hereto as Exhibit G is a true and correct copy of a printout from the

23  Division of Corporations for the state of Delaware.

24      13.    Attached hereto as Exhibit H is a true and correct copy of the Court's decision in

25  *Powerfood, Inc. v. Sports Science Inst.*, No. C-93-0259MHP, 1993 U.S. Dist. LEXIS 2191 (N.D.

26  Cal. Feb. 24, 1993).

27

28

14.     Attached hereto as Exhibit I is a true and correct copy of the Court's decision in *Metro Publ'g, Inc. v. Surfmet, Inc.*, No. C02-01833CW, 2002 U.S. Dist. LEXIS 26232, (N.D. Cal. July 3, 2002.).

I declare under penalty of perjury under the laws of the United States of America that the foregoing information is true and correct and that this Declaration was executed in San Francisco, California, on this 15th day of January, 2008.

/s/Jennifer Lee Taylor
Jennifer Lee Taylor

Taylor Decl. ISO Plaintiff Common Sense Media's Application for TRO
Case No. C08-00155-CW
sf-2450114

3

# EXHIBIT A

MORRISON    FOERSTER

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA 94105-2482

TELEPHONE:415.268.7000
FACSIMILE:415.268.7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SAN DIEGO, WASHINGTON, D.C.

DENVER, NORTHERN VIRGINIA,
ORANGE COUNTY, SACRAMENTO,
WALNUT CREEK, CENTURY CITY

TOKYO, LONDON, BEIJING,
SHANGHAI, HONG KONG,
SINGAPORE, BRUSSELS

December 21, 2007

Writer's Direct Contact
415.268.6538
JTaylor@mofo.com

By Overnight Delivery

Mr. Harold Swift
Common Sense Issues, Inc.
8190-A Beechmont Ave. Ste 103
Cincinnati, OH 45255

Re:    Infringement of COMMON SENSE MEDIA® Trademark Rights

Dear Mr. Swift:

Morrison & Foerster LLP represents Common Sense Media Inc. ("Common Sense"), the nation's leading nonpartisan organization dedicated to improving the media lives of children and families, in legal matters. We are sending this letter to you directly because we are not aware that Common Sense Issues, Inc. ("CSI") has retained counsel for this matter. If it has done so, please let us know the identity of the attorney so that we may direct all future correspondence to his or her attention.

As you probably know, Common Sense is a non-partisan, non-profit organization that provides a family-friendly media rating system and a variety of educational services in the field of children, families, and entertainment media, as well as advocating on the state and federal level regarding media regulation, particularly as it affects children and families. When it was founded in 2003, Common Sense aimed to create a huge constituency for parents and kids in the same way that Mothers Against Drunk Driving or the AARP had done. To achieve this mission, its outreach staff works closely with hundreds of community organizations to access tens of thousands of parents, teachers, and community leaders across the country. In addition, the organization disseminates information over its website, conducts polls, and remains in regular contact with elected officials and candidates from both political parties. Most recently, Common Sense directed a questionnaire about kids-and-media issues to all of the 2008 presidential campaigns and released the responses of the candidates to the general public. Common Sense is also gearing up to host a major debate amongst presidential candidates in early 2008.

Fundamental to Common Sense's activities is its position as a nonpartisan advocacy group. Common Sense's well-publicized drive to establish a transparent and universal rating system

MORRISON | FOERSTER

Mr. Harold Swift
December 21, 2007
Page Two

for media is inherently dependant on the organization's ability to work with and influence
policy makers from across the political spectrum. Since it inception in 2003, Common Sense
has carefully cultivated a nonpartisan roster of supporters, advisors, and donors to give it
effective influence with regulators and industry leaders.

Common Sense has been using COMMON SENSE and COMMON SENSE MEDIA as
trademarks in connection with all of the services that it has offered since spring of 2003.
Common Sense is the owner of several trademark registrations and pending trademark
applications at the United States Patent and Trademark Office ("USPTO") for trademarks
including the phrase COMMON SENSE, including two registrations for COMMON SENSE
MEDIA, one application for COMMON SENSE and one application for USE COMMON
SENSE. These have been assigned Registration Nos. 3,353,234 and 2,973,224 and
Application Serial Nos. 78/858,133 and 78/858,124. In addition, Common Sense retains
common law rights in each of these marks based upon its use of the marks dating back to
2003.

It recently came to our client's attention that CSI has begun using the COMMON SENSE
ISSUES designation in conjunction with its highly politicized, partisan campaign activities
relating to the upcoming presidential campaign and the 2008 election season. We have noted
that CSI also uses the COMMON SENSE ISSUES designation prominently on its website
where it publicizes its highly partisan activities and viewpoints and encourages individuals to
contact elected officials. Such use of the COMMON SENSE ISSUES designation
constitutes an infringement of Common Sense's trademark rights.

Common Sense's established rights in the trademarks COMMON SENSE and COMMON
SENSE MEDIA, among others, include the right to prevent any other entity from using a
mark or name that may cause a likelihood of confusion among the consuming public. The
consuming public is likely to be confused where similar or identical marks are used in
conjunction with similar goods and services. COMMON SENSE ISSUES literally
incorporates our client's COMMON SENSE mark. In addition, COMMON SENSE MEDIA
and COMMON SENSE ISSUES are, for practical purposes, virtually identical because
COMMON SENSE is the dominant portion of both marks and ISSUES and MEDIA are
descriptive of the services offered by the entities. Moreover, both marks are being used in
connection with advocacy services, including in connection with the upcoming presidential
primaries. There is no doubt that confusion will occur as a result of the similarity of the
marks and their respective uses.

In this instance, however, the harm caused by CSI's current use of the mark exceeds simple
confusion. CSI's use has a direct, negative, and immediate effect on Common Sense's
ability to succeed as an organization as the public will come to associate CSI with Common

MORRISON | FOERSTER

Mr. Harold Swift
December 21, 2007
Page Three

Sense and will come to view Common Sense as a partisan organization. Any confusion amongst candidates, elected officials, or donors with regard to the nonpartisan nature of Common Sense will prevent the organization from achieving its organizational directives and will harm the organization's ability to raise the funds necessary to continue its mission.

Accordingly, demand is hereby made on behalf of Common Sense that CSI immediately cease and desist all use of the COMMON SENSE designation as a trademark, trade name, or domain name, including any use on its website. If you do not comply by December 28, 2007, our client will have no choice but to file suit in federal district court and seek a preliminary injunction.

Sincerely,

Jennifer Lee Taylor

sf-2442798

# EXHIBIT B

**MORRISON | FOERSTER**

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA 94105-2482

TELEPHONE: 415.268.7000
FACSIMILE: 415.268.7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SAN DIEGO, WASHINGTON, D.C.

NORTHERN VIRGINIA,
ORANGE COUNTY, DENVER,
SACRAMENTO, WALNUT CREEK

TOKYO, LONDON, BEIJING,
SHANGHAI, HONG KONG,
SINGAPORE, BRUSSELS

January 10, 2008

Writer's Direct Contact
415.268.6538
JTaylor@mofo.com

Norm J. Rich, Esq.
Foley & Lardner LLP
3000 K Street, N.W.
Suite 500
Washington, D.C. 20007-5143

Re:    *Common Sense Media, Inc. v. Common Sense Issues, Inc.*, Northern District of
California, Case No. C08-00155-CW

Dear Mr. Rich:

I am writing to follow-up on our brief telephone call on Tuesday. I understand that you are
representing Common Sense Issues, Inc. in connection with the trademark dispute with
Common Sense Media, Inc.. Accordingly, I am enclosing a courtesy copy of the complaint
that was filed yesterday in the Northern District of California in the above-referenced matter.
We are arranging for service on your client's registered agent in Delaware, which we expect
to occur by Friday.

We anticipate filing an application for a temporary restraining order at the beginning of next
week if we do not receive confirmation by tomorrow that your client will immediately cease
and desist all use of the COMMON SENSE designation as a trademark, trade name, or
domain name, including any use on its website.

Sincerely,

Jennifer Lee Taylor

Enclosure

sf-2448909

# EXHIBIT C

Document Description: **Notice of Allowance**    Mail / Create Date: **13-Feb-2007**



## U.S. Patent and Trademark Office (USPTO)

# NOTICE OF ALLOWANCE

NOTE: If any data on this notice is incorrect, please fax a request for correction to the Intent to Use Unit at 571-273-9550. Please include the serial number of your application on ALL correspondence with the USPTO.

**ISSUE DATE:** Feb 13, 2007

ROSEMARY S. TARLTON                                    ATTORNEY
MORRISON & FOERSTER LLP                          REFERENCE NUMBER
425 MARKET STREET
SAN FRANCISCO, CA 94105-2482                        845312400600

---

### ** IMPORTANT INFORMATION:  6 MONTH DEADLINE **

You filed the trademark application identified below based upon a bona fide intention to use the mark in commerce. You must use the mark in commerce and file a Statement of Use (a.k.a. Allegation of Use) before the USPTO will register the mark. You have six (6) MONTHS from the ISSUE DATE of this Notice of Allowance (NOA) to file either a Statement of Use, or if you are not yet using the mark in commerce, a Request for Extension of Time to File a Statement of use ("Extension Request"). If you file an extension request, you must continue to file a new request every six months until the Statement of Use is filed. Applicant may file a total of five (5) extension requests. FAILURE TO FILE A REQUIRED DOCUMENT DURING THE APPROPRIATE TIME PERIOD WILL RESULT IN THE <u>ABANDONMENT</u> OF YOUR APPLICATION.

Please note that both the "Statement of Use " and "Extension Request" have many legal requirements including fees. Therefore, we encourage use of the USPTO forms, available online at <u>http://www.uspto.gov/teas/index.html</u> (under "File a PRE-registration form"), to avoid the possible omission of important information. Please note that the Trademark Electronic Application System (TEAS) provides line-by-line help instructions for completing the Extension Request or Statement of Use forms online. If you do not have access to the Internet, you may call 1-800-786-9199 to request the printed form(s).

---

### The following information should be reviewed for accuracy:

SERIAL NUMBER:          78/858133
MARK:                          COMMON SENSE (STANDARD CHARACTER MARK)
OWNER:                        Common Sense Media
                                    1550 Bryant Street, Suite 555
                                    San Francisco , CALIFORNIA  94103

This application has the following bases, but not necessarily for all listed goods/services:

    Section 1(a): NO              Section 1(b): YES          Section 44(e): NO

### GOODS/SERVICES BY INTERNATIONAL CLASS

035 - Conducting business research and surveys regarding children, families, and entertainment media; public opinion polling regarding children, families and entertainment media; providing online information regarding business research and surveys regarding children, entertainment and the media -- FIRST USE DATE: NONE; -- USE IN COMMERCE DATE: NONE

041 - Educational services, namely providing seminars and workshops in the field of children, families, and entertainment media; educational services, namely, conducting on-line exhibitions and displays and interactive exhibits in the field of children, families, and entertainment media; providing a website featuring information, advice, analysis, monitoring, ratings and reviews in the field of entertainment media; providing information in the form of reviews and ratings of entertainment media; providing online information regarding entertainment and the media -- FIRST USE DATE: NONE; -- USE IN COMMERCE DATE: NONE

ALL OF THE GOODS/SERVICES IN EACH CLASS ARE LISTED

---

**ADDITIONAL INFORMATION MAY BE PRESENT IN THE USPTO RECORDS**

TDR Home

This document may be displayed as a PDF file containing images without text. You may view online or save the entire document by clicking on the file download icon in the upper right corner of this page. [required PDF viewer] FAQ: Are you seeing only the first page of this PDF document?

*If you need help:*

- **General trademark information**: *Please e-mail TrademarkAssistanceCenter@uspto.gov, or telephone either 571-272-9250 or 1-800-786-9199.*
- **Technical help**: *For instructions on how to use TDR, or help in resolving **technical** glitches, please e-mail TDR@uspto.gov. If outside of the normal business hours of the USPTO, please e-mail Electronic Business Support, or call 1-800-786-9199.*
- **Questions about USPTO programs**: *Please e-mail USPTO Contact Center (UCC).*

**NOTE**: *Within any e-mail, please include your telephone number so we can talk to you directly, if necessary. Also, include the relevant serial number or registration number, if existing.*

Document Description: **Notice of Allowance**       Mail / Create Date: **13-Feb-2007**



## U.S. Patent and Trademark Office (USPTO)

# NOTICE OF ALLOWANCE

NOTE: If any data on this notice is incorrect, please fax a request for correction to the Intent to Use Unit at 571-273-9550. Please include the serial number of your application on ALL correspondence with the USPTO.

**ISSUE DATE:**  Feb 13, 2007

ROSEMARY S. TARLTON                                   ATTORNEY
MORRISON & FOERSTER LLP                       REFERENCE NUMBER
425 MARKET STREET
SAN FRANCISCO, CA 94105-2482                        845312400500

### ** IMPORTANT INFORMATION:  6 MONTH DEADLINE **

You filed the trademark application identified below based upon a bona fide intention to use the mark in commerce.  You must use the mark in commerce and file a Statement of Use (a.k.a. Allegation of Use) before the USPTO will register the mark.  You have six (6) MONTHS from the ISSUE DATE of this Notice of Allowance (NOA) to file either a Statement of Use, or if you are not yet using the mark in commerce, a Request for Extension of Time to File a Statement of use ("Extension Request").   If you file an extension request, you must continue to file a new request every six months until the Statement of Use is filed.  Applicant may file a total of five (5) extension requests. FAILURE TO FILE A REQUIRED DOCUMENT DURING THE APPROPRIATE TIME PERIOD WILL RESULT IN THE <u>ABANDONMENT</u> OF YOUR APPLICATION.

Please note that both the "Statement of Use " and "Extension Request" have many legal requirements including fees.  Therefore, we encourage use of the USPTO forms, available online at http://www.uspto.gov/teas/index.html (under "File a PRE-registration form"), to avoid the possible omission of important information.  Please note that the Trademark Electronic Application System (TEAS) provides line-by-line help instructions for completing the Extension Request or Statement of Use forms online.  If you do not have access to the Internet, you may call 1-800-786-9199 to request the printed form(s).

### The following information should be reviewed for accuracy:

SERIAL NUMBER:          78/858124
MARK:                            USE COMMON SENSE (STANDARD CHARACTER MARK)
OWNER:                          Common Sense Media
                                       1550 Bryant Street, Suite 555
                                       San Francisco , CALIFORNIA  94103

This application has the following bases, but not necessarily for all listed goods/services:

     Section 1(a): NO              Section 1(b): YES              Section 44(e): NO

### GOODS/SERVICES BY INTERNATIONAL CLASS

035 -    Conducting business research and surveys regarding children, families, and entertainment media; public opinion polling regarding children, families and entertainment media; providing online information regarding business research and surveys regarding children, entertainment and the media -- FIRST USE DATE: NONE; -- USE IN COMMERCE DATE: NONE

041 -    Educational services, namely providing seminars and workshops in the field of children, families, and entertainment media; educational services, namely, conducting on-line exhibitions and displays and interactive exhibits in the field of children, families, and entertainment media; providing a website featuring information, advice, analysis, monitoring, ratings and reviews in the field of entertainment media; providing information in the form of reviews and ratings of entertainment media; providing online information regarding entertainment and the media -- FIRST USE DATE: NONE; -- USE IN COMMERCE DATE: NONE

ALL OF THE GOODS/SERVICES IN EACH CLASS ARE LISTED

---

**ADDITIONAL INFORMATION MAY BE PRESENT IN THE USPTO RECORDS**

TDR Home

This document may be displayed as a PDF file containing images without text. You may view online or save the entire document by clicking on the file download icon in the upper right corner of this page. [required PDF viewer]
FAQ: Are you seeing only the first page of this PDF document?

*If you need help:*

- **General trademark information**: *Please e-mail* TrademarkAssistanceCenter@uspto.gov, *or telephone either 571-272-9250 or 1-800-786-9199.*
- **Technical help**: *For instructions on how to use TDR, or help in resolving* **technical** *glitches, please e-mail* TDR@uspto.gov. *If outside of the normal business hours of the USPTO, please e-mail* Electronic Business Support, *or call 1-800-786-9199.*
- **Questions about USPTO programs**: *Please e-mail* USPTO Contact Center (UCC).

**NOTE**: *Within any e-mail, please include your telephone number so we can talk to you directly, if necessary. Also, include the relevant serial number or registration number, if existing.*

# EXHIBIT D

Document Description: **Offc Action Outgoing**    Mail / Create Date: **26-Nov-2007**



# UNITED STATES PATENT AND TRADEMARK OFFICE

**SERIAL NO:**    77/257033

**MARK:** COMMON SENSE ISSUES

# *77257033*

**CORRESPONDENT ADDRESS:**
   NORM J. RICH
   FOLEY & LARDNER LLP
   3000 K ST NW STE 500
   WASHINGTON, DC 20007-5143

**RESPOND TO THIS ACTION:**
**http://www.uspto.gov/teas/eTEASpageD.htm**

**GENERAL TRADEMARK INFORMATION:**
**http://www.uspto.gov/main/trademarks.htm**

**APPLICANT:**    Common Sense Issues, Inc.

**CORRESPONDENT'S REFERENCE/DOCKET NO:**
   090110-0102
**CORRESPONDENT E-MAIL ADDRESS:**

# OFFICE ACTION

TO AVOID ABANDONMENT, THE OFFICE MUST RECEIVE A PROPER RESPONSE TO THIS OFFICE ACTION WITHIN 6 MONTHS OF THE ISSUE/MAILING DATE.

**ISSUE/MAILING DATE:**

## Search Results

The Office records have been searched and no similar registered or pending mark has been found that would bar registration under Trademark Act Section 2(d), 15 U.S.C. §1052(d). TMEP §704.02.

## Recitation of Services

The identification of services is indefinite and must be clarified. TMEP §1402.01. Applicant may adopt the following identification, if accurate: Promoting public awareness of issues in the field of politics and public policy.

For assistance with identifying and classifying goods and/or services in trademark applications, please see the online searchable *Manual of Acceptable Identifications of Goods and Services* at http://tess2.uspto.gov/netahtml/tidm.html.

Please note that, while the identification of services may be amended to clarify or limit the services, adding to the services or broadening the scope of the services is not permitted. 37 C.F.R. §2.71(a); TMEP

§1402.06. Therefore, applicant may not amend the identification to include services that are not within the scope of the services set forth in the present identification.

**Disclaimer**

Applicant must disclaim the descriptive wording "ISSUES" apart from the mark as shown because it merely describes a feature of the services, i.e., promoting public policy issues. Trademark Act Section 6, 15 U.S.C. §1056; TMEP §§1213 and 1213.03(a). The definition of "ISSUE" is:

**is·sue** (ĭsh′ḭ) *noun*
1.    **a.** The act or an instance of flowing, passing, or giving out. **b.** The act of circulating, distributing, or publishing by an office or official group: *government issue of new bonds.*
2.    Something produced, published, or offered, as: **a.** An item or set of items, as stamps or coins, made available at one time by an office or bureau. **b.** A single copy of a periodical: *the March issue of the magazine.* **c.** A distinct set of copies of an edition of a book distinguished from others of that edition by variations in the printed matter. **d.** A final result or conclusion, as a solution to a problem. **e.** Proceeds from estates or fines. **f.** Something proceeding from a specified source: *suspicions that were the issue of a deranged mind.*
3.    Offspring; progeny: *died without issue.*
4.    **a.** A point or matter of discussion, debate, or dispute: *legal and moral issues.* **b.** A matter of public concern: *refused to address the economic issues.* **c.** The essential point; crux: *the issue of how to provide adequate child care.* **d.** A culminating point leading to a decision: *bring a case to an issue.*
5.    A place of egress; an outlet: *a lake with no issue to the sea.*
6.    *Pathology.* **a.** A discharge, as of blood or pus. **b.** A lesion, a wound, or an ulcer producing such a discharge.
7.    *Archaic.* Termination; close.[1]

The Office can require an applicant to disclaim an unregistrable part of a mark consisting of particular wording, symbols, numbers, design elements or combinations thereof. 15 U.S.C. §1056(a). Under Section 2(e) of the Trademark Act, the Office can refuse registration of an entire mark if the entire mark is merely descriptive, deceptively misdescriptive, or primarily geographically descriptive of the goods. 15 U.S.C. §1052(e). Thus, the Office may require an applicant to disclaim a portion of a mark that, when used in connection with the goods or services, is merely descriptive, deceptively misdescriptive, primarily geographically descriptive, or otherwise unregistrable (e.g., generic). TMEP §1213.03(a).

Failure to comply with a disclaimer requirement can result in a refusal to register the entire mark. TMEP §1213.01(b).

A "disclaimer" is a statement that applicant does not claim exclusive rights to an unregistrable component of a mark. A disclaimer does not affect the appearance of the applied-for mark.

A disclaimer does *not* physically remove the disclaimed matter from the mark, but rather is a written statement that applicant does not claim exclusive rights to the disclaimed wording and/or design separate and apart from the mark as shown in the drawing.

The following cases explain the disclaimer requirement more fully: *Dena Corp. v. Belvedere Int'l Inc.,* 950 F.2d 1555, 21 USPQ2d 1047 (Fed. Cir. 1991); *In re Kraft, Inc.,* 218 USPQ 571 (TTAB 1983); *In re EBS Data Processing, Inc.,* 212 USPQ 964 (TTAB 1981); *In re National Presto Industries, Inc.,* 197 USPQ 188 (TTAB 1977).

The computerized printing format for the Office's *Trademark Official Gazette* requires a standardized format for a disclaimer. TMEP §1213.08(a)(i). The following is the standard format used by the Office:

No claim is made to the exclusive right to use "ISSUES" apart from the mark as shown.

*See In re Owatonna Tool Co.*, 231 USPQ 493 (Comm'r Pats. 1983).

/Cimmerian Coleman/
Examining Attorney
Law Office 102
571-272-9146
Fax: 571-273-9102

**RESPOND TO THIS ACTION:** If there are any questions about the Office action, please contact the assigned examining attorney. A response to this Office action should be filed using the form available at http://www.uspto.gov/teas/eTEASpageD.htm. If notification of this Office action was received via e-mail, no response using this form may be filed for 72 hours after receipt of the notification. **Do not attempt to respond by e-mail as the USPTO does not accept e-mailed responses.**

If responding by paper mail, please include the following information: the application serial number, the mark, the filing date and the name, title/position, telephone number and e-mail address of the person signing the response. Please use the following address: Commissioner for Trademarks, P.O. Box 1451, Alexandria, VA 22313-1451.

**STATUS CHECK:** Check the status of the application at least once every six months from the initial filing date using the USPTO Trademark Applications and Registrations Retrieval (TARR) online system at http://tarr.uspto.gov. When conducting an online status check, print and maintain a copy of the complete TARR screen. If the status of your application has not changed for more than six months, please contact the assigned examining attorney.

---

[1]*The American Heritage® Dictionary of the English Language, Third Edition* copyright © 1992 by Houghton Mifflin Company. Electronic version licensed from INSO Corporation; further reproduction and distribution restricted in accordance with the Copyright Law of the United States. All rights reserved.

TDR Home

This document may be displayed as a PDF file containing images without text. You may view online or save the entire document by clicking on the file download icon in the upper right corner of this page. [required PDF viewer]
FAQ: Are you seeing only the first page of this PDF document?

*If you need help:*

- **General trademark information:** Please e-mail *TrademarkAssistanceCenter@uspto.gov*, or *telephone either 571-272-9250 or 1-800-786-9199.*

- *Technical help: For instructions on how to use TDR, or help in resolving **technical** glitches, please e-mail TDR@uspto.gov. If outside of the normal business hours of the USPTO, please e-mail Electronic Business Support, or call 1-800-786-9199.*
- ***Questions about USPTO programs**: Please e-mail USPTO Contact Center (UCC).*

*NOTE: Within any e-mail, please include your telephone number so we can talk to you directly, if necessary. Also, include the relevant serial number or registration number, if existing.*

# EXHIBIT E



Document Description: **Response to Office Action**     Mail / Create Date: **04-Jan-2008**

PTO Form 1957 (Rev 9/2005)
OMB No. 0651-0050 (Exp. 04/2009)

# Response to Office Action

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 77257033 |
| **LAW OFFICE ASSIGNED** | LAW OFFICE 102 |
| **MARK SECTION (no change)** | |
| **GOODS AND/OR SERVICES SECTION (current)** | |
| **INTERNATIONAL CLASS** | 035 |
| **DESCRIPTION** | Promoting political and public policy issues |
| **FILING BASIS** | Section 1(b) |
| **GOODS AND/OR SERVICES SECTION (proposed)** | |
| **INTERNATIONAL CLASS** | 035 |
| **DESCRIPTION** | |
| Promoting public awareness of issues in the field of politics and public policy | |
| **FILING BASIS** | Section 1(b) |
| **ADDITIONAL STATEMENTS SECTION** | |
| **DISCLAIMER** | "No claim is made to the exclusive right to use ISSUES apart from the mark as shown." |
| **MISCELLANEOUS STATEMENT** | In this Office Action, the Examiner has required further clarification of certain wording in the recitation of services in Class 35. Applicant has amended the recitation of services in accordance with the Examining Attorney's helpful suggestions, and the services, as amended, are within the scope of services listed in the original application. See 37 C.F.R. Section 2.71(b). Accordingly, the amended recitation of services should now be acceptable for purposes of registration. |
| **SIGNATURE SECTION** | |

| DECLARATION SIGNATURE | The filing Attorney has elected not to submit the signed declaration, believing no supporting declaration is required under the *Trademark Rules of Practice.* |
| --- | --- |
| RESPONSE SIGNATURE | /norm j. rich/ |
| SIGNATORY'S NAME | Norm J. Rich |
| SIGNATORY'S POSITION | Attorney for Applicant |
| DATE SIGNED | 01/04/2008 |
| AUTHORIZED SIGNATORY | YES |
| FILING INFORMATION SECTION | |
| SUBMIT DATE | Fri Jan 04 10:54:02 EST 2008 |
| TEAS STAMP | USPTO/ROA-204.87.63.254-2 0080104105402089289-77257 033-4109bc0aec4f0d8e03859 5ca7f286e82db1-N/A-N/A-20 080104105241996873 |

PTO Form 1957 (Rev 9/2005)
OMB No. 0651-0050 (Exp. 04/2009)

## Response to Office Action

## To the Commissioner for Trademarks:

Application serial no. **77257033** has been amended as follows:

## CLASSIFICATION AND LISTING OF GOODS/SERVICES
**Applicant proposes to amend the following class of goods/services in the application:**
**Current:** Class 035 for Promoting political and public policy issues
Original Filing Basis:
**Filing Basis: Section 1(b), Intent to Use:** The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services as of the filing date of the application. (15 U.S.C. Section 1051(b)).

**Proposed:** Class 035 for Promoting public awareness of issues in the field of politics and public policy
**Filing Basis: Section 1(b), Intent to Use:** The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services as of the filing date of the application. (15 U.S.C. Section 1051(b)).

## ADDITIONAL STATEMENTS
**Disclaimer**
"No claim is made to the exclusive right to use ISSUES apart from the mark as shown."

In this Office Action, the Examiner has required further clarification of certain wording in the recitation of services in Class 35. Applicant has amended the recitation of services in accordance with the Examining Attorney's helpful suggestions, and the services, as amended, are within the scope of services listed in the original application. See 37 C.F.R. Section 2.71(b). Accordingly, the amended recitation of services should now be acceptable for purposes of registration.

**SIGNATURE(S)**
**Declaration Signature**
I hereby elect to bypass the submission of a signed declaration, because I believe a declaration is not required by the rules of practice. I understand that the examining attorney could still, upon later review, require a signed declaration.
**Response Signature**
Signature: /norm j. rich/     Date: 01/04/2008
Signatory's Name: Norm J. Rich
Signatory's Position: Attorney for Applicant

The signatory has confirmed that he/she is an attorney who is a member in good standing of the bar of the highest court of a U.S. state, which includes the District of Columbia, Puerto Rico, and other federal territories and possessions; and he/she is currently the applicant's attorney or an associate thereof; and to the best of his/her knowledge, if prior to his/her appointment another U.S. attorney or a Canadian attorney/agent not currently associated with his/her company/firm previously represented the applicant in this matter: (1) the applicant has filed or is concurrently filing a signed revocation of or substitute power of attorney with the USPTO; (2) the USPTO has granted the request of the prior representative to withdraw; (3) the applicant has filed a power of attorney appointing him/her in this matter; or (4) the applicant's appointed U.S. attorney or Canadian attorney/agent has filed a power of attorney appointing him/her as an associate attorney in this matter.

Serial Number: 77257033
Internet Transmission Date: Fri Jan 04 10:54:02 EST 2008
TEAS Stamp: USPTO/ROA-204.87.63.254-2008010410540208
9289-77257033-4109bc0aec4f0d8e038595ca7f
286e82db1-N/A-N/A-20080104105241996873

TDR Home

This document may be displayed as a PDF file containing images without text. You may view online or save the entire document by clicking on the file download icon in the upper right corner of this page.
[required PDF viewer]
FAQ: Are you seeing only the first page of this PDF document?

*If you need help:*

- **General trademark information**: *Please e-mail TrademarkAssistanceCenter@uspto.gov, or telephone either 571-272-9250 or 1-800-786-9199.*
- **Technical help**: *For instructions on how to use TDR, or help in resolving **technical** glitches, please e-mail TDR@uspto.gov. If outside of the normal business hours of the USPTO, please e-mail*

*Electronic Business Support,* or call *1-800-786-9199.*
- **Questions about USPTO programs**: *Please e-mail* *USPTO Contact Center (UCC).*

**NOTE**: *Within any e-mail, please include your telephone number so we can talk to you directly, if necessary. Also, include the relevant serial number or registration number, if existing.*

# EXHIBIT F



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Sat Jan 12 04:04:42 EST 2008*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | | NEXT LIST | BOTTOM | HELP |

Logout | *Please logout when you are done to release system resources allocated for you.*

Start | List At: [        ]  OR  Jump | to record: [        ]  **109 Records(s) found (This page: 1 ~ 50)**

Refine Search [(live)[LD] AND  (Common Sense)[COMB]]   Submit

**Current Search: S1: (live)[LD] AND (Common Sense)[COMB] docs: 109 occ: 628**

| | Serial Number | Reg. Number | Word Mark | Check Status | Live/Dead |
|---|---|---|---|---|---|
| 1 | 79010065 | 3104170 | COMMONSENSE | TARR | LIVE |
| 2 | 78936890 | | COMMONCENTS | TARR | LIVE |
| 3 | 78869680 | | THE COMMON SENSE INSTITUTE | TARR | LIVE |
| 4 | 78811442 | 3357615 | YOUR BUSINESS COMMONSENSE GUIDE TO SUCCESS | TARR | LIVE |
| 5 | 78822530 | 3348292 | COMMON SENSE ADVISORS | TARR | LIVE |
| 6 | 78753673 | | COMMON SENSE FOR UNCOMMON LOANS | TARR | LIVE |
| 7 | 78860270 | 3255538 | APPLIED COMMON SENSE | TARR | LIVE |
| 8 | 78629453 | 3290335 | THE COMMON SENSE WAY TO BUY INDUSTRIAL CONTROLS | TARR | LIVE |
| 9 | 78922252 | | COMMON SENSE REVOLUTION | TARR | LIVE |
| 10 | 78881124 | | COMMON SENSE UNCOMMON RESULTS | TARR | LIVE |
| 11 | 78858133 | | COMMON SENSE | TARR | LIVE |
| 12 | 78858124 | | USE COMMON SENSE | TARR | LIVE |
| 13 | 78949062 | | COMMON SENSE, ORGANIZED | TARR | LIVE |
| 14 | 78887807 | 3247012 | COMMON SENSE SOLUTIONS, LLC | TARR | LIVE |
| 15 | 78931638 | 3242252 | UNCOMMON INSIGHT. COMMON SENSE. | TARR | LIVE |
| 16 | 78895593 | | DOORAMP INNOVATION OR COMMONSENSE | TARR | LIVE |
| 17 | 78663750 | 3106666 | FOSTERING COMMON SENSE DISPUTE RESOLUTION WORLDWIDE | TARR | LIVE |
| 18 | 78389532 | 3353234 | COMMON SENSE MEDIA | TARR | LIVE |
| 19 | 78472844 | | COMMON SENSE FOR THE COMMON GOOD | TARR | LIVE |
| 20 | 78443984 | 3147519 | GLOBALPOPS YOUR COMMON-SENSE CARIER | TARR | LIVE |
| 21 | 78399934 | 2986527 | ADVANCED-COMMON-SENSE | TARR | LIVE |
| 22 | 78399465 | 3197308 | COMMON GOOD RESTORING COMMON SENSE TO AMERICAN LAW | TARR | LIVE |

| 23 | 78342197 | 3165964 | TINO | TARR | LIVE |
|----|----------|---------|------|------|------|
| 24 | 78219112 | 2886314 | COMMON SENSE. UNCOMMON SOLUTIONS. | TARR | LIVE |
| 25 | 78381476 | 2974587 | COMMON SENSE PLANNING WITH UNCOMMON RESULTS | TARR | LIVE |
| 26 | 78378806 | 2974571 | AMERICA'S COMMON SENSE LENDER | TARR | LIVE |
| 27 | 78357218 | | COMMONSENSE | TARR | LIVE |
| 28 | 78333773 | 2914651 | THE COMMON SENSE FARM | TARR | LIVE |
| 29 | 78275959 | 2984987 | COMMON SENSE UNCOMMON INDEPENDENCE | TARR | LIVE |
| 30 | 78275949 | 2987191 | COMMON SENSE UNCOMMON EXPERIENCE | TARR | LIVE |
| 31 | 78275593 | 2975689 | COMMON SENSE UNCOMMON CONTINUITY | TARR | LIVE |
| 32 | 78246707 | 2899547 | CHURCH&MAIN, INC. UNCOMMON CREATIVITY AND COMMON SENSE | TARR | LIVE |
| 33 | 78246697 | 2891256 | UNCOMMON CREATIVITY AND COMMON SENSE | TARR | LIVE |
| 34 | 78239707 | 2973224 | COMMON SENSE MEDIA | TARR | LIVE |
| 35 | 78158335 | 2786399 | COMMON SENSE MEDICINE | TARR | LIVE |
| 36 | 78105416 | 2846426 | COMMON SENSE MONEY - FINANCIAL EDUCATION MADE SIMPLE | TARR | LIVE |
| 37 | 77257033 | | COMMON SENSE ISSUES | TARR | LIVE |
| 38 | 77361586 | | COMMON SENSE REASONING | TARR | LIVE |
| 39 | 77226347 | | CREATIVITY FROM COMMON SENSE | TARR | LIVE |
| 40 | 77147310 | 3361619 | THE COMMUNITY STATE BANK "COMMON SENSE BANKING" | TARR | LIVE |
| 41 | 77280450 | | THE COMMON SENSE DIET | TARR | LIVE |
| 42 | 77217237 | | THE COMMON SENSE APPROACH TO MEDICARE | TARR | LIVE |
| 43 | 77107391 | | WHERE COMMON SENSE MEETS INNOVATION. | TARR | LIVE |
| 44 | 77336405 | | COMMON SENSE MATH TIPS, TRICKS & TOOLS FOR DEVELOPING NUMBER SENSE | TARR | LIVE |
| 45 | 77154872 | | SETTLEMENT BY COMMON SENSE | TARR | LIVE |
| 46 | 77304354 | | AMERICA'S COMMON SENSE REVOLUTION | TARR | LIVE |
| 47 | 77304343 | | COMMON SENSE REVOLUTION | TARR | LIVE |
| 48 | 77131739 | | COMMON CENTS | TARR | LIVE |
| 49 | 77264775 | | COMMON SENSE IDEAS FOR THRIVING AFTER 50 | TARR | LIVE |
| 50 | 77248605 | | COMMON SENSE | TARR | LIVE |

# EXHIBIT G



# State of Delaware
## The Official Website for the First State



Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & Local

State Directory | Help | Search Delaware [ GO ]                    Citizen Services | Business Services | Visitor

**Department of State: Division of Corporations**

Frequently Asked Questions    View Search Results

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
General Information
Status
Validate Certificate

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
UCC Searches
Taxes
Expedited Services
Service of Process
Registered Agents
Get Corporate Status
Submitting a Request

## Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | |
|---|---|---|
| File Number: | 4332532 | Incorporation Date / Formation Date: | 04/11/2007 (mm/dd/yyyy) |
| Entity Name: | COMMON SENSE ISSUES, INC. | | |
| Entity Kind: | CORPORATION | Entity Type: | NON-PROFIT OR RELIGI... |
| Residency: | DOMESTIC | State: | DE |

**REGISTERED AGENT INFORMATION**

Name:       **CORPORATION SERVICE COMPANY**

Address:    **2711 CENTERVILLE ROAD SUITE 400**

City:       **WILMINGTON**          County:    **NEW CASTLE**

State:      **DE**                  Postal Code: **19808**

Phone:      **(302)636-5401**

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status  ○ Status,Tax & History Information  [ Submit ]

[ Back to Entity Search ]

To contact a Delaware Online Agent click here.

site map  |  about this site  |  contact us  |  translate  |  delaware.gov

# EXHIBIT H

LEXSEE 1993 U.S. DIST. LEXIS 2191



Cited
As of: Jan 15, 2008

**POWERFOOD, INC., a California Corporation, Plaintiff, v. SPORTS SCIENCE INSTITUTE, a California Corporation, Defendant.**

**No. C-93-0259 MHP**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*1993 U.S. Dist. LEXIS 2191*

**February 24, 1993, Decided**
**February 24, 1993, Filed**

**SUBSEQUENT HISTORY:** [*1] As Amended March 11, 1993.

**JUDGES:** PATEL

**OPINION BY:** MARILYN HALL PATEL

**OPINION**

*AMENDED MEMORANDUM AND ORDER*

1 This Amended Memorandum and Order is issued solely by the purpose of correcting certain typographical errors in the court's Memorandum and Order of February 24, 1993. It supersedes and replaces that previous Memorandum and Order.

Plaintiff PowerFood, Inc. ("PowerFood") brought this action for trademark and trade dress infringement, unfair competition, false advertising, and injury to business reputation against defendant Sports Science Institute ("SSI") under federal law, California state law, and common law. The matter is now before the court on plaintiff's application for a preliminary injunction under Section 34(a) of the Lanham Act, *15 U.S.C. § 1116(a)*, to prevent defendant's infringement of plaintiff's federally registered trademark "POWERBAR." Having considered the submissions and arguments of the parties, and for the

reasons explained below, plaintiff's application for a preliminary [*2] injunction is hereby GRANTED.

*BACKGROUND*

The facts summarized in this section constitute the court's findings of fact pursuant to *Federal Rule of Civil Procedure 65(d)*. To the extent facts are included in the discussion portion of this order, they are also deemed the court's findings of fact.

Plaintiff PowerFood manufactures and markets nationally a high nutrition sports energy bar sold under the trademark "POWERBAR". The trademark POWERBAR was federally registered by PowerFood and assigned Registration Number 1,447,798 on July 14, 1987. Maxwell Dec. Ex. C. POWERBAR sports energy bars are marketed and sold to athletes and others interested in obtaining an energy boost from simple and complex carbohydrates, as well as supplementation of vitamins and minerals. *Id.* P 3. PowerFood has been conducting business and selling sports energy bars under the POWERBAR trademark and in a gold and red trade dress since 1986. *Id.* P 4. It developed the first sports energy bar and is recognized as a leader in the sports energy food industry, with an excellent reputation in the trade and among consumers. *Id.* P 10. In 1992, POWERBAR sales amounted to more than ten million dollars. [*3] *Id.*

PowerFood presently manufactures and sells only one product, POWERBAR. *Id.* P 8. PowerFood advertises and promotes POWERBAR in a variety of media, including magazines, billboards, radio and television, as well as sponsorship of sporting events and athletes. *Id.* P

9. In 1992, PowerFood invested more than two million dollars in the advertising and promotion of the POWER-BAR sports energy bar. *Id.*

Defendant SSI recently began manufacturing a sports energy bar sold under the trademark POWER-STICK. Young Dec. P 3. On November 18, 1991, SSI filed an application for registration of POWERSTICK, but this application has apparently not yet been approved by the Patent and Trademark Office. *See* Owen Dec. Exs. A & B. Apparently in late 1992, SSI produced a limited quantity of POWERSTICK for test marketing in a limited geographical area, apparently the San Francisco Bay Area. Maxwell Dec. P 13; Young Dec. P 3. SSI invested over $ 250,000 to bring POWERSTICK to this test market. Young Dec. P 7. SSI has at no time advertised POWERSTICK in the mass media, but SSI has promoted the product by means of fliers distributed along with it as well as by word of mouth. *Id.* P [*4] 10.

PowerFood filed this action after it learned that SSI was marketing a sports energy bar under the trademark POWERSTICK and in a gold (or copper) wrapper with redish letters which PowerFood alleged was substantially similar to PowerFood's trade dress for POWERBAR. PowerFood's trade dress is a gold nylar wrapper printed with red letters. *See* Complaint Ex. B; Maxwell Dec. Ex. A. Since this lawsuit was filed, SSI has changed its trade dress for POWERSTICK. It now plans to adopt a solid white paper with blue letters trimmed in red. *See* Young Dec. P 13 & Ex. A. It also plans to replace its former red and white display box, which had white printing with yellow and red highlights with a new box that is white with blue letters trimmed in red. *Id.* P 15 & Ex. B.

As a result of these changes, PowerFood concedes that SSI is no longer infringing PowerFood's trade dress, but nevertheless maintains that SSI's continued use of the trademark POWERSTICK is likely to cause confusion with PowerFood's registered trademark POWERBAR and should accordingly be preliminarily enjoined.

*LEGAL STANDARD*

In the Ninth Circuit, a party seeking a preliminary injunction must satisfy one [*5] of two tests.

Under the traditional test, a court may issue a preliminary injunction if it finds that:

> (1) the moving party will suffer irreparable injury if injunctive relief is not granted; (2) the moving party will probably prevail on the merits; (3) in balancing the equities, the non-moving party will not be harmed more than the moving party is helped by the injunction; and (4)

granting the injunction is in the public interest.

*National Wildlife Fed. v. Coston, 773 F.2d 1513, 1517 (9th Cir. 1985).*

A preliminary injunction may also be granted in this circuit when the moving party has shown "either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor." *Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987).* This test is a "continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." *Id.* (quoting *San Diego Comm. Against Registration and the Draft v. Governing Board of Grossmont Union High School Dist., 790 F.2d 1471, 1473 n.3 (9th Cir. 1986)).* [*6] To overcome a weak showing of meritoriousness, a plaintiff seeking a preliminary injunction must make a very strong showing that the balance of hardships is in its favor. *Rodeo Collection, 812 F.2d at 1217.*

*DISCUSSION*

Federal courts may grant injunctions to prevent infringement of a registered trademark "according to the principles of equity and upon such terms as the court may deem reasonable." *15 U.S.C. § 1116(a).* Applying the Ninth Circuit's continuum test, as explained below, the court finds that PowerFood raises serious questions that SSI is presently infringing its POWERBAR trademark and further finds that the balance of hardships tips sharply in PowerFood's favor. Accordingly, PowerFood's application for a preliminary injunction should be granted.

*I. Likelihood of Success on the Merits*

To prevail in a trademark infringement action, the plaintiff must establish that it has a valid, protectable trademark and that the defendant's use of the same or a similar mark is likely to cause confusion, mistake or deception. *15 U.S.C. § 1114(1)* (Lanham Act § 32(1)); *New West Corp. v. NYM Co. of California, Inc., 595 F.2d 1194 (9th Cir. 1979).* [*7]

*A. Valid and Protectable Trademark*

PowerFood owns federal trademark number 1,447,798 on POWERBAR for grain-based food bars. This registration is "prima facie evidence of the validity of the registration, registrant's ownership of the mark, and of registrant's exclusive right to use the mark in commerce." *15 U.S.C. § 1057(b); Charles Schwab & Co., Inc. v. Hibernia Bank, 665 F. Supp. 800, 803 (N.D. Cal. 1987).*

SSI does not challenge PowerFood's right to use its registered POWERBAR trademark in commerce. In addition, PowerFood argues that its right to use the POWERBAR trademark has become "incontestable" due to its continuous use of the mark in commerce since July 14, 1987. *See 15 U.S.C. § 1065* (providing that right of registrant to use a mark becomes "incontestable" after five consecutive years of use, upon certain conditions); *15 U.S.C. § 1115(b)* (where use has become incontestable under *15 U.S.C. § 1065*, registration is "conclusive evidence" of the registrant's "exclusive right to use" the mark). **[*8]** ² Therefore, the court finds that POWERBAR is a valid and protectable trademark.

> 2   While PowerFood's submissions show that it has used the POWERBAR mark continuously since 1987, PowerFood has not made any showing that it has otherwise complied with the requirements of *Section 1065*. *See, e.g., 15 U.S.C. § 1065(3)* (requiring filing of affidavit within one year after the expiration of the five year statutory continuous use period). Nevertheless, there is nothing in the record that indicates that Power-Food's use of its mark since 1987 does not otherwise meet the requirements of *Section 1065*.

### B. *Likelihood of Confusion*

The Ninth Circuit has never articulated a specific or exclusive set of factors that a district court must apply in determining whether an alleged infringer's use of the same or a similar trademark is likely to cause confusion. *Eclipse Assoc. Ltd. v. Data General Corp., 894 F.2d 1114, 1118 (9th Cir. 1990)*. Instead, the Circuit **[*9]** has enumerated several non-exclusive factors that "are helpful in making the ultimate factual determination." *Id.*

In some cases, these factors have appeared in the form of a five-factor test, *see, e.g., Miss World (UK), Ltd. v. Mrs. America Pageants, 856 F.2d 1445 (9th Cir. 1988)*, and in others as a six-factor test, *see, e.g., Americana Trading, Inc. v. Russ Berrie & Co., 966 F.2d 1284 (9th Cir. 1992)*. However, for the sake of completeness, in evaluating PowerFood's application the court will consider all eight of the factors identified by the Ninth Circuit in *AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979)*. ³ These eight factors are:

   1. strength of the mark;

   2. similarity of the marks;

   3. proximity of the goods;

   4. marketing channels used;

   5. likelihood of expansion of the product lines;

   6. type of goods and the degree of care likely to be exercised by the purchaser;

   7. evidence of actual confusion; and

   8. defendant's intent in selecting the mark.

*Id.*

> 3   "There is no indication that the cases applying five or six factors were intended to undermine *Sleekcraft*, and eliminate consideration of the two or three *Sleekcraft* factors excluded in those cases." *Eclipse Assoc. Ltd., 894 F.2d at 1117 n.4.*

**[*10]** The court's primary task in considering these factors is to make the factual determination of whether the public is likely to be deceived or confused by the similarity of the trademarks as to source, relationship or sponsorship. *Eclipse Assoc. Ltd., 894 F.2d at 1118* (citing *Smith v. Chanel, Inc., 402 F.2d 562, 563 (9th Cir., 1968)*). It will consider each factor in turn.

### 1. *Strength of the mark*

The strength of a mark is defined as its tendency to identify a good or service with a particular source. *Rodeo Collection, 812 F.2d at 1217*. A mark's strength can be measured by determining in which of four categories it belongs, ranging from the least protectable to the most protectable: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful. *Id.; Sleekcraft, 599 F.2d at 349*. Generic marks are entitled to no protection at all. *Nutri/System, Inc. v. Con-Stan Industries, Inc., 809 F.2d 601, 605 (9th Cir. 1987)*. Descriptive marks are "weak" marks entitled to protection only if the holder can establish a "secondary **[*11]** meaning", that is, show that an association between the mark and the product has developed in consumers' minds. *Id.* Suggestive marks are also "weak" marks, but a holder will receive protection even without establishing secondary meaning, "if the infringing mark is quite similar and the goods or services they connote are closely related." *Id.* Fanciful or arbitrary marks, which are made up by the user, are "strong" in the sense that they are entitled to greatest protection because of their unique usage. *Alpha Industries v. Alpha Steel, Tube & Shapes, Inc., 616 F.2d 440, 445 (9th Cir. 1980)*.

To determine where a mark falls on the generic to fanciful, weak to strong, spectrum the Ninth Circuit applies the "imagination test" and the "need test". "The imagination test asks how much imagination a consumer must use to associate a given mark with the goods or

services it identifies." *Miss World, 856 F.2d at 1449*. The need test "asks to what extent a mark is needed by competitors to identify their goods or services." *Id.* The greater the imagination quotient of a mark, and the lesser its need quotient, the more fanciful [*12] or arbitrary a mark is; the more it is entitled to protection. Conversely, the greater the mark's need quotient and the lesser its imagination quotient, the less it is entitled to protection.

Applying these considerations to PowerFood's POWERBAR trademark, the court finds that it is a suggestive or "weak" mark. Plaintiff asserts that the mark does "almost nothing" to suggest a high energy food product and is therefore entitled to protection as a "strong" mark. This contention is plainly wrong. The word "power," while it cannot be said to explicitly "describe" the ingredients or qualities of the bar, does suggest the expected result of consuming the bar, that is, an increase in "power". It does not take a great deal of imagination to deduce that a POWERBAR is, in Power-Food's own description of its product, a "energy bar [providing] . . . an energy boost . . . as well as . . . essential vitamins and minerals." Complaint P 4.

Finding that POWERBAR is a "weak" suggestive mark does not mean that it is not entitled to any protection. A suggestive mark such as POWERBAR is entitled to protection without a showing that it has a secondary meaning where the disputed marks are quite similar, [*13] and the goods closely related. *Nutri/System, 809 F.2d at 605; Sleekcraft, 599 F.2d at 350*. As the court explains below, it is undisputed that the goods involved in this action are closely related and PowerFood raises, at the least, serious questions that the disputed marks are quite similar.

Moreover, as a federally registered trademark, POWERBAR is "'presumed to be distinctive and should be afforded the utmost protection.'" *Americana Trading, Inc., 966 F.2d at 1287 (quoting Lois Sportswear, U.S.A., Inc. v. Levi-Strauss & Co., 799 F.2d 867, 871 (2d Cir. 1986)); E & J. Gallo Winery v. Consorzio Del Gallo Nero, 782 F. Supp. 457, 462 (N.D. Cal. 1991)*. This presumption is rebuttable. *See, e.g., Americana Trading, Inc., 966 F.2d at 1287* (defendant wishing to assert that registered descriptive trade mark was weak could do so by showing that secondary meaning had not attached). But SSI has failed to rebut it.

PowerFood's infringement claim is not based on SSI's use of the entire POWERBAR trademark, but [*14] rather, on SSI's use of POWERBAR's 'dominant' portion", [4] the word POWER. Thus, SSI is entitled to rebut any presumption of distinctiveness which may attach to the dominant term POWER by virtue of POWERBAR's federal registration. *See, e.g., Alpha, 616 F.2d at 445-46* (widespread usage of term Alpha as a trademark renders

it weak). To that end, SSI has submitted a printout of the trademark research that it did in connection with its adoption of the POWERSTICK trademark. Young Ex. C. This printout reveals numerous uses of POWER as a dominant term to describe products in the same trademark classification as POWERBAR and which appear to be substantially similar or related to POWERBAR. [5]

4    The dominant portion of a trademark is the term that buyers are more likely to remember and use as indicating the origins of the goods. 2 J. Thomas McCarthy, *Trademarks and Unfair Competition*, § 23:15 C at 85 (2d Ed. 1984).

5    SSI's research shows that POWERBAR is registered as the trademark for a "grain based food bar." The similar or related products for which other manufacturers are either applying for or have registered trademarks include POWER BREAK (a pending registration for "ready to eat cereal based and fruit juice sweetened food bars"); POWER-PLUS (a registered trademark for a "high protein energy food manufactured as a confectionery product in bar form"); M POWER MEALS (a registered trademark for a "low-fat grain-based food bar"); MEGA-POWER (a pending registration for "multi-grain based snack bars"); E POWER (a registered trademark for a "vitamin-enriched candy bar"; the E is disclaimed); and POWER SNACK (a registered trademark for a "natural food-snack made of seeds, raisins and roasted and unroasted nuts"). Young Dec. Ex. C.

PowerFood vigorously objects that "evidence of other unrelated infringers is irrelevant to claims of trademark infringement." *Eclipse, 894 F.2d at 1119*. However, the uses of the term POWER proffered by SSI are for food products related, if not substantially the same as POWER-BAR. *E.g.*, M POWER MEALS and MEGA POWER. The evidence of related uses before the court is easily distinguished from the evidence of unrelated uses rejected in other cases. *See, e.g., Eclipse, 894 F.2d at 1119* (evidence of marks used for floor cleaning products, commercial laundry folding equipment, and hearing equipment irrelevant in infringement case involving computer products).

[*15] However, SSI bears the burden of producing evidence of *actual* widespread usage of the term POWER in the relevant market that is more substantial than a mere printout of trademark registrations and applications. *See, e.g., Charles Schwab & Co., 665 F. Supp. at 806* (mere citation of registrations is not proof

of third party uses for showing a crowded field and relative weakness of the mark; defendant has burden of showing how extensive the uses are and how long they have continued); *see also Scarves by Vera, Inc. v. Todo Imports Ltd., 544 F.2d 1167, 1173 (2d Cir. 1976)*; 1 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 11:26 at 514 (2d Ed. 1984). It has not met that burden. Therefore, SSI's citation of the various other uses of the term POWER in related registrations does not defeat the presumption of distinctiveness and entitlement to protection created by POWERBAR's federal registration.

PowerFood also provides evidence that it spent some two million dollars in 1992 in advertising POWERBAR in various media and by sponsoring athletes and sporting events. *See Maxwell Dec.* P 9 & Ex. B. Consumer recognition [*16] of a mark made known through advertising may increase the amount of protection afforded it. 1 McCarthy § 11:9 at 453-57. But it does not mean that a weak suggestive mark thereby becomes strong and arbitrary. *Nutri/System, 809 F.2d at 605; Sleekcraft, 599 F.2d at 350.* Therefore, while PowerFood's advertising does not lead the court to conclude that POWERBAR is a strong mark, it does add further support to PowerFood's claim that it is entitled to substantial protection against infringement of its trademark.

Although POWERBAR is not a strong mark, POWERBAR's federal registration and PowerFood's advertising weigh in favor of protecting the POWERBAR trademark against infringement by SSI. Of course, the POWERBAR trademark is only entitled to protection if confusion appears likely after consideration of the remaining relevant factors. As will become apparent, analysis of the remaining factors shows that there is at minimum a serious question raised that confusion of POWERSTICK with POWERBAR is likely.

*2. Similarity of the mark*

The similarity of trademarks for purposes of trademark infringement claims is tested on three [*17] levels, by the trilogy of sight, sound and meaning. *Sleekcraft, 599 F.2d at 351; see also Nutri System, 809 F.2d at 605.* In this case, it is undisputed that the products involved are quite similar and that they are in direct competition. Where goods are directly competitive, the degree of similarity of marks needed to give rise to a likelihood of confusion is less than in the case of dissimilar goods. 2 McCarthy § 24:2 at 181. In addition, goods which are reasonably interchangeable by buyers for the same purposes need not be as similar to result in a finding of likelihood of confusion. *United States v. E.I. Dupont de Nemours & Co., 351 U.S. 377 (1956).* Similarity between marks is to be weighed more heavily than difference. *Sleekcraft, 599 F.2d at 351.*

SSI's key argument in opposition to PowerFood's application for a preliminary injunction is that because SSI has changed its trade dress for POWERSTICK, the marks are no longer similar when viewed in their entirety. It is true that determination of similarity involves consideration of the marks "in their entirety [*18] and as they appear in the marketplace." *Alpha, 616 F.2d at 444; Nutri-System, 809 F.2d at 605-06.* Packaging is certainly a factor in the overall appearance of a mark in the marketplace. However, taking into consideration all three prongs of the sight, sound and meaning trilogy, and weighing similarities more heavily than differences, the court finds that the disputed marks are substantially similar.

With respect to "sight" or appearance, "trademarks cannot be isolated from the labels on which they appear." 2 McCarthy § 23:18 at 102 (quoting *Sun-Maid Raisin Growers v. Sunaid Food Products, Inc., 356 F.2d 467 (5th Cir. 1966)).* Although it is inappropriate to equate the inquiry into similarity with the overall inquiry of whether marks are confusingly similar, *Sleekcraft, 599 F.2d at 350,* it is appropriate for a court to consider the overall packaging in which marks are presented on the market in deciding the issue of similarity. *Lindy Pen Co., Inc. v. Bic Pen Corp., 725 F.2d 1240, 1245 (9th Cir. 1984).* Therefore, the parties' trade [*19] dress or packaging is not irrelevant to the issue of similarity.

The record shows that plaintiff's mark as it appears in commerce is one word "PowerBar", with no space between "Power" and "Bar". The "P" and "B" are capitalized; the other letters are in lower case. Four horizontal lines cross the "PowerBar" name. *See Maxwell Dec. Ex's A & B.* PowerFood's trade dress for POWERBAR consists of two items: the product wrapper and the display box used at the point of sale to consumers. *See Complaint Ex. B.* The product wrapper is a high-gloss gold colored nylar wrapper; the "Malt-Nut" flavored POWERBAR features bright red print. The display box is maroon with yellow lettering. The shape of the product wrapper is flat and wide. Pictures of POWERBAR in its distinctive wrapper appear in all of the print advertising submitted to the court by PowerFood. *See Complaint Ex. C; Maxwell Dec. Ex. B.*

On the other hand, SSI's mark appears on the market as "POWER STICK" in two words, with a lightning bolt between the two words. All letters are uppercase. SSI formerly utilized a flat bronze or gold-colored paper with red print. *Complaint Ex. D.* Since this action was filed, SSI has changed [*20] its packaging to a solid white wrapper with blue letters trimmed in red. *See Young Dec. Ex. A.* SSI formerly used a red and white display box with white print and yellow and red highlights. This display box has been discontinued and will be replaced with a white display box with blue letters trimmed in red.

*See* Young Dec. Ex. B. The shape of SSI's wrapper is round and cylindrical.

However, in both *Sleekcraft* and *Lindy* the Ninth Circuit held that the packaging element which renders marks dissimilar is the appearance of conspicuous "house marks", or producer names, on the labels. *See Lindy, 725 F.2d at 1245 n. 4* (finding conspicuous house marks or logos, in comparison to which the disputed trademarks were inconspicuous); *Sleekcraft, 599 F.2d at 351* (noting that a conspicuous house mark and distinctive logo could reduce the likelihood of confusion, but concluding that the effect was negligible where the housemark was inconspicuous and the logo often absent). No conspicuous house marks or logos are present on the packaging before the court. The producers' names, PowerFood and SSI appear on the product wrappers [*21] only in much smaller print than the actual trademarks. See Complaint Exs. B & D. In the case of POWERSTICK, SSI's name and address appear on the back of the wrapper at the end of the list of ingredients. Complaint Ex. D. [6]

> 6   The court refers here to SSI's former packaging. However, because SSI has indicated only that it intends to change the *colors* of its trade dress, the court has no reason to believe that a more conspicuous house mark will be present in SSI's new trade dress.

With respect to the sound of the marks, PowerFood argues that POWERBAR and POWERSTICK sound substantially identical to the average consumer. The court must evaluate the marks in their entirety, but because POWER is the "dominant" or lead term in each mark, the overall aural effect of the marks considered in their entirety is more similar than it is different. Findings of aural and visual similarity are clearly warranted where the difference between marks amounts to only a couple of letters or to a small syllable. *See, e.g., Hillerich* [*22] *&. Bradsby Co. v. Palm Springs Golf Co., 215 U.S.P.Q. 680 (C.D. Cal. 1982)* (POWER BOLT held similar to POWER BILT); *see also Sleekcraft, 599 F.2d at 351* (SLEEKCRAFT held similar to SLICKCRAFT). However, the court finds that, despite the somewhat greater difference between POWERBAR and POWERSTICK, their overall aural effect remains similar due to their use of the same dominant term, POWER. *See, e.g., Rodeo Collection, 812 F.2d at 1219* (THE COLLECTION held similar to RODEO COLLECTION); *Specialty Brands, Inc. v. Coffee Bean Distributors, Inc., 748 F.2d 669, 673 (Fed. Cir. 1984)* (SPICE ISLANDS held similar to SPICE VALLEY).

Moreover, the "meaning" of the two marks is unquestionably substantially similar. First, they share the identical word POWER, connoting or suggesting "energy". In addition, the differing words BAR and STICK can both be used to refer to the product involved, a sports energy bar, interchangeably. SSI essentially admits this fact by freely referring to POWERSTICK as a "sports energy food *bar*" in its briefs. *See* SSI's Opposition Brief at [*23] 1 (emphasis added).

Despite an arguable difference in overall appearance, because of the similarity or near identity of the products involved, and the similarities in sound and meaning of the marks, the overall effect of the marks is more one of similarity than of difference. Thus, despite SSI's proposed change in packaging, the court finds that the trademarks remain substantially similar for purposes of consumer confusion.

### 3. *Proximity of the goods.*

Neither party has submitted evidence or argument on this factor. Therefore, the court disregards it.

### 4. *Marketing channels used.*

SSI does not dispute that it employs the same marketing channels to market POWERSTICK as PowerFood uses to market POWERBAR. This factor must accordingly be weighed in favor of PowerFood.

### 5. *Likelihood of expansion of the product lines.*

Where a strong possibility exists that either party may expand its business to compete with the other, courts are more likely to find infringement. *Sleekcraft, 599 F.2d at 354.* In this action, the parties are already in direct competition, marketing the same or a substantially similar product. Again, this factor weighs in favor [*24] of plaintiff.

### 6. *Type of goods and the degree of care likely to be exercised by the purchaser.*

PowerFood correctly states that since the standard to be applied is "the reasonably prudent buyer exercising ordinary caution," a determination of the likelihood of confusion must include consideration of the level of sophistication or care used by the average consumer in purchasing the goods of the parties. *Sleekcraft, 599 F.2d at 353.* Although the wholly indifferent consumer may be excluded, the standard includes "the ignorant and the credulous." *Id.* Because the goods offered by the parties in this action are relatively inexpensive, both retailing for less than two dollars, it is more likely than not that the typical customer does not exercise great care in his or her decision to purchase a particular health food bar product. *Id.* SSI does not appear to seriously dispute this fact. Thus, this factor also weighs in favor of plaintiff.

### 7. *Evidence of actual confusion.*

No evidence of actual confusion is necessary to support a finding of likelihood of confusion, but where evidence of confusion does exist, it is the best and most compelling [*25] evidence of an ongoing likelihood of confusion. *Rodeo Collection, 812 F.2d at 1219.* PowerFood has submitted three declarations in support of its contention that there is a likelihood of confusion between POWERBAR and POWERSTICK. *See* Kane Dec. PP 3-4; Schneckenberger Dec. PP 3-4; Maxwell Dec. P 17.

However, two of PowerFood's declarations are suspect because they appear to be self-serving documents from individuals associated with PowerFood in ways other than as average consumers of its product. SSI has objected that one of the declarants, Mr. Kane, is the boyfriend and business associate of a paid consultant of SSI, while the other, Mr. Schneckenberger, is a business associate or the employee of a business associate of plaintiff. Newman Dec. P 7. PowerFood correctly objects that these claims are based on hearsay (*see* the Newman Dec.). However, in the same breath, PowerFood admits that its declarants have "a passing familiarity with PowerFood," Reply Brief at 7, and that "it is not surprising that the evidence of confusion that has come to light comes from consumers who are familiar with PowerFood." *Id.* at 8. In addition, PowerFood's third [*26] declaration contains only hearsay as to actual confusion. *See* Maxwell Dec. P 17 (stating that "PowerFood has received numerous complaints" about POWERSTICK from confused customers).

PowerFood's "evidence" of actual confusion accordingly proves little or nothing. However, because evidence of actual confusion is not required, PowerFood's currently weak showing on this factor does not preclude a finding of likelihood of consumer confusion.

### 8. *Defendant's intent in selecting the mark.*

PowerFood also argues that SSI's selection of POWERSTICK as a trademark and of its original trade dress are evidence of wrongful intent. SSI has provided a declaration that it did not intend to imitate any product previously on the market and that its choice of colors for its trade dress was influenced by the colors of the San Francisco Forty Niners football team, not of POWERBAR. Young Dec. P 11.

The court notes that SSI's original trade dress colors do generally resemble the colors of the San Francisco Forty Niners. But they also resemble PowerFood's trade dress for POWERBAR. While SSI's willingness to change its trade dress colors when faced with a lawsuit may provide some evidence of good [*27] faith, its original choice of trade dress cannot be ignored by this court. This evidence of improper intent is by no means conclusive. Nevertheless, the court finds that SSI's original choice of a trade dress in the colors of gold (or copper) and red for POWERSTICK appears to be more than coincidence or the result of independent marketing research. Rather, it suggests that SSI may have improperly intended to imitate PowerFood's trademark.

Having considered the evidence in the record in light of the foregoing factors, the court concludes that PowerFood's submissions, at the very least, raise serious questions that SSI's use of the POWERSTICK trademark in commerce is likely to cause confusion, mistake or deception. *15 U.S.C. § 1114(1)* (Lanham Act § 32(1)). Since it is beyond dispute that PowerFood owns the valid and protectable trademark POWERBAR, it follows that PowerFood has also raised serious questions that it is likely to succeed on the overall merits of its trademark infringement claim against SSI.

### II. *Balance of Hardships*

Under the lower end of the Ninth Circuit's continuum test, because PowerFood has raised serious questions of [*28] a likelihood of success on the merits, if the balance of hardships tips sharply in its favor, injunctive relief should be granted. Applying this test, the court finds that the balance of hardships tips sufficiently in PowerFood's direction to justify the grant of a preliminary injunction.

SSI provides absolutely no argument as to the relative hardships it would suffer if this court granted PowerFood's application. However, at most, an injunction from this court would require SSI to change the trademark under which it plans to market its product. SSI already has plans to change its trade dress. While SSI has to date invested some $ 250,000 to bring its product to a test market, there is no evidence in the record that any substantial part of this investment is related to developing or promoting POWERSTICK as a trademark. As SSI admits, it has thus far employed the POWERSTICK trademark only for a short period of time within a very limited test market, and it has conducted no advertising other than by fliers and word of mouth within the test market area. Therefore, SSI has very little to lose from being enjoined to cease using POWERSTICK. Indeed, SSI admitted as much by conceding [*29] at oral argument that no bond need be posted by PowerFood upon issuance of a preliminary injunction.

PowerFood on the other hand, may suffer considerable hardship if this court denies it a preliminary injunction. The POWERBAR trademark is a valuable asset to PowerFood, representing over ten million dollars in sales last year alone and embodying millions of dollars of investment for advertising and promotion of the trademark and product nationally. Since 1986, PowerFood has worked to create a national market for an energy sports bar using the POWERBAR trademark and has become an industry leader. PowerFood has no control over the

quality of SSI's product; thus, if POWERSTICK is at all an inferior product, PowerFood's reputation is at risk to the extent that consumers may confuse POWERSTICK with POWERBAR. Further, PowerFood's investment of millions of dollars in advertising and promoting POWERBAR will be lost insofar as consumers confuse that mark and POWERSTICK. Finally, to the extent that there are serious questions that SSI's POWERSTICK mark may be confused with POWERBAR, PowerFood is presumed subject to a risk of irreparable injury. *See Apple Computer, Inc. v. Formula Int'l, Inc., 725 F.2d 521, 525-26 (9th Cir. 1984)* [*30] (upon a showing of likelihood of confusion irreparable injury is presumed).

For all of these reasons, the court has no doubt that the balance of hardships tips sharply in favor of Power-Food.

III. *Security*

The parties agreed at oral argument that no bond needs to be posted by PowerFood to serve as security for payment of any costs and damages to SSI which may wrongfully result from this court's preliminary injunction. *See Fed. R. Civ. P. 65(c).*

CONCLUSION

Therefore, for the reasons explained above, Power-Food's application for a preliminary injunction is hereby GRANTED.

IT IS HEREBY ORDERED that pending final resolution of this action, SSI, its officers, directors, servants, employees, attorneys, agents, representatives and distributors, and all other persons in active concert or participation with it, are restrained and enjoined from:

(1) using or displaying in any medium the mark POWERSTICK or any name or mark confusingly similar thereto; and

(2) distributing, selling or offering for sale any food product using the trademark POWERSTICK, or any name or mark confusingly similar thereto.

IT IS FURTHER ORDERED that pending final resolution of this action, SSI, its [*31] officers, directors, servants, employees, attorneys, agents, representatives and distributors, and all other persons in active concert or participation with it, shall cause all its products bearing the mark POWERSTICK to be removed from sale, including removal of products from wholesale and retail stores. SSI shall cause all such products to be removed from sale within ten (10) days of the entry of this order.

IT IS SO ORDERED.

Dated: MAR 11 1993

MARILYN HALL PATEL

United States District Judge

# EXHIBIT I

LEXSEE 2002 U.S. DIST. LEXIS 26232



Positive
As of: Jan 15, 2008

**METRO PUBLISHING, INC., Plaintiff, v. SURFMET, INC., dba SURFMETRO, INC., SURFMETRO MEDIA, SURFMETRO.COM, SURFMET.COM, and THE WAVE, Defendant.**

**No. C 02-01833 CW**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2002 U.S. Dist. LEXIS 26232; 66 U.S.P.Q.2D (BNA) 1134*

**July 3, 2002, Decided**

**SUBSEQUENT HISTORY:** Affirmed by *Metro Publ., Inc. v. Surfmet, Inc., 57 Fed. Appx. 733, 2003 U.S. App. LEXIS 1553 (9th Cir. Cal., Jan. 21, 2003)*

**DISPOSITION:** [*1] Metro's motion for a preliminary injunction GRANTED in part and DENIED in part.

**COUNSEL:** For Metro Publishing, Inc., Plaintiff: Duffy Carolan, Thomas R. Burke, Davis Wright Tremaine LLP, San Francisco, CA.

For Surfmet, Inc., Defendant: Lesley Barlow Gomes, Nicole M. Townsend, William F. Abrams, Pillsbury Winthrop LLP, Palo Alto, CA.

**JUDGES:** CLAUDIA WILKEN, United States District Judge.

**OPINION BY:** CLAUDIA WILKEN

**OPINION**

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Metro Publishing, Inc. (Metro) moves for a preliminary injunction to enjoin Defendant SurfMet, Inc. (Surfmetro) from using Metro's trademarks, METRO and METROACTIVE, and trade dress, pending final disposition of this action (Docket No. 10). Metro also seeks to enjoin Surfmetro from misleading advertisers or the public concerning whether SurfMetro's newspaper circula-

tion is audited, making untrue claims about SurfMetro's newspaper's circulation, and placing its newspapers in Metro's newsracks or otherwise interfering with the distribution of Metro's newspaper. [1] Surfmetro opposes the motion. [2] Having considered all of the papers filed by the parties and oral argument on the motion, Metro's motion for a preliminary [*2] injunction is GRANTED in part and DENIED in part. [3]

1    Plaintiff brings suit against Defendant for trademark infringement, trade dress, and unfair competition under both Federal and State law.

2    Both parties also request judicial notice of certain document submitted in conjunction with this motion (Docket Nos. 10 & 17). The requests are GRANTED, as the facts sought to be noticed are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Fed. R. Evid. 201(b).*

3    SurfMetro filed an unauthorized supplemental memorandum after hearing on this matter. See Local Rule 7-3(d). Although the filing was unauthorized, the Court has considered it along with the other papers filed by the parties and oral argument. It does not affect result.

BACKGROUND

Metro is a San Jose-based publishing company that owns several free weekly tabloid-format alternative news and entertainment papers, including [*3] Metro, which

Case 4:08-cv-00155-CW    Document 5-10    Filed 01/15/2008    Page 3 of 9

Page 2

2002 U.S. Dist. LEXIS 26232, *; 66 U.S.P.Q.2D (BNA) 1134

is distributed throughout Santa Clara County and the Silicon Valley, and in portions of San Francisco, San Mateo and Alameda counties. Metro has been published weekly since 1985, and is distributed from newsracks on sidewalks and in local businesses, schools and transportation hubs.

Metro has used the METRO mark, which appears in the upper, left side of the front cover of every edition of Metro, as a trademark for its publication since 1985, and has held a State trademark registration for METRO under class 16 for newspapers since July, 1991. Pulcrano Ex. B. The METRO mark appears in 127 point font size black-lined white letters against and within a red rectangular backdrop. Id. Ex. C. Below the word "Metro" on the cover is the phrase "Silicon Valley's Weekly Newspaper" in black letters against a yellow backdrop. Since 1994, Metro has also used the METRO mark in association with a second Metro publication, Metro Santa Cruz, a free weekly tabloid-format alternative news and entertainment paper.

In 1995, Metro launched the web-based component of its business, an online entertainment site called metroactive.com. The metroactive.com site contains the word [*4] "metroACTIVE" displayed over a rectangular block of red, yellow and purple squares (the METROACTIVE mark). See Ferguson Ex. B. The METRO mark, as it appears on the cover of Metro, appears on certain pages of metroactive.com that refer to the print newspaper. Metro holds a federal service mark for online computer services in class 42 for the METROACTIVE mark, which was registered January 25, 2000 with a first use in commerce date of October 5, 1995. Pulcrano Ex. E. Also in 1995, Metro registered the domain name metroactive.com with a database now managed by Network Solutions, Inc. Pulcrano Ex. G.

Metro filed two federal trademark registration applications for "Metro" in 1996, one in class 16 for newspapers and the other for a service mark for on-line electronic communication service, both of which have since been abandoned. SurfMetro Request for Judicial Notice, Exs. A, D. The "Metro" trademark application in class 16 for newspapers was initially rejected by the United States Patent and Trademark Office (PTO), apparently because of its confusing similarity to the registered mark METROEXTRA. In a letter to the PTO, Metro's counsel argued that there was no likelihood of confusion [*5] with METROEXTRA because, among other things, the common term in the proposed METRO mark and the METROEXTRA mark, "METRO," was weak, and therefore confusion is unlikely to occur. See id. Ex. F. Metro's counsel also pointed out the coexistence of various "metro" marks used by different publications. See id. In a later letter to the PTO, Metro's counsel noted that the PTO examiner apparently withdrew an earlier objection

that the proposed METRO mark is merely descriptive, in light of evidence of acquired distinctiveness. See Carolan Decl. II Ex. 1.

Metro has promoted and marketed its newspaper and METRO mark extensively over the years, sponsoring events such as Metro's Music in the Park and Metro Fountain Blues Festival, and advertising in such venues as the Imax Theater at the Tech Museum of Innovation in downtown San Jose, the San Jose Arena (home of the National Hockey League San Jose Sharks), the Sybase Tennis Tournament, and the stadium of the minor league baseball team San Jose Giants. See generally Cohen Decl.

SurfMet, Inc. is a California corporation doing business as SurfMetro (as well as SurfMetro, Inc. and SurfMetro Media). See, e.g., Carolan Ex. K. SurfMetro [*6] is a San Jose-based company that publishes The Wave, a free bi-weekly tabloid-format entertainment newspaper distributed through newsracks and local businesses in the Silicon Valley, Santa Clara County, Santa Cruz and the San Francisco Peninsula. Surfmet, Inc. was founded in August, 1999, and SurfMetro began publishing The Wave in July, 2001. SurfMetro's founder claims that the idea for SurfMetro, a "locals only resource guide for the surf generation," was conceived in Des Moines, Iowa in 1994, and a business plan was developed in 1998 and 1999. Brafford Decl. PP 2-3. For the first three issues The Wave was published monthly, but it is now published bi-weekly.

The Wave, like Metro, is a tabloid-format newspaper, in that it has a vertical fold on the left. Compare Pulcrano Ex. C with Townsend Ex. A. However, The Wave is "stitched and trimmed," meaning that it has staples in the vertical fold to hold the pages together, and it does not have a jagged edge on the right, top and bottom. Images on the cover of The Wave run to the edge of the page, while Metro has a black border on the edge of the page. The cover of The Wave displays a logo that [*7] reads "The Wave" in 137 point modified Fink Condensed font (a more whimsical and less plain font than that used in the METRO mark) black-lined white letters, displayed in front of and extending above and below the edges of a horizontal red surfboard shape (THE WAVE mark).

Metro's newsracks for Metro are red with white, black and yellow lettering, while SurfMetro's newsracks for The Wave are turquoise blue with white, red and black lettering. Kearns Ex. E.

SurfMetro also hosts a web-based entertainment site associated with The Wave, located at surfmetro.com and surfmet.com (and previously at metrosurf.com as well), which was launched in early to mid-2001, prior to the first publication of The Wave. Prior to the launch of surfmetro.com, for a few months in 2000 SurfMetro pro-

2002 U.S. Dist. LEXIS 26232, *; 66 U.S.P.Q.2D (BNA) 1134

duced a similar website called surfmet.com, which had a very different appearance than the current surfmetro.com site. Carolan Ex. D. The surfmetro.com website contains a logo that is identical to The Wave's cover logo, except that it reads "SurfMetro" (the SURFMETRO mark). The term "SurfMetro" is used throughout the website, and though archived versions of the website used the word "Metro" alone, [*8] this appears no longer to be the case. See, e.g., Carolan Exs. E, T, U, V. The domain name surfmetro.com was registered with Network Solutions in December, 1998. Carolan Ex. B. When surfmetro.com first launched, it advertised in a few issues of Metro, before Metro objected to the advertisements because of their use of the term "SurfMetro" and canceled the account. Considine Decl. PP 5-8; Pulcrano Decl. P 24.

The first issue of The Wave contained "www.surfmetro.com" in large caps below the title on the cover page, but this is no longer the case, due to an agreement between SurfMetro's President and Metro's CEO that it would be removed from the cover. See Carolan Exs. F, G; Considine Decl. P 13. However, the word "SurfMetro" and "www.surfmetro.com" are used throughout The Wave: on the table of contents page, on the top border of every page, and in advertisements to post a classified advertisement, subscribe to, or work for The Wave. See Townsend Ex. A; Carolan Exs. M--R. Further, SurfMetro's business cards and fax cover sheets, for example, prominently display the SURFMETRO mark and/or "SurfMetro Media," either in conjunction with THE WAVE mark or without it. [*9] See, e.g., Carolan Exs. K, L. Advertisements for The Wave and related promotions often contain the SURFMETRO mark in equal placement as THE WAVE mark. See, e.g., id. Exs. E, F, K, N-R. The Wave's newsracks, company vans, billboards and promotional materials also contain the SURFMETRO mark and/or www.surfmetro.com. See Kearns Ex. A, D; Carolan Exs. N, O.

The Wave and Metro, as well as their online counterparts, contain similar substance: entertainment and event listings and related articles. SurfMetro contends that it does not produce feature articles and is therefore simply an entertainment guide, while Metro's publications are alternative newspapers with substantive articles. However, this difference is not immediately apparent upon a review of the newspapers and websites.

Metro has presented evidence that advertisers, club promoters, readers and job applicants have expressed confusion about SurfMetro, surfmetro.com and The Wave's relationship to Metro, believing that surfmetro.com is the online version of Metro, or that The Wave is a Metro newspaper. See Anderson Decl. PP 5-7 (advertiser expressed opinion that The Wave was pub-

lished by Metro [*10] and that surfmetro.com is on-line version of Metro); Brown Decl.

P 2 (job applicant for Metro design position believed surfmetro.com was Metro's website); Buquet Decl. PP 2-6, 10 (Metro employee, prior to employment, thought The Wave was published by Metro and resembled Metro, and that SurfMetro and Metro were associated; spoke with graphics consultant who believed The Wave to be a new Metro paper); Carrico Decl. PP 3-4 (club promoter asked Metro employee if SurfMetro affiliated with Metro, and said SurfMetro representatives stated they were part of Metro); Dworak Decl. P 4 (reader thought The Wave was a Metro publication because of overall look); Hanson Decl. P 2 (advertiser thought The Wave looked almost exactly like Metro in use of colors and how paper's name presented, associated SurfMetro with Metro, and believed that The Wave was affiliated with Metro and advertising in both newspapers would be combined in one bill); Larson Decl. PP 2-3 (readers expressed belief that The Wave was affiliated with Metro or published by Metro); Pulcrano Decl. PP 29-30; Smith Decl. PP 2-3 (callers asking whether The Wave a Metro publication; advertiser [*11] upset because advertisement bought through Metro not on surfmetro.com website); Spicer Decl. PP 2-3 (advertiser thought Metro and The Wave were affiliated); Trujillo Decl. P 2-5 (reader believed surfmetro.com to be online product of Metro and The Wave to be a Metro publication due to layout and feel of paper); Whizin Decl. P 2 (advertiser placed advertisement in The Wave believing it to be affiliated with Metro *Santa Cruz* because of use of word "SurfMetro" in The Wave). [4]

> 4    On a motion for preliminary injunction, the Court may rely on evidence that would be inadmissible in other contexts. See *Flynt Distrib. Co., Inc. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984).* Therefore, the Court will consider the hearsay contained in declarations filed by Metro as evidence of actual confusion. SurfMetro's evidentiary objections to Metro's declarat are overruled (Docket No. 15).

Metro presents evidence that SurfMetro has used the word "Metro" in its metatags (HTML code for websites) [*12] as one of its keywords used by search engines such as excite.com and google.com to determine which websites to display as results for a certain keyword search. See Carolan Ex. W (showing metatag keywords for SurfMetro homepage including "Surf Metro"). Use of the term "Metro" in SurfMetro's metatags may have resulted in the surfmetro.com website being returned by a search engine as one of the first several results in response to a search using the keyword "Metro" along with other keywords (such as "Silicon Valley," "entertain-

Case 4:08-cv-00155-CW    Document 5-10    Filed 01/15/2008    Page 5 of 9

Page 4

2002 U.S. Dist. LEXIS 26232, *; 66 U.S.P.Q.2D (BNA) 1134

ment," etc.). See, e.g., id. Ex. Y. However, more recent keyword searches and viewing of the HTML code for the surfmetro.com page indicates that SurfMetro no longer uses the word "Metro" as a keyword in its metatags separate from the word "SurfMetro."

Metro claims that SurfMetro and its representatives have placed copies of The Wave in Metro newsracks in the past. See, e.g., Anderson Decl. PP 2-3 (The Wave newspapers found in a Metro rack on more than one occasion in the past); Morgan Decl. PP 6-8 (several reports of copies of The Wave displacing or covering up copies of Metro in Metro newsracks). SurfMetro contends that it has never [*13] been its practice to use other companies' newsracks, move other publications, or cover them with copies of The Wave, and claims that Metro has removed and/or displaced The Wave at certain locations, and placed copies of Metro in SurfMetro's newsracks designated for The Wave. See Smith Decl. PP 2-5; Prusa Decl. PP 2-3; Lilledahl Decl. PP 3, 6.

In at least one media kit, SurfMetro presented The Wave to potential advertisers has having an audited circulation of 135,000 by carrying a Verified Audit Circulation logo on the circulation sheet, though an audit of The Wave's circulation was not yet completed. See Buquet Decl. PP 8-9 & Ex. A (media kit dated March 4, 2002 presenting The Wave's distribution numbers, including circulation of 135,000, with Verified Audit Circulation logo); Desser Decl. P 5. SurfMetro acknowledges that this occurred, and claims that it was an error, that the media kits were recalled to the extent possible, and that all media kits now contain a Verified Audit Circulation Pending logo. See Rhoads Decl. PP 5-7; Desser Decl. II P 6; see also Desser Decl. P 8.

SurfMetro claims that, since The Wave began publication, Metro has [*14] copied topics for its cover stories and special issues from The Wave, by publishing very similar cover stories or special issues shortly after The Wave. See Townsend Exs. F-I (covers of The Wave and Metro addressing similar topics, such as bowling, women and guns, summer music and movie guides). Metro denies that it is copying The Wave and claims that many of its cover stories and special issues are determined months in advance. See Asturias Decl. & Ex. 1.

## LEGAL STANDARD

"The basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312, 72 L. Ed. 2d 91, 102 S. Ct. 1798 (1982). To establish entitlement to a preliminary injunction, a moving party must demonstrate either: (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that there exist serious questions regarding the merits and the balance of hardships tips

sharply in its favor. Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987); California Cooler, Inc. v. Loretto Winery, Ltd., 774 F.2d 1451, 1455 (9th Cir. 1985); [*15] see also William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., 526 F.2d 86, 88 (9th Cir. 1975); County of Alameda v. Weinberger, 520 F.2d 344, 349 (9th Cir. 1975). The test is a "continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." Rodeo Collection, 812 F.2d at 1217 (quoting San Diego Comm. Against Registration & The Draft v. Governing Bd. of Grossmont Union High Sch. Dist., 790 F.2d 1471, 1473 n.3 (9th Cir. 1986)). To overcome a weak showing of merit, a plaintiff seeking a preliminary injunction must make a very strong showing that the balance of hardships is in its favor. Rodeo Collection, 812 F.2d at 1217.

Irreparable injury may be presumed where a likelihood of success has been shown on a trademark infringement claim. See Brookfield Communications, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1066 (9th Cir. 1999).

## DISCUSSION

### I. Trademark Infringement

Under the Lanham Act, 15 U.S.C. § 1114, any person is liable for trademark infringement if that person, without the consent of the trademark [*16] registrant:

> uses in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(a).

A prima facie case for trademark infringement under the Lanham Act is established by a showing that (1) the mark is owned by or associated with a particular plaintiff, and (2) the defendant's use of the mark is likely to cause confusion or mistake among the public as to the origin of the goods. Chesebrough-Pond's, Inc. v. Faberge, Inc., 666 F.2d 393, 396 (9th Cir. 1982); New West Corp. v. NYM Co. of Cal., 595 F.2d 1194, 1201-02 (9th Cir. 1979).

The test for determining the likelihood of confusion in an infringement case "is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." Dreamwerks Prod. Group, Inc. v. SKG Studio,

Case 4:08-cv-00155-CW    Document 5-10    Filed 01/15/2008    Page 6 of 9

Page 5

2002 U.S. Dist. LEXIS 26232, *; 66 U.S.P.Q.2D (BNA) 1134

*142 F.3d 1127, 1129 (9th Cir. 1998).* The party [*17] alleging infringement must show that consumer confusion is "probable, not simply a possibility." *Rodeo Collection. Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987).*

The Ninth Circuit applies an eight-factor test to determine whether there is a likelihood of confusion between a registered trademark and a mark that allegedly infringes it.

> In determining whether confusion between related goods is likely, the following factors are relevant: 1. strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser; 7. defendant's intent in selecting the mark; and 8. likelihood of expansion of the product lines.

*AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979)* (Sleekcraft).

Because each of these factors is not necessarily relevant in every case, the list of factors functions as a guide and is neither exhaustive nor conclusive. *Metro Publ'g, Ltd. v. San Jose Mercury News, 987 F.2d 637, 640 (9th Cir. 1993).* In fact, the Ninth Circuit has warned against [*18] "excessive rigidity" in applying the factors and noted that "it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors." *Brookfield Communications, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1054 (9th Cir. 1999);* see also *Eclipse Assoc., Ltd. v. Data Gen. Corp., 894 F.2d 1114, 1118 (9th Cir. 1990)* (Sleekcraft factors "were not meant to be requirements or hoops that a district court need jump through to make the determination");*Murray v. Cable Nat'l Broad. Co., 86 F.3d 858 (9th Cir. 1996)* (concluding, after abbreviated Sleekcraft analysis, that no likelihood of confusion exists).

A. Likelihood of Confusion

In this case, several of the eight*Sleekcraft* factors are particularly pertinent to the issue of the likelihood of consumer confusion. These are addressed below in the order of their importance. See *Brookfield Communications, 174 F.3d at 1054 n. 16* (addressing Sleekcraft factors roughly in order of their importance to the case).

In examining the likelihood of confusion between Metro's newspaper and website and SurfMetro's [*19] newspaper and website, the METRO mark, METRO-ACTIVE mark, THE WAVE mark and SURFMETRO mark must all be considered.

1. Similarity of the Marks

The METRO mark and the SURFMETRO mark are extremely similar. Similarity is determined with reference to the marks' sight, sound and meaning. See, e.g., *Dreamwerks, 142 F.3d at 1131.* The marks are visually similar, in that both contain black-lined, white letters on a red background, and both contain the word "Metro." While there are slight differences in the marks (the SURFMETRO mark's font is more unique and whimsical, and the red background is surfboard-shaped instead of rectangular), the overall impression of the two marks is somewhat similar. See *GoTo.com. Inc. v. Walt Disney Co., 202 F.3d 1199, 1206 (9th Cir. 2000)* ("With a single glance at the two images, one is immediately struck by their similarity."); J. Thomas McCarthy, 3 McCarthy on Trademarks and Unfair Competition, § 23:41 (marks are to be compared in their entireties rather than broken down into their component parts).

The sound of the marks, in this case, refers to the words appearing on the marks. The SURFMETRO mark contains the word "Metro, [*20] " which is the entirety of the METRO mark. Though the SURFMETRO mark contains the additional word, "Surf," and is therefore a much longer word, it capitalizes the first letter of "Metro," producing greater similarity to the METRO mark, which contains simply the word "Metro," with the first letter capitalized.

The meaning of the METRO and SURFMETRO marks is not particularly clear, but the visual similarity suggests similar meanings. The SURFMETRO mark contains the word "Surf" and the shape of a surfboard, conveying a meaning relating to surfing which the METRO mark does not contain, while the METRO mark contains no meaning separate from the meaning of the word "Metro," which is an abbreviated version of the words "metropolis" or "metropolitan," referring to a city or urban lifestyle.

The SURFMETRO mark is fairly similar to the METROACTIVE mark, due to the shared use of the word "metro," though the METROACTIVE mark is spelled "metroACTIVE," while the SURFMETRO mark is spelled "SurfMetro." The METROACTIVE mark uses a completely different color scheme than the SURFMETRO mark, with white letters on a red, yellow and purple rectangular background. Therefore, while the appearance of these [*21] two marks is different, the use of the word "metro" still leads to a certain degree of similarity.

The METRO mark and THE WAVE mark are similar in their use of colors (black-lined, white letters on a

Case 4:08-cv-00155-CW    Document 5-10    Filed 01/15/2008    Page 7 of 9

Page 6

2002 U.S. Dist. LEXIS 26232, *; 66 U.S.P.Q.2D (BNA) 1134

red background), but in every other way they are different. Most important, the METRO mark and THE WAVE mark do not contain any words in common, which leads to a very small likelihood of confusion. Further, the METROACTIVE mark and THE WAVE mark are very different, and contain no similarities in sight, sound or meaning.

For these reasons, the only marks that may lead to a likelihood of confusion are the METRO, METROACTIVE and SURFMETRO marks, which are similar in their use of the word "Metro." Therefore, the Court will analyze the remainder of the *Sleekcraft* factors with regard to the METRO, METROACTIVE and SURFMETRO marks only.

2. Proximity of the Goods and Marketing Channels Used

These two factors are addressed together. Metro and SurfMetro both produce free tabloid-format newspapers in San Jose, which are distributed in various areas of the Bay Area, primarily the Silicon Valley. The newspapers are distributed in newsracks on sidewalks and in other public places, and through [*22] local businesses. Often, the two newspapers, Metro and The Wave, are distributed right next to each other, and many of the newsracks are very close to one another. The two newspapers often have advertisers in common. The two newspapers are marketed in the same channels and are distributed in very close proximity to one another.

The content of the newspapers is very similar, containing entertainment and events listings and feature articles. Though SurfMetro attempts to distinguish them by describing The Wave as solely an entertainment newspaper with no news articles, and Metro as an alternative newspaper with news content, this is not a major distinction. A review of the two papers reveals that they are very similar in format and content. Further, both parties acknowledge that they have run cover stories and special issues on very similar topics.

The metroactive.com and surfmetro.com websites are also marketed in the same channels and in close proximity to one another. The websites are advertised within Metro and The Wave, referring those readers to their respective online counterparts. SurfMetro places the phrase "www.surfmetro.com" on the outside of its newsracks, [*23] and in several places within The Wave, while Metro advertises metroactive.com in Metro. Moreover, keyword searches for entertainment guides or listings in the Silicon Valley and/or San Jose may produce both websites as results.

The Ninth Circuit has pointed out that use of the web as a marketing channel is "a factor that courts have consistently recognized as exacerbating the likelihood of

confusion." *Brookfield Communications, 174 F.3d at 1057.* The Ninth Circuit noted: "In the Internet context, in particular, entering a web site takes little effort-- usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership." *Id.*; see also *GoTo.com, 202 F.3d at 1207.* This is the case here, where it would be very easy for a web user to arrive at surfmetro.com, believing it to be Metro's website. Moreover, use of the web is not simply a marketing tool, but an important facet of the business of both Metro and SurfMetro, whose products are in close proximity on the web as well as in newsracks.

[*24] This factor weighs heavily in favor of a likelihood of confusion between the METRO, METROACTIVE and SURFMETRO marks.

3. Evidence of Actual Confusion

Metro has produced evidence of actual confusion on the part of Metro readers, advertisers, job applicants, and club promoters. People who are familiar with Metro have voiced confusion about the source or origin of The Wave, believing it be a Metro publication or affiliated with Metro in some way, and believing SurfMetro to be a part of Metro. Much of this confusion appears to result from the use of the word "SurfMetro" in conjunction with The Wave, both in the newspaper itself and in related advertisements and promotions. [5] Further, Metro has presented evidence that certain web users have mistakenly believed that surfmetro.com is Metro's website, which is not surprising given that surfmetro.com is an online entertainment guide for the Silicon Valley, where Metro has published a free weekly newspaper for over seventeen years.

> 5   Some of the confusion regarding the origin of The Wave also appears to be due to the similar layout and feel of the two newspapers including the colors used in the METRO and THE WAVE marks that appear on the cover of the newspapers. However, as explained above, the METRO and THE WAVE marks are not similar enough to support a likelihood of confusion, and the similar layout and feel results primarily from the tabloid-format used by these two newspapers, which is used by many other papers as well. This does not support a likelihood of confusion between the METRO and THE WAVE marks.

[*25] The evidence of actual confusion produced by Metro strongly supports a finding of a likelihood of confusion between the METRO, METROACTIVE and SURFMETRO marks.

4. Strength of the Marks

Case 4:08-cv-00155-CW    Document 5-10    Filed 01/15/2008    Page 8 of 9

Page 7

2002 U.S. Dist. LEXIS 26232, *; 66 U.S.P.Q.2D (BNA) 1134

The strength of a mark is often considered based on a continuum of inherent abilities to distinguish a product, using the following "categories of generally increasing distinctiveness": generic, descriptive, suggestive, arbitrary, and fanciful. See *Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 120 L. Ed. 2d 615, 112 S. Ct. 2753 (1992).* "The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive." *Id.* Marks that are merely generic or descriptive of a product are not inherently distinctive and must have acquired distinctiveness to warrant protection.

The METRO mark is at least suggestive and therefore inherently distinctive. It is not merely descriptive, for it does not describe the product: a newspaper. It is suggestive because "a consumer must use imagination or ... multistage reasoning to understand the mark's significance." *Kendall-Jackson Winery, Ltd. V. E. & J. Gallo Winery, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998);* [*26] see also *Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1142 (9th Cir. 2002).* Further, the METRO mark has been used in the Silicon Valley for over seventeen years to identify Metro, and has been extensively marketed and promoted. Because of the years of use of the METRO mark in the Silicon Valley, it has acquired distinctiveness as well. Therefore, the METRO mark, and the associated METROACTIVE mark, which is also at least suggestive, are fairly strong marks.

### 5. Defendant's Intent in Selecting the Mark

There is no evidence of bad intent in this case. SurfMetro's founder apparently created the idea for SurfMetro in 1994 in Des Moines, Iowa, to identify a "locals only resource guide for the surf generation," which he then sought to use in the Silicon Valley. While SurfMetro must have become aware of the presence of Metro and metroactive.com, and chose to continue with the use of the SURFMETRO mark and surfmetro.com, there is no evidence that the creation of SurfMetro was an effort to take advantage of the goodwill associated with the METRO and METROACTIVE marks.

### 6. Type of Goods and the Degree of Care Likely to be Exercised by the Purchaser

The goods at [*27] issue in this case are free tabloid-format newspapers and entertainment websites. These are not products for which a consumer exercises a great degree of care, for they are free and easily located (in sidewalk newsracks, local businesses, on the Internet). Therefore, it is more likely that consumers will be confused and will choose SurfMetro's products, The Wave and surfmetro.com, believing them to be associated with Metro. More care is likely taken by potential advertisers in choosing a newspaper in which to place an advertisement, but the evidence presented by Metro suggests that even advertisers who have spoken with SurfMetro representatives have continued to believe SurfMetro was associated with Metro. Therefore, this factor weighs in favor of a likelihood of confusion.

### 7. Likelihood of Expansion of the Product Lines

This is not a factor in this case, because both parties are already competing, both in the free tabloid-format newspaper product line and in the online entertainment website product line.

The above analysis of the Sleekcraft factors suggests that SurfMetro's use of the SURFMETRO mark is likely to cause confusion with Metro's use of the METRO and METROACTIVE [*28] marks. SurfMetro's use of the SURFMETRO mark likely infringes Metro's METRO and METROACTIVE marks. The Court therefore grants Metro's motion for a preliminary injunction prohibiting SurfMetro from using the METRO or METROACTIVE marks, or any marks, names or logos confusingly similar to Metro's marks, including the SURFMETRO mark. However, SufMetro is not prohibited from using "SurfMet," which is the company's corporate name, as well as a name under which it previously produced a website. "SurfMet" is not so similar to the METRO and METROACTIVE marks that it is likely to cause consumer confusion.

## II. Unfair Competition

Metro also seeks a preliminary injunction preventing SurfMetro from engaging in unfair competition by (1) misrepresenting or misleading advertisers, potential advertisers or the public that the circulation of SurfMetro's newspapers is audited if it is not, (2) making untrue claims about the circulation of its newspaper, and (3) placing its newspaper in Metro newsracks or otherwise unlawfully interfering with the distribution of Metro's newspaper.

Metro has failed to present sufficient evidence that SurfMetro has had a practice of labeling its circulation audited, [*29] misrepresenting its circulation, or interfering with the distribution of Metro's newspaper. If anything, Metro has shown isolated incidents of each of these things. SurfMetro has shown that the one instance in which it represented that its circulation was audited was a mistake which was recalled. Further, there is no evidence that SurfMetro has lied to potential advertisers or others about its circulation. Nor has Metro shown that SurfMetro interferes with the distribution of Metro's newspaper; both parties have alleged that the other is interfering with their distribution, but this may be the isolated acts of certain carriers and distributors, and none of the actions alleged can be attributed to a company-wide practice that must be enjoined in the future. There-

2002 U.S. Dist. LEXIS 26232, *; 66 U.S.P.Q.2D (BNA) 1134

fore, Metro's motion for a preliminary injunction on these issues is denied.

.   CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction based on the trademark and trade dress claims is GRANTED. Plaintiff's motion for a preliminary injunction based on the unfair competition claim is DENIED.

Pending entry of final judgment in this action, SurfMetro is preliminarily enjoined from infringing Metro's [*30] trademarks and trade dress as follows:

(1) SurfMetro (which for all purposes includes SurfMet, Inc., SurfMetro Media, and The Wave), together with its officers, agents, servants, employees, and attorneys, and all those in active concert or participation with any or all of them, are enjoined from using the METRO mark, or any mark confusingly similar such as the SURFMETRO mark (but not "SurfMet"), as part of the names used by SurfMetro to promote, advertise, market or sell SurfMetro's products or services within the market areas that both parties presently operate, or any other market areas into which it would be natural for Metro to expand.

(2) SurfMetro, together with its officers, agents, servants, employees, and attorneys, and all those in active concert or participation with any or all of them, are enjoined from using the METRO mark as part of its domain names--"metrosurf.com" and "surfmetro.com"-- those domain names' corresponding url addresses and any other domain name or url address confusingly similar to the METRO or METROACTIVE marks (but not "surfmet.com").

(3) SurfMetro, together with its officers, agents, servants, employees, and attorneys, and all those in active [*31] concert or participation with any or all of them, are enjoined from using the METRO mark alone in the surfmet.com. website, or any other renamed website owned or operated by SurfMetro, to the extent the METRO mark is used in headers or incorporated as part of the design of the website (as in SurfMetro's use in the past of the METRO mark in the left-hand column on the homepage and on the merchants' login page), but not when the word "metro" is used in text on the website and when that textual use of the word "metro" is descriptive rather than suggestive of Metro or that company's products or services.

This preliminary injunction is effective on Metro's posting a bond in the amount of $ 450,000.00.

IT IS SO ORDERED.

/s/ CLAUDIA WILKEN

United States District Judge

Dated: 7/3/02