JAMES D. NGUYEN, CA BAR NO. 179370
jnguyen@foley.com
**FOLEY & LARDNER LLP**
2029 CENTURY PARK EAST, SUITE 3500
LOS ANGELES, CA 90067-3021
TELEPHONE: 310.277.2223
FACSIMILE: 310.557.8475

Attorneys for Defendant COMMON SENSE ISSUES, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COMMON SENSE MEDIA, INC., a California corporation<br><br>Plaintiff,<br><br>vs.<br><br>COMMON SENSE ISSUES, INC., a Delaware corporation,<br><br>Defendant. | Case No: 008-00155CW<br><br>Judge: Hon. Claudia Wilken<br><br>**DEFENDANT COMMON SENSE ISSUES, INC.'S OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR A TRO** |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 2

A. COMMON SENSE ISSUES .......... 2

B. PLAINTIFF & ITS KNOWLEDGE OF COMMON SENSE MARKS .......... 5

C. CROWDED FIELD OF "COMMON SENSE" MARKS .......... 6

III. LEGAL STANDARD .......... 7

IV. NO EMERGENCY EXISTS TO WARRANT *EX PARTE* RELIEF .......... 8

V. PLAINTIFF IS NOT LIKELY TO PREVAIL ON ITS TRADEMARK INFRINGEMENT CLAIM .......... 10

A. PLAINTIFF CANNOT SHOW LIKELIHOOD OF CONFUSION .......... 10

(1) Weakness of Plaintiff's Marks .......... 11

(2) The Marks Are Not Confusingly Similar .......... 14

(3) The Services Are Not Closely Related .......... 17

(4) Lack of Evidence of Actual Confusion .......... 19

(5) Intent in Selecting the Mark .......... 20

(6) High Degree Of Care Exercised By "Purchasers" .......... 20

(7) Marketing Channels Used .......... 21

(8) No Likelihood of Expansion .......... 22

(9) Summary .......... 22

VI. THE EQUITABLE FACTORS FAVOR COMMON SENSE ISSUES. .......... 22

A. PLAINTIFF WILL NOT SUFFER ANY IRREPARABLE INJURY .......... 22

B. THE BALANCE OF THE HARDSHIPS STRONGLY FAVOR COMMON SENSE ISSUES .......... 23

C. THE PUBLIC INTEREST FAVORS DENIAL OF THE TRO .......... 24

VII. NO OSC FOR PRELIMINARY INJUNCTION SHOULD ISSUE .......... 24

VIII. CONCLUSION .......... 24

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, L C*, 447 F.Supp.2d 266 (S.D.N.Y. 2006) .......... 22

*Abercrombie & Fitch Co. v. Moose Creek, Inc.*, 486 F.3d 629 (9th Cir. 2007) .......... 12

*Adobe Sys. v. South Sun Prods., Inc.*, 187 F.R.D. 636 (D. Cal. 1999) .......... 7

*AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979) .......... *Passim*

*Brookfield Commc'n, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999) .......... 14, 21

*Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) .......... 22

*Century Theatres, Inc. v. Landmark Theatres Corp.*, 2000 U.S. Dist. LEXIS 10693 (N.D. Cal. 2000) .......... 8

*Churchill Village L.L.C. v. General Electric Co.*, 169 F. Supp 1119 (N.D. Cal. 2000) .......... 8

*Cohn v. Petsmart, Inc.*, 281 F.3d 837 (9th Cir. 2002) .......... 19

*Colgate-Palmolive Co. v. Carter Wallace, Inc.*, 432 F.2d 1400, 167 U.S.P.Q. 529 (C.C.P.A. 1970) .......... 15

*E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280 (9th Cir. 1992) .......... 12

*Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114 (9th Cir. 1990) .......... 12

*Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503 (2d Cir. 1997) ........ 12

*Franklin Resources, Inc. v. Franklin Credit Management Corp.*, 988 F.Supp. 322 (S.D.N.Y.1997) ........ 12

*Glow Industries, Inc. v. Lopez*, 252 F.Supp.2d 962 (C.D. Cal. 2002) ........ 12, 20

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000) ........ 14

*Halo Mgmt., LLC v. Interland, Inc.*, 308 F.Supp.2d 1019 (N.D.Cal. 2003) ........ 12

*In the Matter of Vuitton et Fils S.A.*, 606 F.2d 5 ........ 8

*Instant Media, Inc. v. Microsoft Corp.*, 2007 WL 2318948 (N.D.Cal. Aug. 13, 2007) ........ 11

*Int'l Jensen, Inc. v. Motorsound U.S.A., Inc.*, 4 F.3d 819 (9th Cir. 1993) ........ 8

*King v. Saddleback Junior College*, 425 F.2d 426 (9th Cir. 1970) ........ 8

*M2 Software, Inc., v. Madacy Entertainment*, 421 F.3d 1073 (9th Cir. 2005) ........ 11, 21

*Matter of Vuitton et Fils S.A.*, 606 F.2d 1 (2d Cir. 1979) ........ 7

*Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445 (9th Cir. 1988) ........ 12, 14

*Mission Power Engineering Co. v. Continental Casualty Co.*, 883 F. Supp. 488 (C.D. Cal. 1995) ........ 7

*NEA Enterprises, Inc. v. American Horse Enterprises, Inc.*, 1980 U.S. Dist. LEXIS 16910 (D. Cal. 1980) .......... 7

*Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601 (9th Cir. 1987) .......... 12, 21

*Perfumebay.com Inc. v. EBAY, Inc.*, 506 F.3d 1165 (9th Cir. 2007) .......... 10

*Quokka Sports, Inc. v. Cup Int'l Ltd.*, 99 F. Supp. 2d 1105 (D. Cal. 1999) .......... 9

*Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126 (9th Cir. 2006) .......... 7-8, 10, 15

*Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215 (9th Cir. 1987) .......... 8

*Skechers U.S.A., Inc. v. Vans, Inc.*, 2007 WL 4181677 (C.D.Cal. 2007) .......... 13

*Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625 (9th Cir. 2005) .......... 11, 22

*Tillamook County v. United States Army Corps of Eng'rs*, 288 F.3d 1140 (9th Cir. 2002) .......... 8

*White v. United States*, 2007 U.S. Dist. LEXIS 55549 (N.D. Cal. 2007) .......... 8

**STATE CASES**

*State ex rel. Ohio Democratic Party v. Blackwell*, 111 Ohio St.3d 246 (2006) .......... 20

**REGULATORY CASES**

*In re Merch. Motivation, Inc.*, 184 U.S.P.Q. 364 (T.T.A.B. 1974) .......... 15

*Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 212 U.S.P.Q. 246 (1st Cir. 1981) ........ 15

**FEDERAL STATUTES**

15 U.S.C. § 1052 ........ 17

15 U.S.C. § 1052(d) ........ 16

15 U.S.C. § 1062 ........ 16

**RULES**

Fed. R. Civ. P. 65(b) ........ 7

**I. INTRODUCTION**

> "I offer nothing more than simple facts, plain arguments, and common sense…" Thomas Paine, pamphlet, COMMON SENSE (1776).

The facts are simple-- Plaintiff feigns an emergency to move this Court for an *Ex Parte* temporary restraining order to enjoin Common Sense Issues, Inc. ("Common Sense Issues) from further use of "Common Sense Issue" or any designation of "Common Sense," claiming Common Sense Issues is infringing its COMMON SENSE MEDIA and COMMON SENSE MEDIA & Design trademarks. Plaintiff is hardly entitled to claim dominion over all uses of the ubiquitous term "Common Sense," let alone claim that its request for a TRO warrants emergency relief on an *ex parte* basis. Plaintiff's chairman, Mr. Robert Wehling, has been aware of Common Sense Issues and its predecessor "Common Sense" organizations since at least April 2007 (when he discussed, without complaint, the similarity of the parties' names with a friend, who also happens to be an advisor for Common Sense Issues). (Estruth, Decl. ¶ 4). Despite the fact that Plaintiff and Commons Sense Issues's marks have co-existed in the marketplace for nearly one and half years, with no actual confusion having occurred, Plaintiff claims there is an "immediate" need for a TRO. Plaintiff's "immediate" need is apparently the imminent announcement of its own initiative and its *ongoing* involvement in the upcoming elections, including a debate among the presidential candidates scheduled for Spring of 2008. This is not a situation where Plaintiff is trying to prevent certain imminent activities by the defendant, and Plaintiff has utterly failed to identify any upcoming act by Common Sense Issues that must be urgently stopped. The Court can swiftly deny the TRO application simply for lack of any emergency.

Not only is there no emergency to warrant this *Ex Parte* application, Plaintiff also fails to meet the standard for issuance of a TRO. Plaintiff has not shown a reasonable likelihood of success on the merits, nor has Plaintiff demonstrated the possibility of irreparable injury if this request for a TRO were denied. Plaintiff concedes that there has been no actual confusion between the two relevant marks. Nor are Plaintiff's marks likely to be confused with the COMMON SENSE ISSUES mark. This is supported by

the fact that the United States Patent and Trademark Office ("USPTO") has approved Common Sense Issues's application to register the COMMON SENSE ISSUES mark, without any likelihood of confusion issues raised by the trademark examiner. The USPTO's clearance of the mark is highly persuasive.

Moreover, Plaintiff's marks are weak because they rely on the common phrase "Common Sense;" such a weak mark hardly justifies injunctive relief, let alone on an emergency basis. There is a crowded field with **many** other political and social organizations, and businesses, using "Common Sense" in their names. In fact, there are so many similarly-named entities that one must wonder whether Plaintiff's decision to single out Common Sense Issues is politically motivated.

Furthermore, Plaintiff's claims of irreparable injury defy <u>common sense</u>. It is Common Sense Issues and the American public, not Plaintiff, who would be irreparably harmed if a TRO were issued and the status quo were disrupted. It would cripple Common Sense Issues' operations during a volatile election season, at a time when the American public is thirsty for more, not less, access to information about common sense issues, candidates and policies. The chilling effect the TRO would have on political activities and free speech further weigh against issuance of an injunction.

## II. <u>FACTUAL BACKGROUND</u>

### A. COMMON SENSE ISSUES

Common Sense Issues is a public information organization devoted to promoting American values. (Swift Decl., ¶ 2.) It is dedicated to building a national movement of citizens who want public officials to exercise common sense in their approach to the issues. (*Id.*) Common Sense Issues educates the public as to the positions of leaders and political candidates on a variety of issues of central importance to the American people. (*Id.*) Some of Common Sense Issues' activities include telephone calls, advertisements in newspaper, television, radio and internet, and operating web sites as a means to communicate to the public information about key public policy and political issues. (*Id.*)

Common Sense Issues does not communicate or coordinate its efforts with candidates, campaigns, or political parties.  (*Id.*)  Common Sense Issues conducts its activities wholly independently of any and all candidates, campaigns and political parties. (*Id.*)

Common Sense Ohio, Common Sense for the 21st Century and Common Sense Issues Coalition together with Common Sense Issues comprise the Common Sense Entities.  (Swift Decl., ¶ 6.) Each is publicly registered under the laws of either Ohio or Delaware in 2006 or 2007, well before this action.   (*Id.* ¶ 6; *see also* Exs. 1 and 2).

The "Common Sense" entities, such as Common Sense Ohio, Common Sense for the 21st Century, engaged in significant public policy work during the 2006 federal election cycle.  Common Sense Issues was conceived and formed to build upon the work of those predecessor entities.  The "Common Sense Issues" name was conceived in 2006, and was chosen to build on the recognition those predecessor entities developed during the 2006 election year.  (Estruth Decl., ¶ 3.)

The "Common Sense" name was chosen for historical reasons.  Common Sense Issues and its predecessors adopted the COMMON SENSE ISSUES mark and other variations of COMMON SENSE, to reflect Thomas Paine's classic essay on American politics, *Common Sense*.  (Swift Decl., ¶ 8.)  Common Sense Issues is, as an organization, dedicated to the following model espoused in Paine's *Common Sense* essay, to-wit: "In the following pages I offer nothing more than simple facts, plain arguments, and common sense; and have no other preliminaries to settle with the reader, than that he will divest himself of prejudice and prepossession, and suffer his reason and his feelings to determine for themselves; that he will put on, or rather that he will not put off the true character of a man, and generously enlarge his views beyond the present day." (Swift Decl., ¶ 8.)  Common Sense Issues and its predecessors have continuously used variations of "COMMON SENSE" marks since July 2006, including Internet domain names that incorporated the "Common Sense" moniker with 49 different states' names (i.e. www.commonsensemontana.com).  (Swift Decl., ¶ 11.)  Common Sense Issues and its predecessors also registered domain names for the combination of the "Common

Sense" moniker with the years 2006 through 2016 (*i.e.* www.commonsense2006.com), to reflect timeliness in any given year. (Swift Decl., ¶ 11.)

On August 16, 2007, Common Sense Issues filed an application to register its trademark COMMON SENSE ISSUES (U.S. Serial No. 77/257,033) for use in connection with "promoting public awareness of issues in the fields of politics and public policy." (Ex. 4.) The mark has been examined by the USPTO; quite notably, the trademark examiners found the mark not to conflict with any registered trademark or pending application (including, presumably, Plaintiff's marks) because the USPTO examiner has approved the application for publication on January 9, 2008. (Ex. 5.)

Common Sense Issues prides itself on operating in a manner that complies with all applicable laws, in as transparent a manner as possible; to publicly disclose all activities, sources of contributions and expenditures as required by applicable laws; and to insure that there is no confusion about the organization, its purpose and goals, what it stands for and what supporters and members can accomplish by participating with Common Sense Issues. (Swift Decl., ¶ 23.) A TRO requiring it to immediately change its name and cease use of its COMMON SENSE ISSUES mark could be viewed by the public and portrayed by the media as an effort to obfuscate or hide its donors and activities -- a perception that would violate Common Sense Issues' core principles and message. (Swift Decl., ¶24.)

Common Sense Issues and its related entities have invested nearly two years and approximately $5 million dollars into promoting its movement with key donors, media, supporters, potential supporters of its message and advocacy efforts. (Swift Decl., ¶ 22.) In addition to monetary contributions, professionals and supporters have donated thousands of hours of time and energy to the Common Sense Entities. (*Id.*) These activities have all been done under the COMMON SENSE ISSUES and related COMMON SENSE marks, with considerable public attention. (*Id.*) The national and international attention attracted by Common Sense Issues, including numerous front page articles in the *New York Times*, *Washington Post*, and *Wall Street Journal*, features on international and national cable stations, and articles in national magazines such as

*Newsweek*, is a testament to the energy and money Common Sense Issues has devoted to building and promoting the goodwill associated with its mark. (*Id.*, ¶ 12.) Yet, Plaintiff never complained until now.

**B. PLAINTIFF & ITS KNOWLEDGE OF COMMON SENSE MARKS**

Plaintiff has two federal trademark registrations: COMMON SENSE MEDIA (U.S. Reg. No. 2,973,224) and COMMON SENSE MEDIA & Design (U.S. Reg. No. 3,353,234). It also has two pending applications: COMMON SENSE (U.S. Serial No. 78/858,133) and USE COMMON SENSE (U.S. Serial No. 78/858,124). The registrations and applications all cover substantially the same services in International Classes 35 and 41.

The TRO application at this time is quite surprising because Plaintiff's chairman has known about Common Sense Issues and its related organizations since at least April 2007. Bob Wehling, Plaintiff's chairman, is a long-time friend and former co-worker of Nathan Estruth, one of the Common Sense Entities' advisors. (Estruth Decl., ¶ 4.) During a conversation around April 13, 2007, Mr. Wehling informed Mr. Estruth that he had accepted a position as head of Common Sense Media. Mr. Estruth then responded that he was involved as a volunteer in various organizations using the same phrase "Common Sense" in the name, and that his "Common Sense" organizations dealt with ongoing issues and public policy efforts. (*Id.*) The two gentlemen even went so far as to then discuss how ironic it was that they were both volunteering for organizations using the phrase "Common Sense" in their names. (*Id.*) Mr. Wehling never complained, either during the conversation or any time later, to Mr. Estruth – his longtime friend -- about the name of the Common Sense Entities. (*Id.*) Nor did he suggest there was any problem or harm that would be caused to Common Sense Media because of Common Sense Issues or its related organizations used "Common Sense" in their names. (*Id.)*

Mr. Wehling's lack of complaint is not surprising because there is, in fact, no problem between the parties' names. Admittedly, there are common terms in the parties' marks. However, the mark, COMMON SENSE ISSUES, is different from Plaintiff's

marks in terms of sound, appearance, and overall commercial impression such that there is no risk of likelihood of confusion between the marks (or a minor risk at best). In fact, the USPTO sees no conflict between the parties' marks, as shown by the fact that Common Sense Issues' mark has been "allowed" by the USPTO and approved for publication. (Ex. 5.) The risk of confusion is so remote that the Trademark Office did not even raise any likelihood of confusion objection.

**C. CROWDED FIELD OF "COMMON SENSE" MARKS**

Plaintiff cannot claim sweeping exclusive rights to use the term "COMMON SENSE" in the fields of advocacy and education, or in any field for that matter:

- A search of the USPTO online database (available at www.uspto.gov) showed hundreds of marks wholly comprised of or containing the term "COMMON SENSE." (Ex. 7.) A number of these marks are used in precisely the same classes of services for which Plaintiff has registrations, and involve many political or social organizations. (*See* Ex. 8.) In cases where there are a number of third party registrations including the same term, such as "COMMON SENSE," there is an inherent weakness in that shared portion of the marks and, slight differences are sufficient to distinguish one from the other. In this case, the significant differences between COMMON SENSE **MEDIA** and COMMON SENSE **ISSUES** is more than sufficient to distinguish the marks in view of the hundreds of "COMMON SENSE" formative marks;
- A Google Internet search of the phrase "common sense" yields 41,500,000 search results. (Ex. 9.) A number of the top-ranked results include references to the "Common Sense" essay by Thomas Paine. The search result also reveals many other organizations and publications using the phrase "Common Sense," such as "Common Sense for Drug Policy," "Taxpayers for Common Sense," and "Common Sense Magazine," and "The Common Sense Foundation.";
- An online telephone directory search shows 198 businesses nationwide with the phrase "common sense" in the business or organization name. (Ex. 10.) The results include various political organizations, such as "Common Sense & Sound Public Policy

Think Tank," "Common Sense About Kids and Guns," "Common Sense America Inc." and "Common Sense Environmental."

## III. LEGAL STANDARD

Plaintiff must show not only a likelihood of success on the merits and irreparable injury, but must also demonstrate a legitimate reason for obtaining *ex parte* relief. The moving papers conveniently ignore the standard required for *ex parte* relief. In order to justify *ex parte* relief, the evidence must show that the moving party's cause must be irreparably prejudiced if the relief is not granted on an *ex parte* basis, and it must be established that the moving party is without fault or neglect in creating the crisis that requires *ex parte* relief. *Mission Power Engineering Co. v. Continental Casualty Co.*, 883 F. Supp. 488, 492 (C.D. Cal. 1995). *Ex parte* relief is to be granted only in extraordinary circumstances because it "detracts from a fundamental purpose of the adversary system, namely, to give the court the best possible presentation of the merits and demerits of the case on each side." *Mission Power*, 883 F.Supp. at 491. As the *Mission Power* court acknowledged, in responding to *ex parte* applications, "[t]he opposing party can rarely make its best presentation on such short notice."

Obtaining an *ex parte* TRO should be even more difficult, given the drastic nature of TROs. An *ex parte* TRO may be granted only if the failure to issue it would result in "immediate and irreparable injury, loss or damage." *NEA Enterprises, Inc. v. American Horse Enterprises, Inc.*, 1980 U.S. Dist. LEXIS 16910, at p. 6 (D. Cal. 1980); Fed. R. Civ. P. 65(b). "Courts have recognized very few circumstances justifying the issuance of an *ex parte* TRO." *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006). A plaintiff may obtain an *ex parte* restraining order by showing that proceeding *ex parte* is the "sole method of preserving a state of affairs in which the court can provide effective final relief." *Adobe Sys. v. South Sun Prods., Inc.*, 187 F.R.D. 636, 639 (D. Cal. 1999) (citing *Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 4 (2d Cir. 1979).

Substantively, to obtain a TRO,[1] Plaintiff must demonstrate that: (1) it is likely to prevail on the merits; (2) it will suffer irreparable injury if relief is denied; (3) the balance of potential harms favors the moving party; and (4) the public interest favors granting relief. *Int'l Jensen, Inc. v. Motorsound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir. 1993).[2] Due to the drastic nature of the remedy, a temporary injunction carries with it the risk of significant injury to the rights of the enjoined party and, in some instances, such as the situation before this Court, the public.[3]

## IV. NO EMERGENCY EXISTS TO WARRANT *EX PARTE* RELIEF

Plaintiff's moving papers do not address the standard required for *ex parte* relief, perhaps that is because Plaintiff knows it cannot show any true emergency. In the trademark arena, court usually grant *ex parte* TROs in situations where an alleged infringer is likely to dispose of the infringing goods or destroy evidence before the hearing, or in cases of actual confusion. *McCord*, 452 F.3d at 1131; *see e.g.*, *In the Matter of Vuitton et Fils S.A.*, 606 F.2d at 5 (plaintiff had showed its efforts to enforce its trademarks in the past was frustrated because defendants transferred the inventories to

---

[1] Various cases cited in this brief deal with preliminary injunctions, however, the substantive standard for issuing a temporary restraining order is the same as the standard for issuing a preliminary injunction. *Century Theatres, Inc. v. Landmark Theatres Corp.*, 2000 U.S. Dist. LEXIS 10693 (N.D. Cal. 2000).

[2] There are two alternative but consistent tests used in the Ninth Circuit to determine whether a temporary restraining order or preliminary injunction should be issued. The "alternate" test requires the moving party to establish: (1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that there exist serious questions regarding the merits and the balance of hardships tips sharply in its favor. *Tillamook County v. United States Army Corps of Eng'rs*, 288 F.3d 1140, 1143 (9th Cir. 2002); *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir. 1987).

[3] *See Churchill Village L.L.C. v. General Electric Co.*, 169 F. Supp 1119, 1125 (N.D. Cal. 2000) (preliminary injunction is an "extraordinary and drastic remedy"); *King v. Saddleback Junior College*, 425 F.2d 426, 427 (9th Cir. 1970)(court should consider, among other factors, the importance of the rights asserted, the hardship to the parties, and the public interest). "Because injunctive relief prior to trial is a harsh and extraordinary remedy, it is to be granted sparingly and only in cases where the issues are clear and well defined and Plaintiff has established a reasonable certainty of prevailing at trial." *White v. United States*, 2007 U.S. Dist. LEXIS 55549 (N.D. Cal. 2007).

others); *Quokka Sports, Inc. v. Cup Int'l Ltd.*, 99 F. Supp. 2d 1105, 1115 (D. Cal. 1999) (infringer was using a domain name containing a trademark to divert traffic away from the official website). In such cases, the TRO is needed to preserve the status quo.

Plaintiff's request for injunctive relief does not involve counterfeit goods or infringing items that might be physically destroyed. And Plaintiff concedes that no actual confusion exists. The parties marks have co-existed for nearly one and half years. Moreover, through its chairman, Plaintiff knew about the existence of Common Sense Issues and its related entities as early as April 2007, but never complained or suggested it had a problem with the COMMON SENSE ISSUES mark. (Estruth Decl., ¶ 4.) Plaintiff delayed **8 months** after that conversation to raise any objection to the COMMON SENSE ISSUES mark. Now Plaintiff suddenly claims an "emergency" due to the current election, including Plaintiff's planned presidential debate and a policy initiative it is announcing on January 22, 2008. Presumably, Plaintiff's policy initiative was not created overnight; it has most likely been in the works for months, if not years. Plaintiff's decision to announce this initiative on January 22, 2008 is its own prerogative.

Most significantly, Common Sense Issues has not scheduled a single activity or event which would run counter to or compete with Plaintiff's scheduled activities to justify the need for immediate relief or a TRO. (Swift Decl., ¶ 21.) And Plaintiff has not identified a single act which Common Sense Issues will soon take that must be urgently stopped. Thus, Plaintiff has the TRO process turned on its head because Plaintiff is not bringing this motion to prevent defendant from some imminent act that could harm Plaintiff. It is Plaintiff who is doing something to put its name and trademark out before the public. A TRO would disrupt - not preserve - the status quo.

Given the briefing schedule agreed upon for this application, no order would likely issue before January 22, 2008. As such, the need for an emergency TRO due to Plaintiff's January 22 initiative announcement appears feigned and will become moot. Meanwhile, Plaintiff will not be hosting its presidential debate (another reason Plaintiff offers for the purported emergency) until Spring 2008, again hardly justifying an

emergency. Plaintiff has been continuously promoting its agenda in connection with the presidential election in November; the election is clearly not a basis for emergency relief.

Moreover, Plaintiff is certainly not without fault in creating so called "immediate" need for this *ex parte* application. Despite its awareness of the Common Sense Entities mark since at least April 2007 (Estruth Decl. ¶ 4), Plaintiff did not challenge Common Sense Issues' trademark until December 2007.[4] (Swift Decl., ¶ 19.)

## V. PLAINTIFF IS NOT LIKELY TO PREVAIL ON ITS TRADEMARK INFRINGEMENT CLAIM[5]

### A. PLAINTIFF CANNOT SHOW LIKELIHOOD OF CONFUSION

"The core element of trademark infringement is whether customers are likely to be confused about the source or sponsorship of the products." *Perfumebay.com Inc. v. EBAY, Inc.*, 506 F.3d 1165, 1173 (9th Cir. 2007) (quoting *McCord*, 452 F.3d at 1135). As Plaintiff explains, the Ninth Circuit has identified the following eight nonexclusive factors to assist in analyzing whether there is a likelihood of confusion: (1) the strength of the mark; (2) proximity or relatedness of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the degree of care customers are likely to exercise in purchasing the goods; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion into other markets. *Id.; AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). A review of these factors indicates that there is no likelihood of confusion between Plaintiff's trademarks and Common Sense Issues' trademark.

---

[4] Given the amount of media coverage given to Common Sense Issues and that Plaintiff is a media entity, presumably it knew or should have known of the existence of the COMMON SENSE ISSUES mark. (Swift Decl., ¶ 12.)

[5] The moving papers only make arguments about Plaintiff's trademark infringement claim, and not the ancillary causes of action in Plaintiff's complaint. Given that Plaintiff has not proffered its ancillary causes of action as grounds for a TRO, Common Sense Issues will not address them.

**(1) Weakness of Plaintiff's Marks**

Plaintiff's trademarks are conceptually and commercially weak and thus are entitled to a very narrow scope of protection. "Trademarks are classified along a spectrum of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. Generic and descriptive marks are deemed weak; arbitrary marks are considered strong. However, even 'strong' marks will be deemed 'weak' if they exist in a 'crowded field' of similar marks." *Instant Media, Inc. v. Microsoft Corp.*, 2007 WL 2318948 at *12 (N.D.Cal. Aug. 13, 2007) (internal quotations omitted).

First, Plaintiff's marks are conceptually weak because they are, at best, suggestive and thus warrant only narrow protection on that basis alone. The strongest type of mark, and the type entitled to the broadest scope of protection, is an arbitrary mark. *See M2 Software, Inc., v. Madacy Entertainment*, 421 F.3d 1073, 1080 (9th Cir. 2005). An arbitrary mark is a mark that is comprised of words with common linguistic use but which, when used with the services in issue, neither suggests nor describes any characteristic of those services. *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 632 (9th Cir. 2005). By no stretch of the imagination are Plaintiff's marks arbitrary. Plaintiff's marks are, at best, suggestive because "*Common Sense* Media" connotes clear, plain or reasonable thinking about media issues, which is precisely the type of services Plaintiff purports to offer. In fact, Plaintiff admits that the "MEDIA" portion of its marks is merely descriptive. (Mem. for TRO App., at 18: 7-14). That leaves it to rely on the "COMMON SENSE" portion of the mark—hardly a distinctive phrase. Plaintiff's federal registrations provide it with evidentiary presumptions that its marks COMMON SENSE MEDIA and COMMON SENSE MEDIA & Design are valid. Nevertheless, the scope of Plaintiff's protection is key, and must be narrowly construed in light of the facts of this case. Even if Plaintiff's marks were the only trademarks in U.S. commerce to use the term "COMMON SENSE," which they most certainly are not, the highly suggestive nature of the marks renders them so weak that Plaintiff is significantly limited in its ability to prevent third party use of the components of its marks. In a crowded field, "the

ability of any member of th[e] field to prevent use by others is relatively weak." *Halo Mgmt., LLC v. Interland, Inc.*, 308 F.Supp.2d 1019, 1034, 1037 (N.D.Cal. 2003). Rather, it may only prevent third party use of its precise trademarks, COMMON SENSE MEDIA and COMMON SENSE MEDIA & Design, on the services covered by its registrations. *See Glow Industries, Inc. v. Lopez,* 252 F.Supp.2d 962, 990 (C.D. Cal. 2002) (noting "relative weakness of Glow, Inc.'s mark, which is suggestive only, and which competes in an exceedingly crowded field of beauty products using the word "glow" in some manner as a trade name or trademark.").[6]

Second, Plaintiff's marks are commercially weak because of the "crowded field" of similar "COMMON SENSE" marks, *i.e.*, the large number of marks wholly comprised of or incorporating "COMMON SENSE." "In a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd." *Abercrombie & Fitch Co. v. Moose Creek, Inc.*, 486 F.3d 629, 634 n.1 (9th Cir. 2007) (quoting *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988), *abrogation in part on other grounds recognized by Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1116 n.1 (9th Cir. 1990)). In other words, the term "COMMON SENSE" is used so frequently, by so many diverse parties, that Plaintiff is not allowed to claim broad exclusive use of the term.

A review of the USPTO online TESS database uncovered over 100 pending applications or issued registrations for marks incorporating "COMMON SENSE". These include at least 70 registrations for the precise mark "COMMON SENSE" or marks

---

[6] *See also E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992) (suggestive marks given moderate protection); *Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601, 605 (9th Cir. 1987) (same); *Franklin Resources, Inc. v. Franklin Credit Management Corp.*, 988 F.Supp. 322, 328 (S.D.N.Y.1997) ("[i]t is well settled that third-party registration and use dilutes the strength of a trademark" and "extensive use of the name 'Franklin' by third parties engaged in one aspect or another of the financial service industry [shown by] a chart listing 65 such companies is significant…"); *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1509-11 (2d Cir. 1997) (holding that Estee Lauder's "100% Time Release Moisturizer" mark was weak because Lauder's use of "100%" was not original, as there were more than seventy trademark registrations, pending applications for registration or renewal, or publications-for-opposition that incorporated the term "100%," some of which were for cosmetic products.).

wholly comprising "COMMON SENSE." (Ex. 7.) "A mark which is hemmed in on all sides by similar marks on similar goods cannot be very 'distinctive'. It is merely one of a crowd of marks. In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other." *Skechers U.S.A., Inc. v. Vans, Inc.*, 2007 WL 4181677 at *5 (C.D.Cal. 2007).

Plaintiff's marks are indeed hemmed in on all sides by similar marks for similar services, and it cannot prevent use by others of COMMON SENSE. The USPTO online records shows more than thirty registrations or pending applications incorporating the term "COMMON SENSE" in the same classes (Classes 35 and/or 41) in which Plaintiff has applications and registrations. (Ex. 7.) Of these, several make use of the term COMMON SENSE in relation to educational services and the promotion of public awareness in a variety of fields, including market research and analysis, talk radio programs, and even workshops in the field of parenting. (Ex. 8.) For example:.

- COMMON SENSE CONSERVATION (U.S. Reg. No. 3,354,834), used by David Earl Miller for "promoting public awareness of the need for the preservation and efficient use of natural resources for the protection of the earth's environment through everyday means;"
- RADICAL COMMON SENSE (U.S. Reg. No. 2,653,874) is used by The Arras Group Inc. in connection with "providing market research and analysis and marketing communications consultation;"
- COMMON SENSE COALITION (U.S. Reg. No. 1,939,693) is used by Common Sense Coalition LLC in connection with "entertainment services in the nature of an ongoing talk radio program;"
- COMMON SENSE REVOLUTION (U.S. Serial No. 77/304,343) is used by Bridget Ann Vespe in connection with "educational services namely, developing informal programs in the fields of well-being and self-help;" and
- THE COMMON SENSE GUY (U.S. Serial No. 77/191,540) is used by Bud Bilanich in connection with "leadership consulting, motivational speaking, and

career and executive coaching services." See Exhibit 8 showing U.S. Trademark Office records for the aforementioned marks.

In cases where there are a number of third party registrations including the same term, the conclusion to be drawn is that there is an inherent weakness in that shared portion of the marks and, therefore, only slight differences in the marks may be sufficient to distinguish one from the other. *See Miss World (UK) Ltd*., 856 F.2d at 1449 (in a crowded field, "customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other."). Here, the shared wording "COMMON SENSE" is simply too weak to dominate the overall commercial impression of the marks, and, in view of that weakness, only minor differences between the parties' marks should be necessary to distinguish them from one another.

Accordingly, Plaintiff's marks are weak and entitled to a limited scope of protection. This factor weighs in Common Sense Issues' favor, and it would be especially inappropriate to grant an emergency TRO for such weak marks.

**(2) The Marks Are Not Confusingly Similar**

"The similarity of the marks will always be an important factor. Where the two marks are entirely dissimilar, there is no likelihood of confusion." *Brookfield Commc'n, Inc. v. W. Coast Entm't Corp*., 174 F.3d 1036, 1054 (9th Cir. 1999). On the other hand, the greater the similarity between two marks, the greater the likelihood of confusion. *GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1206 (9th Cir. 2000). In determining whether two marks are similar, courts consider their sight, sound and meaning. *Id*. "In analyzing this factor, 'the marks must be considered in their entirety and as they appear in the marketplace.'" *Brookfield Commc'n,* 174 F.3d at 1054 (citations omitted). According to the "anti-dissection" rule, courts may not dissect marks to examine and compare their component parts. 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 23:41 (4th ed. 2004). "[A] court does not consider the similarity of the marks in the abstract, but rather in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase." *McCord*, 452 F.3d at

1137 (citation and internal quotation marks omitted).

To the extent the marks share the wording "COMMON SENSE," the distinguishing wording "MEDIA" and "ISSUES" is sufficient to negate the likelihood of confusion in light of the numerous "COMMON SENSE" formative marks that are permitted to co-exist in the marketplace, as discussed above. *See, e.g., Colgate-Palmolive Co. v. Carter Wallace, Inc.*, 432 F.2d 1400, 167 U.S.P.Q. 529 (C.C.P.A. 1970) (PEAK PERIOD not confusingly similar to PEAK); *In re Merch. Motivation, Inc.*, 184 U.S.P.Q. 364 (T.T.A.B. 1974) (MMI MENSWEAR not confusingly similar to MEN'S WEAR); *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 212 U.S.P.Q. 246 (1st Cir. 1981) (The Court of Appeals for the First Circuit affirmed a federal district court's granting of a motion for summary judgment holding that no likelihood of confusion existed between the words "ALPHA" and "ALPA").

The marks as <u>wholes</u> are sufficiently distinct in terms of sight, sound, and commercial impression so as to reduce any likelihood of confusion.

Distinctions arise because each party uses a stylized version of its mark.

Plaintiff's "ON" portion of "COMM**<u>ON</u>**" is enclosed in a square that appears to be a camera lens. Common Sense Issues uses a stylized version of its mark COMMON SENSE ISSUES on its web site. In the stylized version of its mark, Common Sense Issues displays the wording over an image of the top of the United States Capitol building. The words "COMMON" and "SENSE" are both capitalized, "SENSE" appears in bold font, and "ISSUES" appears in somewhat smaller font, lower case letters, below

and aligned to the right of the words "COMMON SENSE." A side-by-side comparison of the stylized marks shows that the visual appearance of, and commercial impressions conveyed by, the marks are so different that no reasonable consumer would be likely to be confused as to the source of the services. Because of the emphasis on "ON", the clear commercial impression conveyed by COMMON SENSE MEDIA & Design is that the organization promotes or advocates common sense on media-related topics. On the other hand, Common Sense Issues' use of the U.S. Capitol building effectively conveys its message that it advocates common sense thinking in American politics.

Both parties also claim rights to their marks as standard characters. The presence of the term "MEDIA" in Plaintiff's mark to conveys to consumers that the organization is targeted specifically toward media-related topics. (*i.e.* helping parents make media choices for their children). Nothing in the wording of COMMON SENSE ISSUES suggests that Common Sense Issues connotes entertainment or media-related topics and, in fact, it does not. The commercial impression conveyed by COMMON SENSE ISSUES is that the organization promotes and advocates a common sense approach to *all* issues. Based on differences in sight, sound, and commercial impression, Plaintiff's marks and Common Sense Issues' mark are not confusingly similar. The only similarity is the ubiquitous phrase "COMMON SENSE" which Plaintiff cannot monopolize.

In fact, the USPTO agrees that Common Sense Issues' trademark is not confusingly similar to Plaintiff's marks, or any other registered marks, as evident by the fact that Common Sense Issues' trademark (U.S. Serial No. 77/257,033) has been approved for publication. (*See* Ex. 5 print out from the USPTO Database.) Approval for publication signifies that in the opinion of the USPTO there is no likelihood of confusion between the mark COMMON SENSE ISSUES and *any other* registered mark or pending application to register a mark, including Plaintiff's COMMON SENSE MEDIA marks. *See* 15 U.S.C. § 1062; *see also* 15 U.S.C. § 1052(d). When an applicant applies to register a trademark, the USPTO is required to reject the application if there is the possibility that the applied-for mark is likely to be confused with a registered mark. *See*

15 U.S.C. §1052; *see also* Trademark Manual of Examining Procedure § 1207.01.[7] The issue of a potential conflict with the COMMON SENSE MEDIA marks was not raised by the USPTO at any time during the examination process. (*See* TRO App., Taylor Decl., Ex. E (only Office Action issued failed to raise likelihood of confusion issue.)). The USPTO's examination is persuasive proof that Plaintiff is not likely to succeed on its claim of trademark infringement.[8]

**(3) The Services Are Not Closely Related**

Related goods are those "products which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Sleekcraft*, 599 F.2d at 348 n.10. Plaintiff's registrations and applications cover substantially the same services in International Classes 35 and 41.[9] In sharp contrast, Common Sense Issues' trademark application covers only Class 35: "promoting public awareness of issues in the field of politics and public policy." A comparison of the parties' claimed services shows that the organizations provide different services:

---

[7] The TMEP section quoted provides: "The examining attorney must conduct a search of Office records to determine whether the applicant's mark so resembles any registered mark(s) as to be likely to cause confusion or mistake, when used on or in connection with the goods or services identified in the application. The examining attorney also searches pending applications for conflicting marks with earlier effective filing dates. *See* TMEP §§1208 *et seq*. regarding conflicting marks. . . If the examining attorney determines that there is a likelihood of confusion between applicant's mark and a previously registered mark, the examining attorney refuses registration under §2(d)."

[8] Once the COMMON SENSE ISSUES mark clears the opposition period and Common Sense Issues files an Amendment to Allege Use showing its use of the mark in commerce, the mark will proceed to registration. Of course, once the COMMON SENSE ISSUES mark registers it will be entitled to a presumption of validity.

[9] Plaintiff claims rights as follows:

Class 35: Conducting business research and surveys regarding children, families, and entertainment media; public opinion polling regarding children, families and entertainment media; providing online information regarding business research and surveys regarding children, entertainment and the media; and

Class 41: Educational services, namely providing seminars and workshops in the field of children, families, and entertainment media; educational services, namely, conducting on-line exhibitions and displays and interactive exhibits in the field of children, families, and entertainment media; providing a website featuring information, advice, analysis, monitoring, ratings and reviews in the field of entertainment media; providing information in the form of reviews and ratings of entertainment media; providing online information regarding entertainment and the media. (TRO App., Zehren Decl. Exs. 1-4).

| Class 35: | |
|---|---|
| **Services provided by Plaintiff** | **Services provided by Common Sense Issues** |
| Does not provide this service. | Promoting public awareness of issues in the field of politics and public policy |
| Conducting business research and surveys regarding children, families, and entertainment media; | Does not provide this service. |
| Public opinion polling regarding children, families and entertainment media; and | Does not provide this service. |
| Providing online information regarding business research and surveys regarding children, entertainment and the media. | Does not provide this service. |

| Class 41: | |
|---|---|
| **Services provided by Plaintiff** | **Services provided by Common Sense Issues** |
| Educational services, namely providing seminars and workshops in the field of children, families, and entertainment media; | Does not provide this service. |
| Educational services, namely, conducting on-line exhibitions and displays and interactive exhibits in the field of children, families, and entertainment media; | Does not provide this service. |
| Providing a website featuring information, advice, analysis, monitoring, ratings and reviews in the field of entertainment media; | Does not provide this service. |
| Providing information in the form of reviews and ratings of entertainment media; and | Does not provide this service. |
| Providing online information regarding entertainment and the media. | Does not provide this service. |

By the terms of Plaintiff's own trademark filings, its marks are limited to use involving entertainment and media. In contrast, Common Sense Issues informs citizens about a broad range of public policy issues. (Swift Decl., ¶ 2.) It does so through direct, personalized telephone calls, television advertisement campaigns, newspaper articles, and

websites. (*Id.*) Principal among the differences between the services provided by the organizations is that Common Sense Issues conducts its activities wholly independently of any and all candidates, campaigns and political parties. whereas Plaintiff asserts that it works directly with such individuals and entities. (*Id.*) Furthermore, Common Sense Issues promotes public awareness related to a broad range of social issues and is not limited to entertainment and media related issues, like Plaintiff. (*Id.*) It also targets all American voters, not those principally concerned with how social issues affect children and families, like Plaintiff. (*Id.*) While it is true that both parties are in the business of advocacy, they deal in unrelated subject matter. This factor also weighs against a TRO.

**(4) Lack of Evidence of Actual Confusion**

A "lack of evidence about actual confusion after an ample opportunity for confusion can be a powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 843 (9th Cir. 2002). Common Sense Issues' predecessors first used the mark "Common Sense Ohio" in July 2006 as its trade name and active domain name <www.CommonSenseOhio.com>. (Swift Decl., ¶ 3.) In August and September 2006, Common Sense Issues or its predecessor in interest registered <www.CommonSense[State].com> for each state except Colorado, at the top level domains /.com/.net/ and /.org/. Common Sense Issues or its predecessor in interest also registered <www.CommonSense2006.com> from 2006 through 2016 by year. (*Id.* at ¶ 11.) Common Sense Issues ultimately decided to adopt its current name and mark in April 2007. (*Id.* at ¶ 14.) Common Sense Issues or its predecessor in interest used each of these designations on precisely the same services on which it currently uses COMMON SENSE ISSUES. (*Id.* at ¶ 22.)

Common Sense Issues and its predecessors have used various "COMMON SENSE" marks since July 2006. (Swift Decl., ¶ 9.) These uses have all garnered national publicity, including the State of Ohio (corporate filings and in legal proceedings in the judicial system of the State of Ohio, which Common Sense won), State of Delaware (corporate filings), the Internal Revenue Service (Form 990 tax returns of

exempt organizations) and the Federal Election Commission (Form 5 Reports of Independent Expenditures). (Id. at ¶ 10; *see* Ex. 3, copy of *State ex rel. Ohio Democratic Party v. Blackwell*, 111 Ohio St.3d 246, (Ohio 2006).) Yet, despite the widespread recognition of the various "COMMON SENSE" marks and the supposed notoriety of Plaintiff's marks, Plaintiff is unable to produce a shred of evidence of any actual confusion with its marks. Indeed, the parties' marks have co-existed with no actual confusion since July 2006, of more than 1½ years. (Swift Decl., ¶ 17.)

Plaintiff contends that any use of "COMMON SENSE" on advocacy services by another entity is likely to lead to consumer confusion. Such a ruling would reach to far. Despite 1½ years of concurrent use, in a year in which the parties' activities are in especially high profile due to the upcoming election, there have been <u>no</u> reports of actual confusion. (Swift Decl., ¶ 17.) This show that consumers can, and do, distinguish between the marks. This factor weighs in favor of Common Sense Issues.

**(5) Intent in Selecting the Mark**

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354. "Knowing adoption of a mark closely similar to another is a sound basis for inferring an intent to deceive." *Glow Indus*., 252 F.Supp.2d at 1002. In adopting the COMMON SENSE ISSUES mark, Common Sense Issues had no reason to trade on Plaintiff's COMMON SENSE MEDIA mark. (Swift Decl., ¶ 16; Estruth Decl., ¶ 6 .) In fact, Common Sense Issues chose its mark to reflect Thomas Paine's classic essay, *Common Sense*. (Swift Decl.,¶ 8.) Common Sense Issues is, as an organization, dedicated to the model espoused in Paine's essay. In light of the historical inspiration, Plaintiff simply cannot claim exclusive rights to use the phrase "COMMON SENSE" in the field of advocacy. This factor weighs in favor of Common Sense Issues.

**(6) High Degree Of Care Exercised By "Purchasers"**

"Likelihood of confusion is determined on the basis of a reasonably prudent

consumer. However, what is expected of this reasonably prudent consumer depends on the circumstances." *Brookfield*, 174 F.3d at 1060 (internal quotations and alternations omitted). In situations dealing with goods, when purchasing expensive items, the buyer is expected to be more discerning and less easily confused. *Id.*; *Sleekcraft*, 599 F.2d at 353. Conversely, when purchasing inexpensive items, customers often exercise less care, thereby making confusion more likely. *Brookfield*, 174 F.3d at 1060.

Plaintiff contends that it will be irreparably harmed by Common Sense Issues' continued use of the mark COMMON SENSE ISSUES because the public and the politicians with whom it works are likely to be confused. This is simply not the case. Politics are a highly personal and emotionally charged subject, for individual members of the public and certainly for politicians and especially in this 2008 election cycle. Therefore, one can expect the public to exercise a very high degree of care when affiliating with, donating money to, or otherwise patronizing political organizations. For example, an individual who is sufficiently motivated to donate money to a particular cause - be it to Plaintiff because she cares deeply about how entertainment and media affect children, or to Common Sense Issues because she wants to stay informed as to how various candidates stand on issues of importance to her--will take great care in ensuring that she is donating money to her intended organization. This directly negates Plaintiff's assertion that it is likely to suffer financial harm because its donors will cease contributions based on confusion with COMMON SENSE ISSUES. A financial donor can be expected to exercise a high degree of care. Thus, this factor also weighs in favor of Common Sense Issues.

**(7) Marketing Channels Used**

"Convergent marketing channels increase the likelihood of confusion." *M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1083 (9th Cir. 2005) (quoting *Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987)). Common Sense Issues uses the Internet, telephone, print, and broadcast. To the extent that Plaintiff also uses these channels, this factor might weigh slightly in favor of Plaintiff, but

certainly not enough to justify a TRO.

**(8) No Likelihood of Expansion**

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354. Any purported expansion plans must be supported by admissible evidence; vague assertions are insufficient to demonstrate that the parties' uses of their respective marks are likely to converge. *See Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 634 (9th Cir. 2005) (plaintiff's "complete inability to adduce any concrete evidence of expansion plans tilts this factor in favor of" defendant); *see also 24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, L C*, 447 F.Supp.2d 266, 277 (S.D.N.Y. 2006) (speculative intentions are insufficient to demonstrate likelihood of expansion).

Given the advocacy nature of the parties' organizations, this factor seems to have little relevance and is neutral. Certainly, Common Sense Issues has no intention to "expand" into providing ratings of entertainment, and Plaintiff offers no such evidence.

**(9) Summary**

Virtually all of the the *Sleekcraft* factors weigh in favor of Common Sense Issues. Thus, Plaintiff is not likely to prevail on its trademark infringement claim and has failed to meet its burden to justify a TRO.

## VI. THE EQUITABLE FACTORS FAVOR COMMON SENSE ISSUES.

### A. PLAINTIFF WILL NOT SUFFER ANY IRREPARABLE INJURY

Even if Plaintiff were to demonstrate a likelihood of success on the merits, it has not made a sufficient showing of irreparable harm in the absence of a TRO. "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Plaintiff is merely speculating about the harm that may be caused if Common Sense Issues is not to immediately enjoined from using its mark. This is supported by the

fact that both Plaintiff and Common Sense Media their "Common Sense" marks simultaneously for nearly one year and a half , and yet, neither Plaintiff nor Common Sense has experienced any *actual confusion*. Possible association with Common Sense Issues, even though it is a partisan organization, will not cause such irreparable injury that a TRO is needed. As such, Plaintiff has no reason to believe that the continued use of Common Sense Issues would cause irreparable harm in the future.

**B. THE BALANCE OF THE HARDSHIPS STRONGLY FAVOR COMMON SENSE ISSUES**

The balance of the hardships weighs in favor of Common Sense Issues. Common Sense Issues has spent significant time and resources to develop its own reputation among the American public and the media as a leader and educator in a national movement to restore common sense issues of concern. (Swift Decl., ¶ 22.) Common Sense Issues cannot simply change its name and start using another, because it would completely unravel the relationships of trust it has built with the public, its donors, and the media. In educating the public as to the positions of presidential and other candidates on various issues, Common Sense Issues has been upfront, honest and operated in a transparent manner. (*Id.* at ¶ 23.) This is important for political advocacy organization in order to maintain credibility. If it were suddenly forced (by TRO) to operate under a new name, that would undermine the very core of the Common Sense Issues movement because the public, the media and its own members and donors may suspect that Common Sense Issues changed its name to hide improper activities (which Common Sense does not do). It might appear as if Common Sense Issues changed its identity to avoid press and public scrutiny, giving a false impression of its dedication to transparency and openness. (*Id.* at ¶ 24.) A change in the name of the organization may also put the organization as risk of legal repercussions from the Federal Election Commission, because if the same organization files cumulative reports of aggregate expenditures under totally different names, a legal investigation may ensue. (*Id.*)

As demonstrated, the balance of the hardships weights in favor of Common Sense

Issues: if the Court denies the restraining order, both parties can continue to thrive in their respective realms, and the status quo would be maintained.

**C. THE PUBLIC INTEREST FAVORS DENIAL OF THE TRO**

If this Court were to grant a TRO, Common Sense Issues would be significantly hampered from carrying out its activities when its service would most benefit the public. A TRO would stifle its public outreach campaign, depriving the public of access to Common Sense Issues' viewpoint about political candidates, and public policies. After all, it would be in the *common interest* of the public and Plaintiff , whose very mission is to improve the media and entertainment lives of families, to encourage an open and democratic discourse about issues that matter most to Americans.

**VII. NO OSC FOR PRELIMINARY INJUNCTION SHOULD ISSUE**

Plaintiff's position is as weak as its mark. Not only should a TRO be denied, there is not even a basis for the Court to issue an OSC for a preliminary injunction, which would unnecessarily burden the Court and Common Sense Issues.

**VIII. CONCLUSION**

As Thomas Paine himself would suggest, all that is needed are simple facts, plain arguments, and common sense. When the Court evaluate all of those simple facts, plain arguments, and common sense outlined by Common Sense Issues, it can easily deny Plaintiff's application for a TRO and an OSC re: preliminary injunction.

Dated: January 18, 2008

FOLEY & LARDNER LLP
JAMES D. NGUYEN

By: /s/________________________________
JAMES D. NGUYEN
Attorneys for Defendant COMMON SENSE ISSUES, INC.