1  JENNIFER LEE TAYLOR (CA SBN 161368)
   JTaylor@mofo.com
2  MORRISON & FOERSTER LLP
   425 Market Street
3  San Francisco, California 94105-2482
   Telephone: (415) 268-7000
4  Facsimile: (415) 268-7522

5  DEAN J. ZIPSER (CS SBN 94680)
   DZipser@mofo.com
6  CAROLE E. REAGAN (CA SBN 162674)
   CReagan@mofo.com
7  MORRISON & FOERSTER LLP
   19900 MacArthur Boulevard, Suite 1200
8  Irvine, California 92612-2445
   Telephone: (949) 251-7500
9  Facsimile: (949) 251-0900

10 Attorneys for Plaintiff
   COMMON SENSE MEDIA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| COMMON SENSE MEDIA, INC., a California corporation,<br><br>           Plaintiff,<br><br>     v.<br><br>COMMON SENSE ISSUES, INC., a Delaware corporation,<br><br>           Defendant. | Case No.   C08-00155-CW<br><br>**PLAINTIFF COMMON SENSE MEDIA'S REPLY BRIEF IN SUPPORT OF ITS EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER**<br><br>Date:<br>Time:<br>Ctrm:<br>Judge:   Honorable Claudia Wilken |

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ............................................................................................................................. 1

I. COMMON SENSE MEDIA HAS ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS ................................................................................................ 1

    A. Common Sense Media Has Strong Rights ............................................................. 1

    B. The Marks Are Similar ........................................................................................... 3

    C. The Services Are Similar ....................................................................................... 5

    D. Actual Confusion ................................................................................................... 7

    E. Intent ....................................................................................................................... 8

    F. Level of Care .......................................................................................................... 8

    G. Marketing Channels Used ...................................................................................... 9

    H. Likelihood of Expansion ........................................................................................ 9

II. URGENT RELIEF IS WARRANTED .................................................................................... 9

III. CSI SHOWS NO HARDSHIP THAT WOULD RESULT FROM A NAME CHANGE ............................................................................................................................... 13

# TABLE OF AUTHORITIES

## CASES

*AMF, Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979) ................................................................................................ *passim*

*Americana Trading, Inc. v. Russ Berrie & Co.*,
  966 F.2d 1284 (9th Cir. 1992) ............................................................................................................ 3

*Apple Computer, Inc. v. Formula Int'l, Inc.*,
  725 F.2d 521 (9th Cir. 1984) .......................................................................................................... 14

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*,
  174 F.3d 1036 (9th Cir. 1999) .................................................................................................. 11, 12

*Carter-Wallace, Inc. v. Procter & Gamble Co.*,
  434 F.2d 794 (9th Cir. 1970) ............................................................................................................ 3

*Century 21 Real Estate Corp. v. Sandlin*,
  846 F.2d 1175 (9th Cir. 1988) ................................................................................................ 4, 8, 14

*Charles Schwab & Co. v. Hibernia Bank*,
  665 F. Supp. 800 (N.D. Cal. 1987) .................................................................................... 2, 6, 8, 14

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
  967 F.2d 1280 (9th Cir. 1992) .......................................................................................................... 2

*Geo. Washington Mint, Inc. v. Wash. Mint, Inc.*,
  349 F. Supp. 255 (S.D.N.Y. 1972) ................................................................................................. 11

*Glow Indus. v. Lopez*,
  252 F. Supp. 2d 962 (C.D. Cal. 2002) ............................................................................................. 1

*GoTo.Com v. Walt Disney Co.*,
  202 F.3d 1199 (9th Cir. 2000) ................................................................................................ 5, 8, 12

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,
  4 F.3d 819 (9th Cir. 1993) .............................................................................................................. 12

*Nova Wines, Inc. v. Adler Fels Winery LLC*,
  467 F. Supp. 2d 965 (N.D. Cal. 2006) ........................................................................................... 10

*S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*,
  483 U.S. 522 (1987) ....................................................................................................................... 15

*Sun Microsystems v. Astro-Med, Inc.*,
  39 U.S.P.Q.2D (BNA) 1144 (N.D. Cal. 1996) ................................................................................ 4

## MISCELLANEOUS

2 McCarthy, *McCarthy on Trademarks and Unfair Competition* (4th ed. 2007) ...................... 4, 5

**INTRODUCTION**

CSI's Opposition demonstrates that it misapprehends several basic points of trademark law, as its brief is replete with incorrect citations and incorrect standards. Similarly, CSI relies on incomplete and selective citations of the facts to build its defense. Applying the correct legal standards to the accurate facts demonstrates that Common Sense Media has more than met its burden in connection with this Application and that a temporary restraining order should issue to prevent ongoing and irreparable harm to Common Sense Media's family of COMMON SENSE Trademarks.

**I.  COMMON SENSE MEDIA HAS ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS.**

There is no dispute in this case that Common Sense Media established valid and protectable trademark rights prior to CSI's adoption of the COMMON SENSE ISSUES designation. Instead, CSI argues that Common Sense Media's trademark rights are not sufficiently strong to stop it from using COMMON SENSE ISSUES for what it asserts is an entirely unrelated purpose. CSI is wrong on both accounts: Common Sense Media's trademark rights are not weak and its services are not unrelated to CSI's services. Moreover, the trademarks are not dissimilar, as CSI posits.

**A.  Common Sense Media Has Strong Rights.**

CSI starts its likelihood of confusion analysis with a false statement regarding the standard of protection afforded suggestive trademarks:[1] it says that Common Sense Media "may only prevent third party use of its *precise* trademarks." This is *false* and is not supported by the case that CSI cites. (CSI Br. at 12.) In fact, the one case that CSI cites for this proposition, *Glow Indus. v. Lopez*, 252 F. Supp. 2d 962, 990 (C.D. Cal. 2002), is a reverse likelihood of confusion case involving common law trademarks where the senior user had limited use of its mark and

---

[1] Common Sense Media's family of trademarks are, at a minimum suggestive and likely arbitrary because on the spectrum of classification the distance between Common Sense Media's services and the connotation drawn from the mark is one that requires a large imaginative leap. *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979). CSI concedes that Common Sense Media's marks are suggestive. (CSI Br. at 11.)

could not even establish trademark rights. As such, the case provides no support for CSI's proposition that Common Sense Media may only stop third parties who are using its *precise* trademarks. This proposition is also not supported by the case law. Suggestive trademarks are afforded protection from a likelihood of confusion, and not just in the cases of precisely identical trademarks. Indeed, in the seminal *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979) case, the Ninth Circuit found a likelihood of confusion between the suggestive mark SLICKCRAFT and the SLEEKCRAFT mark. Later in *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992), the Ninth Circuit affirmed that the level of protection afforded to suggestive marks is *moderate*, not the limited protection that CSI suggests.

Second, CSI's reference to third-party applications and registrations for marks including the phrase COMMON SENSE is not sufficient to support its claim that Common Sense Media's COMMON SENSE Trademarks are weak. *See Charles Schwab & Co. v. Hibernia Bank*, 665 F. Supp. 800, 806 (N.D. Cal. 1987) ("Such citation [registrations and telephone listings of third party users of a mark] is not proof of third party uses for showing . . . weakness of the mark."). In claiming a mark is weak, the defendant has the burden of showing how extensive the uses by others are and how long they have continued. *Id.* CSI has not met this burden.

Furthermore, the vast majority of marks CSI identifies are not for similar or related services. For example, "Common Sense Heat & Hot Water Technology" is for water heaters and boilers, "Common Sense Carpet Care" is for educational services related to carpet cleaning, and "Common Sense for Uncommon Loans" is for loan financing services. (Supplemental Declaration of Jennifer Lee Taylor in Support of Common Sense Media's Application for a Temporary Restraining Order ("Supp. Taylor Decl.") ¶ 15, Ex. O.) None of these applications or registrations can have any bearing on whether CSI's use of COMMON SENSE ISSUES infringes Common Sense Media's family of COMMON SENSE Trademarks. To the extent that CSI refers to five specific examples as "hemming in" Common Sense Media's trademark rights on page 13 of its brief, none of them is relevant to the analysis as none of the services is related to Common Sense Media's educational, informational, and advocacy services in the fields of children, families, and media.

PLAINTIFF'S REPLY BRIEF ISO ITS EX PARTE APPLICATION FOR A TRO
CASE NO. C08-00155-CW
sf-2454701

2

1  • COMMON SENSE CONSERVATION is used by an environmental organization.

2  • RADICAL COMMON SENSE is used by a marketing consulting firm.

3  • COMMON SENSE COALITION is used by a radio talk show program.

4  • COMMON SENSE REVOLUTION is used for informal self-help programs.

5  • COMMON SENSE GUY is used by a motivational speaker.

In sum, CSI has not overcome the presumption that Common Sense Media's federally registered COMMON SENSE MEDIA® trademarks are distinctive, and strong. *Americana Trading, Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1287 (9th Cir. 1992) ("'Registered trademarks are presumed to be distinctive and should be afforded the utmost protection.'") (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986)).  Accordingly, this factor weighs in favor of Common Sense Media.

**B.     The Marks Are Similar.**

CSI's COMMON SENSE ISSUES designation is strikingly similar to Common Sense Media's COMMON SENSE Trademarks.[2]  Not only do they all share the distinctive COMMON SENSE element, but also Common Sense Media's COMMON SENSE MEDIA® trademark has a similar style and connotation to COMMON SENSE ISSUES:  both start with the same term COMMON SENSE and both end with a non-distinctive descriptive term.  In fact, the COMMON SENSE ISSUES designation does nothing to distinguish itself from Common Sense Media; it sounds like it is just another in Common Sense Media's family of COMMON SENSE

---

[2] CSI puts far too much emphasis on the fact that the United States Patent and Trademark Office ("USPTO") did not reject CSI's application for COMMON SENSE ISSUES in light of Common Sense Media's prior applications and registrations for its family of COMMON SENSE Trademarks.  The Ninth Circuit described the analysis on which CSI puts such great weight "as inconclusive since made at its lowest administrative level." *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 801-02 (9th Cir. 1970).  The same is true here.  CSI's application has survived only the *ex parte* examination process during which the examining attorney may cite only prior registrations and pending applications, as CSI concedes on pages 16 and 17 of its brief.  The examining attorney is not permitted to consider common law rights during this analysis, rights that are before this Court on Common Sense Media's Application, and rights on which Common Sense Media will rely when it files its opposition to the COMMON SENSE ISSUES trademark application once it is published.

1  Trademarks. Indeed, the term ISSUES would be an equally apt description for Common Sense
2  Media's services as is MEDIA. The public could easily assume that Common Sense Issues *is*
3  Common Sense Media (if it did not note the one-word distinction between the marks) or that
4  COMMON SENSE ISSUES is the public advocacy arm of Common Sense Media. *See Sun*
5  *Microsystems v. Astro-Med, Inc.*, 39 U.S.P.Q.2D (BNA) 1144 (N.D. Cal. 1996) ("[I]f Plaintiff
6  can demonstrate that it has established a 'family of marks," then Plaintiff may obtain trademark
7  protection against one whose mark emanates from the same source as the Plaintiff's family.").

8       It is well settled that the dominant distinctive elements COMMON SENSE should be
9  given greater weight than the descriptive elements when comparing marks, particularly when the
10 distinctive elements appear first in the marks, as shown in the cases from the Ninth Circuit and
11 the Northern and Central Districts of California that were cited in Common Sense Media's
12 opening brief. (*See* CSM Br. at 14 -15 & cases cited therein.) CSI ignores this case law and
13 instead reaches to find a *1970* case from the Court of Customs and Patent Appeals, a *1974* case
14 from the Trademark Trial and Appeal Board, and a *1981* case from the First Circuit, none of
15 which is controlling and none of which contradicts the later Ninth Circuit authority cited by
16 Common Sense Media. (CSI Br. at 15); *see Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d
17 1175, 1178 (9th Cir. 1988).

18      CSI's reliance on the "anti-dissection" rule to state that "courts may not dissect marks to
19 examine and compare their component parts" is even more surprising as CSI wrongly claims that
20 courts are not to "dissect marks to examine and compare their component parts" and cites to
21 Professor McCarthy's treatise for the proposition. (CSI Br. at 14.) In fact, the very section of
22 Professor McCarthy's treatise cited by CSI states: "The point is that the two marks should not be
23 examined with a microscope to find the differences, for this is not the way the average purchaser
24 views the marks. To the average buyer, the points of similarity are more important than minor
25 points of difference." 2 McCarthy, *McCarthy on Trademarks and Unfair Competition*
26 § f23:41(4th ed. 2007). The anti-dissection rule thus strongly counsels *against* the very argument
27 that CSI then makes: that the "ISSUES" portion of its mark distinguishes it from Common Sense
28 Media's family of COMMON SENSE Trademarks. As the section of Professor McCarthy's

PLAINTIFF'S REPLY BRIEF ISO ITS EX PARTE APPLICATION FOR A TRO      4
CASE NO. C08-00155-CW
sf-2454701

1  treatise following the one cited by CSI states: "It is appropriate in determining the question of

2  likelihood of confusion to give greater weight to the important or 'dominant' parts of a composite

3  mark, for it is that which may make the greatest impression on the ordinary buyer." *Id*., § 23:42.

4        Having ignored Ninth Circuit authority to argue that the Court should not focus on the

5  COMMON SENSE element of the marks, CSI goes on to argue that the trademarks are

6  distinguishable because Common Sense Media uses a logo that is distinct from CSI's logo. (CSI

7  Br. at 15.) This argument ignores the fact that Common Sense Media owns a federal trademark

8  registration for the words COMMON SENSE MEDIA® alone, that Common Sense Media

9  frequently uses the COMMON SENSE MEDIA® mark and its other COMMON SENSE

10 Trademarks without any logo (*see* Zehren Decl. ¶¶ 10-17, Exs. 1-4.), that CSI has filed an

11 application to register the words COMMON SENSE ISSUES alone as a trademark, and that CSI

12 frequently uses the COMMON SENSE ISSUES trademark without any logo. (Zehren Decl.

13 ¶¶ 18-19, 24-25, Exs. 8-9.)

14       CSI's logo argument is a red herring. Even if the logos were sufficient to distinguish the

15 marks, a point that Common Sense Media does not concede, the fact that both parties use and

16 have applied to register their respective marks without their logos renders the logos irrelevant to

17 the likelihood of confusion analysis.

18       Accordingly, the similarity of the marks factor weighs in favor of Common Sense Media.

19 CSI has offered no solid evidence or arguments to suggest otherwise.

20       **C.    The Services Are Similar.**

21       Once again, CSI misapprehends trademark law when it argues that the services are not

22 closely related. First, the test is not whether the services are *closely* related. (CSI Br. at 17.) It is

23 sufficient for the services to be merely related or complementary as such services are more likely

24 to confuse the public as to the producers of the services than are unrelated services. *GoTo.Com v.*

25 *Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000); *Sleekcraft*, 599 F.2d at 350. A basic

26 principle of trademark law is that the greater the similarity between marks, the less similarity is

27 required in the goods or services of the parties to support a finding of likelihood of confusion.

28 *Sleekcraft*, 599 F.2d at 350. When marks are as similar as COMMON SENSE ISSUES on the

1  one hand, and COMMON SENSE and COMMON SENSE MEDIA on the other, the services do
2  not need to be *closely* related for the Court to find a likelihood of confusion.  It is sufficient for
3  them to be merely related, or even complementary.  *Id.*

4  Second, Common Sense Media's rights are not limited "[b]y the terms of [Common Sense
5  Media's] own trademark filings," as CSI argues.  (CSI Br. at 18.)  Not only does Common Sense
6  Media have extensive common law trademark rights, which CSI ignores in its chart on page 18 of
7  its brief, Common Sense Media's registered rights are not limited to the specific services listed in
8  the registrations.  *See Charles Schwab*, 665 F. Supp. at 804 ("The rights of the owner of a
9  registered trademark are not limited to protection with respect to the specific goods stated on the
10 certificate, but extend to any goods related in the minds of a consumer in the sense that a single
11 producer is likely to put out both goods. . . . The modern rule expands trademark rights to prevent
12 use on related, but noncompetitive goods; and gives the trademark owner protection against use
13 of its mark on any product or service which would reasonably be connected with, or sponsored
14 by, the trademark owner. . . ."). The fact that CSI checks a box in its chart to indicate that it "does
15 not provide this service" is not the end of the analysis if its services would be viewed as
16 "connected with, or sponsored by" Common Sense Media, which they clearly are.

17 As explained in detail in Common Sense Media's opening papers, Common Sense Media
18 has been offering several distinct services since 2003:  (i) a media ratings system that is available
19 to the public through a variety of resources, (ii) educational and informational services related to
20 media issues, and (iii) public policy and advocacy work consisting of framing public policy on
21 issues related to media and children, as well as advocacy related to these issues.  (Zehren Decl.
22 ¶¶ 2-6.)  Common Sense Media has been using its COMMON SENSE and COMMON SENSE
23 MEDIA® trademarks in connection with each of these services since that time and has been using
24 the USE COMMON SENSE trademark in connection with each of these services since 2005.
25 (Zehren Decl. ¶¶ 10-17.)

26 CSI cannot dispute that it is offering a complementary and related service:  "promoting
27 public awareness of issues in the field of politics and *public policy*."  (Taylor Decl. ¶ 10, Ex. E.)
28 Both organizations are advocating their views on various issues to the public,to elected officials,

and to those running for political office, and both organizations are closely involved in the presidential election cycle. Moreover, although CSI's services may not be related to media issues at this time, there is no reason to believe that CSI will not address media issues in the future, particularly as the media itself has become increasingly polarized with networks like Fox News and commentators like Rush Limbaugh increasingly being viewed as conservative Republican supporters and "Hollywood" and National Public Radio increasingly being viewed as partisan supporters of liberal and Democratic causes. In this media environment, CSI's claim that it currently offers no services related to children, families, entertainment, and the media offers no solace to Common Sense Media and provides no basis for distinguishing the services offered by the organization.

### D.  Actual Confusion

CSI's argument on this point demonstrates yet another misapprehension of trademark law. It suggests that it has been using COMMON SENSE ISSUES for one and a half years, when it did not even incorporate under that mark until last April and appears to have made no public use of it until late 2007. (Swift Decl ¶¶ 5, 7.) Its argument that it has used the COMMON SENSE ISSUES mark for one and a half years is apparently based upon a belief that past uses of COMMON SENSE OHIO, COMMON SENSE FOR THE 21ST CENTURY, and COMMON SENSE ISSUES COALITION by other entities is relevant to the analysis. (CSI Br. at 2-4.) However, none of these three marks is at issue in this proceeding and none is as close to COMMON SENSE MEDIA as is COMMON SENSE ISSUES.[3] Moreover, because these other "Common Sense" groups did not generate the same type of publicity on a national scale or enter into the same national channels of trade the public had little reason to know of them, which makes confusion unlikely. CSI does not dispute that its political activities under the COMMON

---

[3] For example, the lack of any actual confusion between COMMON SENSE FOR THE 21ST CENTURY, a name allegedly used an undisclosed period of time and in connection with undisclosed services, and Common Sense Media's COMMON SENSE Trademarks has no bearing on whether COMMON SENSE ISSUES and COMMON SENSE MEDIA® are likely to be confused when used in connection with complementary and related services, particularly when both entities are actively involved in the current presidential campaign season.

PLAINTIFF'S REPLY BRIEF ISO ITS EX PARTE APPLICATION FOR A TRO                    7
CASE NO. C08-00155-CW
sf-2454701

1  SENSE ISSUES name – the mark at issue in this case – until late 2007.  (Swift Decl. ¶ 7.)  As
2  such, late 2007 is the first instance when there is any chance that the public could have become
3  confused between COMMON SENSE ISSUES and COMMON SENSE MEDIA®.
4      The law does not require actual confusion and courts recognize that proving actual
5  confusion before discovery can be difficult for plaintiffs.  *GoTo.Com*, 202 F.3d at 1208. (noting
6  that "'while evidence that the use of the two marks has already led to confusion is persuasive
7  proof that future confusion is likely,' the converse is not true") (quoting *Sleekcraft*, 599 F.2d at
8  352).  Moreover, if a plaintiff takes "immediate action in attempting to stop defendant's use of the
9  plaintiff's registered trademark," as Common Sense Media has, this may be "a contributory factor
10 in rendering a situation in which such evidence [of actual confusion] is unavailable."  *Charles*
11 *Schwab*, 665 F. Supp. at 809.

12      **E.   Intent**

13     CSI does not deny that it knew of Common Sense Media's rights in its family of
14 COMMON SENSE Trademarks when it adopted its own COMMON SENSE ISSUES trademark.
15 Indeed, Nathan Estruth, an advisor to CSI, admits in his declaration that he was aware of
16 Common Sense Media's use of the COMMON SENSE Trademarks prior to the formation of CSI.
17 (Estruth Decl.¶ 5.)  CSI's claim that CSI "had no reason to trade on Common Sense Media's
18 COMMON SENSE MEDIA mark" rings hollow in light of CSI's actual knowledge of Common
19 Sense Media's trademark rights and its obligation to avoid choosing a trademark that is
20 confusingly similar to another one.  (CSI Br. at 20); *Century 21*, 846 F.2d at 1182 (citation
21 omitted) ( "A newcomer who has the 'entire material universe' or, stated in other terms, 'a whole
22 dictionary full of words, an encyclopedia full of proper names, or a world atlas full of place
23 names,' from which it could have chosen its name and mark, has a duty to avoid the use of a mark
24 similar to an established one").

25      **F.   Level of Care**

26     The *Sleekcraft* factor regarding the consumer's level of care weighs the care that is given
27 to the services associated with the marks in question.  While consumers may exercise care with
28 regard to presidential candidates, the services in question are those specific services provided

1  under the marks, such as polls, questionnaires, video segments, advertisements, news sound bites,

2  and other information that is made available to the public for free via the Internet, television, and

3  the telephone, usually for very short twenty or thirty second video and audio clips.

4        With respect to the telephone calls in particular, CSI is regularly telephoning millions of

5  people for its "push polls."  (Supp. Taylor Decl. ¶¶ 1-14, Exs. A-N.)  Given the nature of these

6  calls, many of people receiving the calls probably do not appreciate the intrusion in their daily

7  lives and may not remember anything about the calls, other than that they were from "COMMON

8  SENSE ISSUES" and that they related to a conservative or Republican issue or candidate.  These

9  are not the careful individuals that CSI holds them out to be.  They do not have the ability to

10 "exercise a high degree of care" when answering their telephones, and they are not likely to note

11 the differences between COMMON SENSE ISSUES and COMMON SENSE MEDIA in the

12 future.

### G.   Marketing Channels Used

14 CSI concedes that this factor favors Common Sense Media.

### H.   Likelihood of Expansion

16 CSI concedes that this factor is neutral.

## II.   URGENT RELIEF IS WARRANTED.

18       As set forth in Common Sense Media's Opening Brief, the standard for granting a

19 temporary restraining order is the same as that for issuing a preliminary injunction, namely, a

20 showing of probable success on the merits and the possibility of irreparable harm, *or* "serious

21 questions" as to the merits combined with the balance of hardships tipping sharply in favor of the

22 moving party.  Common Sense Media has demonstrated that relief is warranted under either test.

23 While acknowledging in its opposition brief (in a footnote) that this is the correct test, CSI asserts

24 that there are various additional requirements that Common Sense Media must meet and cannot.

25 Each of these arguments is either legally or factually inapplicable.

26       First, CSI asserts at length that an *ex parte* TRO may only be granted in "extraordinary

27 circumstances" and that there are "very few circumstances justifying the issuance of an *ex parte*

28 TRO."  (CSI Br. at 7-8.)  The cases that CSI cites, however, involve *ex parte* applications where

the defendant had *no notice and no opportunity to respond*. That obviously is not the case here. Common Sense Media's Application is "ex parte" only in the sense of being expedited. Common Sense Media gave CSI prior notice of its intent to seek a TRO, served the TRO papers on CSI and its counsel, and agreed to a briefing schedule that allowed CSI time to brief the issues fully and to submit multiple declarations and other evidence. (Supp. Taylor Decl. ¶¶ 16-18.)

Second, CSI incorrectly argues that a TRO is only appropriate where the defendant is about to dispose of infringing goods or destroy evidence, or where actual confusion has been established. This is simply not true. While CSI cites cases involving those circumstances, nothing in those cases indicates that such circumstances are *required*. They are merely examples. *See, e.g.*, *Nova Wines, Inc. v. Adler Fels Winery LLC,* 467 F. Supp. 2d 965 (N.D. Cal. 2006) (issuing TRO without any such facts present).

Third, CSI places far too much reliance on its assertion that Common Sense Media "knew" about CSI eight months ago, delayed any action until now, and therefore is not entitled to ex parte relief because any urgency is of its own making. This assertion is not supported by the facts and is based solely on the Declaration of Nathan Estruth, a CSI advisor, which evidences no such knowledge on the part of Common Sense Media. Mr. Estruth's Declaration, which describes an April 2007 conversation between himself and Bob Wehling (the Chair of Common Sense Media's volunteer Board of Directors), is carefully crafted. It does not say that Mr. Estruth actually told Mr. Wehling about Common Sense Issues and its mission – because, in fact, he did not. Rather, as set forth in Mr. Wehling's Declaration (submitted herewith), there was at most a vague reference to a non-profit organization with "Common Sense" in the name. (Wehling Decl. ¶ 3.)

As Mr. Wehling confirms, Mr. Estruth did not identify Common Sense Issues specifically, nor did he provide any information about its political purpose and goals, its highly partisan nature, its geographic location or scope, or the types of activities in which it planned to engage. (*Id*. ¶¶ 2-4.) As Mr. Wehling states, the comment was insufficient to raise any concern, and, until he read Mr. Estruth's Declaration submitted in connection with the pending Application, Mr. Wehling made no connection between the organization referenced by Mr. Estruth and

PLAINTIFF'S REPLY BRIEF ISO ITS EX PARTE APPLICATION FOR A TRO    10
CASE NO. C08-00155-CW
sf-2454701

1  defendant CSI. (*Id.* ¶¶ 4, 6.) Clearly, and contrary to CSI's arguments, Mr. Estruth's passing
2  mention of another entity somewhere using "Common Sense" in some way plainly did not
3  constitute "notice" to Common Sense Media of CSI's infringing use. Until a few weeks ago, no
4  one at Common Sense Media had heard of CSI. (Zehren Decl. ¶¶ 9-10.) Mr. Estruth's
5  Declaration shows nothing to the contrary. Moreover, CSI offers no evidence to refute that its
6  activities have received national attention only since December 2007, shortly before the Iowa
7  caucuses. Common Sense Media has not delayed in the slightest in bringing this matter to the
8  Court's attention.

9  Fourth, and similarly, CSI claims repeatedly that the parties' marks have "coexisted" for
10  one and a half years with no resulting confusion. To establish this "use" going back to July 2006,
11  CSI offers only corporate and tax filings, domain name registrations, and a lawsuit against
12  Common Sense 2006 alleging violation of campaign finance laws. None of these are "uses in
13  commerce" for trademark purposes, and logically would not generate confusion among
14  consumers who would never have occasion to be aware of them. *See Brookfield Commc'ns,*
15  *Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036, 1051 (9th Cir. 1999) (registration of a domain
16  name "does not in itself constitute 'use' for purposes of acquiring trademark priority." "Use" for
17  trademark purposes occurs "when a mark is used in conjunction with the actual sale of goods or
18  services"); *Geo. Washington Mint, Inc. v. Wash. Mint, Inc.,* 349 F. Supp. 255, 260 (S.D.N.Y.
19  1972) ("[P]rior incorporation of the defendant, in itself, does not establish priority of trademark
20  use"); McCarthy, § 16:12 ("The mere act of incorporation alone does not establish priority use of
21  the corporate name as a mark").

22  CSI also seeks to claim a year and a half of use by tacking onto alleged uses of other
23  "Common Sense" names by different entities. That effort is unavailing. "Tacking" is a
24  constructive use theory whereby a trademark user seeks to "tack" his first use date in an earlier
25  mark onto a subsequent mark. *Brookfield,* 174 F.3d at 1048. The standard for tacking "is
26  exceedingly strict: [t]he marks must create the same, *continuing commercial impression* . . . . the
27  previously used mark must be the *legal equivalent* of the mark in question or indistinguishable
28  therefrom, and the consumer should consider both as the same mark. This standard is

1  considerably higher than the standard for 'likelihood of confusion.'" *Id.* (emphasis in original)

2  (internal citations and quotation marks omitted).  CSI makes no showing that "Common Sense

3  Ohio" or "Common Sense for the 21st Century" are indistinguishable to consumers from

4  "Common Sense Issues."  Further, it appears that all of these entities operate only during an

5  election cycle and then disappear or go dormant.  Accordingly, there is no showing of continuous

6  use.  In any event, even if CSI *could* make a credible "tacking" argument, the activities of these

7  alleged predecessors were brief and localized in the state of Ohio, focusing on the Ohio

8  gubernatorial race.  (See CSI Br. at 3, 19-20, Ex. 3.)  There was, therefore, little opportunity for

9  consumer confusion in the broader national market in which Common Sense Media operates --

10  and in which Common Sense Issues is now operating.  Accordingly, the "tacking" argument has

11  no relevance to the urgency of the requested relief.

12       Fifth, CSI likewise wrongly argues that the claimed irreparable harm may not be

13  "speculative."  The case it cites for this proposition, however, was not a trademark case and the

14  court issued an injunction *without any consideration of plaintiff's likelihood of success on the*

15  *merits.*  Thus, the case has no bearing here.  As set forth in Common Sense Media's Application,

16  irreparable injury is *presumed* if a likelihood of confusion is shown.  *GoTo.Com,* 202 F.3d at

17  1204-05; *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 827 (9th Cir. 1993).

18       Sixth, CSI argues that a TRO should not issue because Common Sense Media has not

19  pointed to a specific event or action by CSI that must be enjoined, but it cites no authority for any

20  such requirement.  Nor can it, as there is no such authority.  CSI does not dispute that its "public

21  education" activities are ongoing, nor does it deny that it will continue its operations through the

22  balance of the state primaries and until the general election in November.  With "Super Tuesday"

23  fast approaching on February 5, 2008, CSI's "push-polling," which has already reached *millions*

24  of homes, and other activities will only increase and continue to generate even more negative

25  publicity for the COMMON SENSE name.  (Supp. Taylor Decl. ¶¶ 1-14, Exs. A-N.)  At the same

26  time, Common Sense Media's name is in the public eye every day through its own advocacy

27  work as well as its media ratings service, public service announcements, and various other

28  initiatives concerning the media.  (Zehren Decl. ¶¶ 2-9, 27-33.)  Moreover, Common Sense

1  Media is now undertaking two major events that will generate nationwide publicity—the
2  January 22, 2008 wireless auction initiative announcement and its upcoming presidential debate.
3  All these factors put the parties on a collision course with their nearly identical names garnering
4  ever-increasing publicity in the same political realm.

5  Thus, none of the foregoing arguments diminishes Common Sense Media's showing of
6  the urgent need for relief.  As set forth in Common Sense Media's Application, CSI's use of the
7  COMMON SENSE designation threatens harm that is both irreparable and immediate.  CSI does
8  not deny that a misperception that Common Sense Media is a partisan organization would be
9  devastating to Common Sense Media's reputation, income, and mission, because it cannot.  Nor
10 does CSI deny that it is a partisan organization.  And here, CSI is not merely an intensely partisan
11 organization, but one that is being reviled in the press and disavowed by the candidates it is trying
12 to support.  (Supp. Taylor Decl. ¶¶ 1-14, Exs. A-N.)  Such notoriety only exacerbates the
13 potential harm to Common Sense Media's reputation as a resolutely unbiased, nonpartisan,
14 trustworthy source of information and public policy development.  The threat of being mistakenly
15 affiliated with CSI is real and immediate and should be enjoined.

### III. CSI SHOWS NO HARDSHIP THAT WOULD RESULT FROM A NAME CHANGE.

For the reasons set forth above and in its Application, the balance of hardships tips sharply in Common Sense Media's favor.  The hardships CSI says it may suffer if it is forced to change its name are either illusory or negligible.

First, CSI claims that it is worried about harm to its reputation as "a leader and educator" among the American public, and "unravel[ing] the relationships of trust" that it has built with the public, the press, and its donors.  (CSI Br. at 23:12-15.)  This claim is highly questionable given that CSI has received nothing but near-constant negative publicity, complaints, and calls for government investigations -- not to mention disavowal by the very presidential candidate it supports.  (Supp. Taylor Decl. ¶¶ 1-14, Exs. A-N.; Zehren Decl. ¶¶ 29, 31-32.)  In other words, CSI seemingly has generated nothing but *distrust* among the public, the media, the candidates, and potential donors.  CSI is not viewed by anyone as "a leader and educator" and cannot

1  seriously claim that it has established "a relationship of trust" with anyone, let alone that it fears
2  losing that trust.

3  Second, CSI has only been in existence since April 2007, at the earliest, and has only been
4  conducting its election-related activities only since December 2007, shortly before the Iowa
5  Caucuses. (Swift Decl. ¶ 14.) Its claimed "reputation," therefore, is irreconcilable with its short
6  life. *See Charles Schwab,* 665 F. Supp. at 812 (finding that defendant's claim of having achieved
7  "consumer identity" with its mark "difficult to reconcile" with the fact that it had only been using
8  the mark for six months, and publicizing it for only a few weeks). When compared with the four
9  and a half years Common Sense Media has spent developing its reputation and goodwill, and the
10 irreversible potential harm to that reputation and goodwill caused by CSI's activities under the
11 COMMON SENSE ISSUES mark, the balance of hardships clearly tips in Common Sense
12 Media's favor. *See Apple Computer*, *Inc. v. Formula Int'l, Inc.,* 725 F.2d 521, 526 (9th Cir.
13 1984); *Charles Schwab*, 665 F. Supp. at 812.

14 Third, CSI's unsupported claim that it fears being seen as trying to "hide improper
15 activities" if it is ordered to change its name (CSI. Br. at 23.) likewise merits little consideration
16 as CSI offers no explanation of why a court-ordered name change would cause anyone to think
17 that it is hiding something. Moreover, to the extent that the public does view CSI's compliance
18 with a court order to change its name as "hiding something," CSI has only itself to blame as it
19 selected the COMMON SENSE ISSUES name with full knowledge of Common Sense Media's
20 prior use of the COMMON SENSE Trademarks, as detailed in Mr. Estruth's Declaration in
21 paragraph 5. *See Century 21*, 846 F.2d at 1182 (citation omitted) ("A newcomer who has . . . a
22 duty to avoid the use of a mark similar to an established one").

23 Fourth, CSI's allegations about being at risk of an investigation or legal repercussions
24 from the Federal Election Committee ("FEC") are specious at best. If CSI is investigated because
25 it has to file "cumulative reports of aggregate expenditures under totally different names," it will
26 be able to explain the reports by pointing to the Court's order of injunctive relief. So long as CSI
27 is not hiding improper activities, which it has assured the Court it is not at page 23 of its
28 opposition, it has nothing to fear from such a routine investigation. Carried to its logical

conclusion, CSI's argument would mean that political organizations could never change their names, and courts could never order them to do so, whether as a result of an application for a TRO or a motion for preliminary or permanent injunctive relief, for fear of an FEC investigation. This is not the law; political organizations are not exempt from trademark law merely because they are regulated by the FEC. Moreover, by CSI's own admission, the "Common Sense Entities" have already allegedly operated under a variety of names (CSI Br. at 3:8-13), apparently with no adverse consequences.

Fifth, CSI alleges harm to the public and "free speech" if the public is deprived of access to CSI's viewpoint and services. There is no basis for this assertion. Common Sense Media does not seek to stop CSI from engaging in its activities—it only seeks to stop CSI from doing them under the COMMON SENSE name. (Zehren Decl. ¶ 34.) The United States Supreme Court has found that prohibiting the use of a word for particular purposes does not prohibit a group from conveying its message. *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.,* 483 U.S. 522, 536 (1987) (finding that Congress' prohibition on using the word "Olympic" in a promotion of sporting events without the USOC's permission did not violate the First Amendment). Such a prohibition only restricts the *manner* in which the group may convey the message. *Id.* CSI's First Amendment rights to communicate its political message would in no way be impeded by an injunction prohibiting it from using the trademark COMMON SENSE ISSUES.

Thus, CSI has demonstrated no discernible hardship to counter the substantial hardships Common Sense Media faces should its Application be denied.

Dated: January 22, 2008                    MORRISON & FOERSTER LLP


By:   /s/ Jennifer Lee Taylor
         Jennifer Lee Taylor

         Attorneys for Plaintiff
         JTaylor@mofo.com

PLAINTIFF'S REPLY BRIEF ISO ITS EX PARTE APPLICATION FOR A TRO           15
CASE NO. C08-00155-CW
sf-2454701